Electronically Received 09/05/2024 12:38 PM

RICARDO ECHEVERRIA #166049
DANICA CRITTENDEN #273309
TAYLOR R. PORTER #334862
CLAIRE ARNAIZ #352001
**SHERNOFF BIDART ECHEVERRIA LLP**
600 South Indian Hill Boulevard
Claremont, California 91711
Telephone: (909) 621-4935
Facsimile: (909) 625-6915

Attorneys for Plaintiff

**FILED**
Superior Court of California
County of Los Angeles
09/05/2024
David W. Slayton, Executive Officer / Clerk of Court
By: N. Osollo Deputy

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| NICHOLAS MATTHEWS, an individual;<br><br>Plaintiff,<br><br>v.<br><br>STANDARD INSURANCE COMPANY, an Oregon corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 24STCV22519<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>2. BREACH OF CONTRACT<br><br>3. VIOLATIONS OF BUSINESS & PROFESSIONS CODE § 17200, *et seq.* |

## I.

## INTRODUCTION

1. Defendant Standard Insurance Company ("The Standard") sells and markets their insurance products to millions of vulnerable consumers who have the right to rely on The Standard to handle their total disability claims with the utmost good faith.

2. The privilege of selling insurance in California imposes solemn, obligatory responsibilities on insurers such as The Standard to promptly, thoroughly, and fairly conduct balanced investigations of claims for benefits made by their insureds.

3. In discharging this responsibility, The Standard is required to:

- Give as much consideration to the interests of its insureds as it does to its own; and
- Search diligently for any and all facts that support the payment of the claim for benefits.

4. Despite these solemn obligations, The Standard is engaged in an unremediated pattern and practice of unreasonable and egregious claims investigation procedures. The Standard's systematic violations of California law include improperly evaluating occupational disability claims, repeatedly ignoring treating physicians' recommendations, improperly administering functional capabilities examinations, and relying on extrinsic and undisclosed policies in the administration of functional capabilities examinations.

5. Plaintiff Nicholas Matthews, D.D.S. ("Nick" or "Plaintiff") and his wife, Christine Matthews, D.D.S ("Christine"), began their careers as dentists in 2006. They loved their work and enjoyed caring for their patients. In 2010, they started their own practice. In 2011, Nick and Christine's oldest child was born, and by 2014, they had three children. As their family and practice began to grow, Nick wanted to protect his family financially in the event he was no longer able to work as a dentist.

6. In October 2013, Nick contacted The Standard regarding its disability insurance options. Subsequently, he procured an Individual Disability Income Insurance policy, Policy Number 00CC338770, effective November 4, 2013 (the "Policy"). The Policy afforded Nick $15,000 per month in disability benefits through "November 4, 2045," in the event he became disabled and could no longer perform his "Regular Occupation."

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

7. On April 25, 2019, Nick sustained serious, permanent injuries that rendered him unable to perform his work as a dentist. When his treaters opined that he could no longer work as a dentist, he was devastated. Soon after, The Standard determined that he was disabled, could no longer perform his regular occupation, and began paying the disability benefit.

8. However, beginning in January 2021, The Standard began making despicable attempts to terminate Nick's disability benefit. On January 26, 2021, without any reasonable basis for doing so, The Standard notified Nick that it determined he was not disabled. He promptly appealed the denial, which was then overturned.

9. Over the next few years, Nick's disability did not improve, and he remained unable to perform the regular duties of a dentist. Notwithstanding his continued disability, on April 9, 2024, The Standard again notified Nick that it believed he was no longer disabled under the Policy and terminated his benefits. As of the filing of this Complaint, he remains unable to perform his regular occupation and is entitled to the disability benefits under the Policy.

10. As a direct result of The Standard's conduct, Nick has suffered economic and non-economic damages.

11. This conduct has not only caused harm to Nick, but also to other Californians similarly situated.

12. The Standard's denial of coverage for Nick's total disability is a tortious breach of the implied covenant of good faith and fair dealing and breach of contract. In addition, it constitutes unfair, unlawful, and fraudulent conduct that violates the UCL and should be enjoined.

## II.

## THE PARTIES

13. Plaintiff Nick is, and at all relevant times was, a resident of the State of California, County of Los Angeles.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

14. Defendant Standard Insurance Company is, and at all relevant times was, duly organized and existing under the laws of the State of Oregon and is authorized to transact, and is transacting, the business of insurance in the State of California, with its principal place of business in the Portland, Oregon.

15. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 100, inclusive, are unknown to Plaintiff, who therefore sue said defendants by such fictitious names. Plaintiff is informed and believes, and on such information and belief alleges, that each of the defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and will ask leave of this Court to amend this Complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to Plaintiff.

16. Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the defendants was the agent, partner, joint venturer, associate, and/or employee of one or more of the other defendants and was acting in the course and scope of such agency, partnership, joint venture, association, and/or employment when the acts giving rise to the causes of action occurred.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## III.

## FACTUAL BACKGROUND

**A. Nick establishes and grows his dental practice**

17. In 2006, Nick obtained his Doctor of Dental Surgery and shortly thereafter began working as a dentist at a dental practice. He immediately fell in love with the practice of dentistry. He especially loved exploring the implementation of new technologies in his practice.

18. As Nick grew in his profession, he and his wife, Christine, realized they wanted more freedom to implement new technologies and specialize their practice. In 2010, they decided to branch out on their own and opened their own dental practice,

Nicholas Matthews DDS, Inc. dba The Dental Spot ("The Dental Spot") in Redondo Beach, California.

19. The Dental Spot grew significantly and became a thriving business within just the first year. As the years went on, The Dental Spot continued to gain popularity and notoriety within the dental community. Nick specifically was known for his exceptional workmanship, personable approach, and community-focused demeanor that drew patients to the practice.

20. In 2018, Nick and Christine decided to expand their practice to aesthetics. Nick was dedicated to using the best materials and procedures available in service of his patients, and used cutting-edge implant technology, such as Chairside Economical Restoration of Esthetic Ceramics, which allowed for the creation of a dental crown in a single visit. This cutting-edge technology further allowed The Dental Spot to shine among its competitors.

21. In his daily practice, Nick performed routine dental procedures like teeth cleanings, surgical procedures on teeth, bone, and soft tissue and diagnostic testing. He also diagnosed oral diseases and created treatment plans for patients. Nick appreciated detail-oriented work and found deep satisfaction in the intricacies required in dentistry. Most of all, he loved creating relationships with his patients and helping them look and feel their best. He was known for spending extra time with his patients during appointments to ensure their questions were answered, irrespective of the time constraints required in a successful dental practice. He appreciated that his small-town dental practice allowed him the flexibility to form relationships with his patients.

22. Although his work was physically exhausting, requiring near-constant use of his hands, arms, and feet, Nick loved being a dentist and had never had any intention of changing his career.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**B. Nick purchases a Total Disability Income Insurance Policy with The Standard**

23. On October 7, 2013, Nick applied for a Total Disability Income Insurance Policy with The Standard. On November 4, 2013, The Standard issued Nick the Policy, Policy Number 00CC338770 ("the Policy"), conditioned on delivery of his premium payment and several other documents by December 16, 2013. Nick timely submitted the premium payment and documents, and the Policy went into effect. (Exhibit 1.)

24. The Policy defines "We/Our" as Standard Insurance Company and "You/Your" as the Insured under the Policy. (*Id.* at pp. 14, 16.) Nick is the Named Insured under the Policy. (*Id.* at p. 23.)

25. The Policy goes on to define "Disability" as "Total Disability." (*Id.* at pp. 14, 25.) In turn, "Total Disability" is defined as follows:

> Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to perform Your Regular Occupation in the usual and customary way and You choose not to work in any occupation.
>
> If You choose to work at any job, You will not be considered Totally Disabled under this policy. However, You may qualify for the benefit for Partial Disability found in the Partial Disability Rider. In compliance with California law, the Partial Disability Rider is mandatory and is attached to this policy. (*Id.* at pp. 14, 27.)

26. However, the Policy includes an Own Occupation Benefit Rider, which changes the definition of Total Disability/Totally Disabled as, "Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial And [sic] Material Acts of Your Regular Occupation ***in the usual and customary way***." (*Id.* at p. 49, emphasis added.)

27. "Injury" is defined in the Policy as "Injury sustained by You: 1. After the Effective Date; and 2. While this policy is in force." (*Id.* at pp. 14, 25.)

28. "Regular Occupation" is defined as follows:



SHERNOFF BIDART ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

> Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the job You are performing when the Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation. (*Ibid.*)

29. "Substantial and Material Acts" is defined as, "[T]hose acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified." (*Id.* at pp. 14, 26.)

30. If found to have a "Total Disability," upon the 91st day of that disability, the Policy states The Standard will pay the Basic Monthly Benefit of $15,000.00 until Nick turned 67 years old on November 4, 2045. (*Id.* at pp. 3, 15.)

31. In other words, if at any point during the Policy period, Nick sustains an injury that renders him unable to perform the usual and customary acts normally required by him as a dentist, he would be considered totally disabled and would be entitled to the monthly disability benefit.

32. To file a claim, the Policy requires written notice of a claim by Nick within 30 days after the loss, or as soon reasonably possible after that. (*Id.* at p. 5.)

33. The Policy also includes an "Indexed Cost of Living Benefit Rider," which Nick separately purchased. (*Id.* at pp. 39–41.) This rider provides that in the event of a disability, his benefit would increase by either 3% or the average Consumer Price Index for All Urban Consumers, minus one, on the anniversary of the date his disability began. (*Ibid.*) Thus, the Policy guarantees that Nick's benefits will increase each year he is disabled.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**C. Nick falls off a ladder and can no longer perform the normal duties of a dentist**

34. On April 25, 2019, Nick's life changed forever. As he was preparing for his daughter's birthday celebration, he slipped and fell off a ladder from a two-story height onto the ground. Immediately, he felt extreme pain in his entire body, and Christine saw that he was badly bruised and cut on his back left side. She quickly took him to the hospital for emergency treatment. There, he was administered pain medication in his left arm.

35. Ultimately, Nick was diagnosed with a calcaneal fracture in his left foot, pan labral left shoulder tear, thoracic outlet syndrome (neck pain and numbness and decreased strength in fingers), and posttraumatic left subtalar arthritis in his left ankle as the result of the fall. Although he did not realize it at the time, this was the last day he was able to practice dentistry and live without daily pain.

36. Despite seeking medical treatment, it soon became clear to Nick and his treaters that he was no longer able to perform his duties as a dentist due to his injuries. Working as a dentist requires a high level of manual dexterity, physical stamina, and ability to perform delicate procedures in close proximity to patients. Due to the pain in Nick's neck and shoulder and the numbness and pain in his left hand, he was, and is, unable to hold instruments in his left hand or reach for instruments during procedures. These limitations make it impossible for him to perform the intricate and precise movements needed to perform dental procedures.

37. Even if Nick were to try to perform his duties with additional assistance, the inability to reach for instruments would prolong appointments, which would be uncomfortable for his patients and negatively affect the success of The Dental Sport. More importantly, if he tried working as a dentist despite his hand numbness, Nick would be putting his patients at risk. Moreover, he is unable to walk or stand for long periods of time due to his left ankle injury. This inability poses a safety risk to himself, his staff, and his patients, as dentistry involves working in a small and confined space.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

Any sudden movements or loss of balance could lead to injuries to the patient, support staff, or himself.

38. Nick's pain and physical limitations also impacts his personal life. He struggles to sleep at night, and if he turns his body even slightly in the wrong direction, he is left writhing in pain. He also can no longer help with physical chores around the home or play sports with his kids.

39. Thus, Nick's injuries forced him to step away from dentistry despite his love for the profession and his patients.

**D. The Standard accepts and then denies Nick's Individual Disability Benefits claim**

40. On July 2, 2019, Nick submitted an Individual Disability Benefits Claim, Claim Number 00WA0352 (the "Claim"), with The Standard due to his injuries and inability to work as a dentist.

41. On August 7, 2019, the Claim was assigned to a Senior Disability Claim Specialist in the Individual Disability Claims department at Standard, Kim Sparrow.

42. On September 9, 2019, the Claim was approved for Total Disability under the Own Occupation Benefit Rider, and Nick began to receive monthly benefits shortly thereafter.

43. On May 19, 2020, upon The Standard's request, Nick completed an Activities and Capabilities Questionnaire where stated he was employed by The Dental Spot, but was not presently working. He stated his sources of income as the disability benefits he received from The Standard and as owner of Nicholas Matthews DDS, Inc. (i.e., the Dental Spot) and Jn Builds, Inc. ("Jn Builds"), a construction company. In his capacity at Jn Builds, Nick stated he was the owner or part-owner of the business, but did not actively engage in its operation. Instead, he worked over the phone and networked for the company.




SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

44. As time passed, Nick continued to receive medical treatment for his injuries. Unfortunately, he continued to experience the numbness in his left hand and pain in his neck and left hand, arm, shoulder, and ankle. Although he deeply desired to return to work at The Dental Spot, he remained physically unable to do so. He continued to struggle with sleep and could not perform the responsibilities he felt he had as a father and husband.

45. To Nick's surprise, on January 26, 2021, The Standard issued its first denial of the Claim, stating he no longer met the definition of Disability in his "Regular Occupation" as a dentist after June 29, 2020. (Exhibit 2.) The rationale for the denial was based on observations made of him in his daily life and a paper review by a Physician Consultant of his medical records. The letter cited to the U.S. Department of Labor *Dictionary of Occupational Titles*, Fourth Edition, revised 1991, which rated the purported strength level for the occupation of dentist as "light," which was defined as:

> Light Work – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible. (Exhibit 2, p. EX02-002.)

46. The letter then acknowledged that Nick's duties required constant reaching, handling, and fingering; frequent sitting; and occasional standing and walking. (*Id.* at p. 3.) It then concluded, based on a review of medical records and observations of Nick walking, that he no longer met the definition of "Total Disability."



SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

(*Id.* at p. 7.) Notably, the Physician Consultant who purportedly reviewed Nick's medical records never spoke with any of his treating physicians, nor did he personally examine Nick.

47. Moreover, The Standard argued that Nick held a "dual occupation[]" as owner of Jn Builds, a construction company. The Standard "closed" Nick's claim and stopped payment of his benefits, effective January 26, 2021. It gave Nick 180 days to appeal the denial.

48. On July 16, 2021, Nick submitted an appeal of The Standard's denial explaining that his extensive injuries made it impossible for him to work as a dentist and requested the Claim be re-opened and reinstated. (Exhibit 3.) In his appeal, Nick attached medical records from several different providers, including records from 2021, showing that his injuries and pain were ongoing.

49. On August 17, 2021, after an administrative review of its January 26, 2021 denial, The Standard overturned the denial and determined that "limitations and restrictions" prevented Nick from performing "Substantial and Material Acts" in his "Regular Occupation" as a dentist. However, prior to reopening the Claim, The Standard requested additional documentation to determine if he met the definition of Total Disability or Partial Disability, which Nick later provided.

50. Almost five months after the denial was overturned, in a letter dated January 12, 2022, The Standard notified Nick that it had conducted an investigation to determine his regular occupation and whether he continued to be totally disabled. It then determined that his regular occupation was that of a dentist and found him to be Totally Disabled and re-opened the Claim. Furthermore, retroactive benefits covering the period of January 27, 2021 to December 31, 2021 would be released, and his monthly benefits would be reinstated moving forward. Additionally, effective May 1, 2021, his monthly income benefit would be increased in accordance with the Indexed Cost of Living Benefit Rider attached to the Policy.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

51. However, despite it overturning the denial, The Standard continued to "investigate" the Claim. The letter concluded by requesting Nick's treating providers complete and return a Physician's Report – Musculoskeletal ("Physician's Report") form.

52. Nick promptly sent the Physician's Report form to his orthopedic surgeon, Nelson Soohoo, M.D. at UCLA Medical Center for completion. On January 26, 2022, Dr. SooHoo submitted the Physician's Report form and explained that Nick had significant left post-traumatic subtalar traumatic arthritis pain in his left ankle and was unable to stand or bend, even for short periods of time.

53. For several months thereafter, The Standard had limited communication with Nick regarding the Claim. Throughout this time, Nick continued to seek medical treatment for his injuries, which sadly did little to alleviate his pain, and did nothing to increase his ability to perform his duties as a dentist.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**E. The Standard demands Nick undergo a Functional Capacities Evaluation to support the Claim and refuses to allow audio or video recording**

54. As Nick has now come to learn, The Standard had little interest in performing its duties and properly paying the disability benefits without also looking for reasons to deny the Claim. In a letter dated July 14, 2022, an entity Nick had never heard of, Exam Coordinators Network ("ECN"), advised Nick that The Standard required him to undergo an Independent Functional Capacities Evaluation (the "Evaluation") to continue receiving benefits for the Claim. ECN scheduled the Evaluation for July 27, 2022 with Samantha E. Nusbaum, OT.

55. On July 22, 2022, ECN sent a letter rescheduling the Evaluation with Ms. Nusbaum to August 26, 2022. On August 24, 2022, Nick sent an email to Ms. Sparrow confirming he would attend the Evaluation and stated his intention that Christine accompany him and video tape the Evaluation with her phone.

56. On August 26, 2022, as Nick was leaving his house to drive to the Evaluation, he received a call stating the Evaluation was cancelled because the event could not be staffed. However, on August 31, 2022, Ms. Sparrow sent Nick an email stating the examining facility was unable to staff the Evaluation because they would not allow him to be accompanied by an observer or videotape, purportedly, due to other patients' Health Insurance Portability and Accountability Act ("HIPAA") rights. Ms. Sparrow stated The Standard agreed with the facility's position and would expect Nick to comply with these limitations once the Evaluation was rescheduled.

57. On September 8, 2022, ECN sent Nick a letter rescheduling the Evaluation to September 20, 2022 with Jason J. Baran, PT. A few days later, on September 13, 2022, it sent another letter confirming the Evaluation on September 20, 2022 with Jason J. Baran, PT. Then, in a letter dated September 16, 2022, ECN advised Nick that his Evaluation would now be conducted by Carissa Beyer, P.T.

58. That same day, Ms. Sparrow sent an email to Nick claiming that it was the examination provider, ECN, which prohibited videotaping the Evaluation. It would, however, allow Christine to attend and observe.

59. On September 19, 2022, Nick sent an email reiterating his intention to attend the Evaluation with Christine present and have it *audio* recorded. (Exhibit 4.) Ms. Sparrow responded stating that audio recording was not permitted, and the examiner would terminate the Evaluation if any recording was attempted. (*Ibid.*) She further stated The Standard would consider termination of the Evaluation due to audio or video recording as Nick's failure to cooperate. (*Ibid.*)

60. Later the same day, Jonathan T. Nguyen, Esq. of Gilbert & Nguyen sent a letter to The Standard advising it of his representation of Nick. Mr. Nguyen reiterated Nick's intention of audio recording the exam and explained that it was necessary in light of Standard's previous attempt to terminate the disability benefits. He then requested The Standard provide the Policy provision that prohibited audio recording during the Evaluation. (Exhibit 5.)

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

61. Despite the assertion of Mr. Nguyen as Nick's counsel, Ms. Sparrow responded to Nick directly reiterating The Standard's position regarding the Evaluation. Ms. Sparrow did not provide the Policy provision that stated audio recording was not permitted during the Evaluation. She also threatened to hold Nick in breach of the Policy if he tried to audio record the Evaluation, stating:

> Your failure to attend tomorrow's FCE, or any termination of the FCE due to an attempt to record it would represent your unreasonable failure to cooperate under the policy. I can assure you The Standard is aware of the implied duty of good faith and fair dealing in every contract in California, including insurance policies. We would point out that this duty applies both to the insurance company and the insured. (Exhibit 6.)

62. On September 20, 2022, Nick and Christine attended the Evaluation with Ms. Beyer. The Evaluation was held in an office building housing several businesses and a common conference room. Nick and Christine were taken to a conference room—not a treatment room—for the Evaluation. No other patients were in sight, and audio taping the exam would not have violated any other patient's HIPPA rights as Ms. Sparrow had previously claimed. Consequently, Christine notified Ms. Beyer that she was audio recording the Evaluation. Ms. Beyer confirmed that was not a problem with her, and in fact, insisted that ***The Standard did not allow videotaping or audiotaping.*** Ms. Beyer further stated ***The Standard had instructed her to stop the Evaluation immediately upon learning of the recording and note that it was a failed Evaluation.***

63. At this time, Ms. Beyer handed Christine pages 1, 2, and 3 of the instructions from ECN on how to proceed with the Evaluation. Christine then took photographs of these instructions. (Exhibit 7.) Curiously, these pages stated Ms. Beyer was to submit her report of the Evaluation in Word document format so that The Standard could make "administrative edits." It further stated that Ms. Beyer should contact The Standard if she did not authorize those edits.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

64. Shortly thereafter, without having examined Nick, Ms. Beyer ended the Evaluation in accordance with The Standard's instructions.

65. For months after the incomplete Evaluation, Nick did not receive any communications with The Standard regarding the Evaluation.

66. Despite The Standard's clear efforts to find any excuse to terminate Nick's benefits, his condition did not improve. In fact, his shoulder pain only worsened. He could not sleep comfortably at night. The wrong movement would leave him in excruciating pain. Nick wanted nothing more than to improve so he could play with his kids, but he physically could not. For example, whenever he tried to throw to play catch with his son, with just one throw his left shoulder and arm stung with excruciating pain, and he could barely sleep for days after.

67. On top of the physical pain and inability to engage in the activities with his family or work in the career that he loved, The Standard's conduct caused Nick severe stress. Knowing that it could be constantly observing him, looking for any excuse to deny his disability benefits made him anxious and on edge. He hoped, however, that The Standard would accept the reality that his career as a dentist was over. It did not.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**F. The Standard denies the Claim for a second time**

68. In the months that followed, Nick continued receiving treatment for his disability. On January 18, 2023, Nick attended an appointment with Hugh Gelabert, M.D., a vascular surgeon at UCLA Medical Center, for the pain and numbness in his neck, left arm, and left hand. Dr. Gelabert reviewed an MRI of Nick's brachial plexus (network of nerves in the shoulder) and found the MRI was "evidently abnormal" and "appear[ed] to undercount the degree of abnormality." Further, he noted that Nick's symptoms remained the same as before and were possibly more severe. Moreover, Dr. Gelabert stated in his report that Nick could not hold dental instruments in his left hand as he drops them and has pain, numbness, and tingling in his left arm.

69. In April 2023, The Standard sent a letter requesting Nick complete a medical questionnaire, which he did. He then sent the questionnaire to Dr. Gelabert. On June 5, 2023, The Standard received the medical questionnaire signed by Dr. Gelabert, which clearly stated his January 18, 2023 findings that Nick could not hold dental instruments in his left hand due to numbness and tingling.

70. On August 30, 2023, Nick attended a consultation with Ausaf Bari, M.D., a neurosurgeon at UCLA Medical Center. In his report from this visit, Dr. Bari stated that Nick's November 19, 2022 MRI demonstrated clear kinking of the supraclavicular area of his left shoulder.

71. As time passed, Nick's condition did not improve. The numbness and pain in his left hand, arm, and shoulder continued, and his left ankle continued to limit his ability to walk or stand for periods of time.

72. Nearly a year passed after Dr. Gelabert submitted the questionnaire to The Standard. Then, unexpectedly, in a letter dated April 9, 2024, The Standard denied Nick's Claim for a second time based on a mere paper review of his medical records. It asserted several unsupported bases for the denial. (Exhibit 8.)

73. Specifically, the letter argued that "Regular Occupation is not limited to one specific employer." (*Id.* at p. 3.) However, it did not provide any support for this assertion. In fact, the Policy only ever refers to the term occupation in the singular.

74. Furthermore, the April 9, 2024 denial stated that The Standard's "Physician Consultant" had reviewed Dr. Gelabert's and Dr. Bari's recent respective records, and spoke with Jae Jung, M.D., Nick's physical medicine and rehabilitation specialist. It claimed that Dr. Jung had reported that Nick had "no focal deficits in [his] left upper extremity but, because [his] strength was rated 4 out of 5, [Dr. Jung] felt you had some weakness of the entire left upper extremity from shoulder to hand." (*Ibid.*) However, the denial omitted any reference to Dr. Jung's notes from his February 1, 2023 visit with Nick in which he noted that his spinal range of motion was restricted in all planes, that his hand and forearm were hypersensitive, that he continued to experience

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

severe pain, among other symptoms. Nor did the letter indicate that The Standard's consultant made any attempt to speak with Nick's other providers, including Dr. Gelabert and Dr. Bari.

75. In fact, the denial was rife within consistent and false statements. For example, it argued that Nick had "normal gait." (*Id.* at p. 4.) Yet, records from his recent November 2, 2023 appointment with Dr. Soohoo confirmed that Nick had an "antalgic gait"—or in other words, a limp that is caused by pain.

76. The letter further explained that The Standard's consultant—who had never examined Nick and only based the review on his medical records—concluded that Nick no longer had any restrictions due his left calcaneal (heel) fracture and subtalar (ankle) arthritis injury, could lift up to 20 pounds despite his shoulder pain and labral tear, and that his thoracic outlet syndrome (neck pain and numbness and decreased strength in fingers) was not supported by the medical records (although none of his providers ever made such an inference).

77. Absurdly, The Standard concluded that Nick was able to perform the duties of a dentist with the primary use of his non-injured right hand, while only using his injured left hand in a supportive role, despite the persistent numbness and pain. Notably, it made no mention of how Nick's left hand, shoulder, and neck pain might endanger a patient. The denial letter was signed by Ms. Sparrow.

78. Upon receiving the letter, Nick was devastated. He had attended dozens of medical appointments in the last five years, had to stop working in the career that he loved, could no longer play sports with his kids, and lived in daily pain. The Standard's conduct left Nick with severe anxiety and stress.

79. Despite The Standard's denial of the Claim and termination of ongoing disability payments, Nick has continued paying the premiums on the Policy.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## FIRST CAUSE OF ACTION

**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against all Defendants)**

80. Nick refers to each and every paragraph above and incorporate those paragraphs as though set forth in full in this cause of action.

81. The Standard and DOES 1 through 100, inclusive, and each of them, breached their duty of good faith and fair dealing owed to Nick in the following respects:

a) Unreasonably delaying and denying benefits under the Policy;

b) Unreasonably failing to conduct a thorough, fair, and balanced investigation in evaluating Nick's claims for disability benefits;

c) Unreasonably failing to give at least as much consideration to Nick's interests and welfare in the investigation and handling of his claims as it gave to its own interests;

d) Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to Nick's in the investigation and handling of his claim as it gives its own interests;

e) Conducting unreasonable investigations into Nick's claims, including surveillance that unreasonably invades Nick and his family's privacy and places their safety and welfare at risk;

f) Unreasonably placing its own financial interests above Nick's interests;

g) Unreasonably failing to diligently search for and consider evidence to support coverage for Nick's Claim;

h) Unreasonably relying on extrinsic guidelines instead of the terms of the Policy to deny benefits;

i) Unreasonably misapplying the standards in the medical community in evaluating Nick's claims;

j) Unreasonably failing to contact Nick's treating physicians to conduct peer-to-peer discussions;

k) Unreasonably giving Nick's treating physicians arbitrary and unreasonable deadlines to conduct peer-to-peer discussions;

l) Unreasonably failing to provide the proper criteria to its consultants investigating Nick's claims;

m) Unreasonably failing to give the proper measure of deference to Nick's treating physicians in evaluating his Claim;

n) Unreasonable failing to apply the Policy's definitions and terms to determine whether Nick's Claim was covered; and

o) Unreasonably compelling Plaintiff to institute this litigation to obtain benefits due under the Policy.

82. The Standard and DOES 1 through 100, inclusive, and each of them, have breached their duty of good faith and fair dealing owed to him by other acts or omission of which Nick is presently unaware, and which will be shown according to proof at the time of trial.

83. The foregoing unreasonable conduct was not limited to the Defendants' evaluation of Nick's claims, but represents an ongoing pattern and practice, which it applies to all of its policyholders, which is specifically designed by the Defendants to save money at the expense of its policyholders. This ongoing pattern of conduct constitutes institutional bad faith.

84. Defendants' institutional bad faith constitutes reprehensible conduct because it is part of a repeated pattern of unfair practices and not an isolated occurrence. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Defendants' established company policies and practices. Defendants have engaged in similar wrongful conduct as to individuals other than Nick and substantially increased their profits as a result of causing similar harm to others.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

85. Defendants' conduct was undertaken by its deputies or managing agents, who were responsible for claims supervision and operations, communications and decisions. This conduct was undertaken on behalf of Defendants. Defendants further had advanced knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized and approved by managing agents whose precise identities are unknown to Nick at this time.

86. As a proximate result of the aforementioned unreasonable and bad faith conduct by Defendants, and each of them, Nick has suffered, and will continue to suffer in the future, damages under the Policy, plus interest and other economic and consequential damages, including personal physical injuries, physical sickness, and physical disability, for a total amount to be shown at the time of trial.

87. As a further proximate result of Defendants', and each of them, unreasonable conduct, Nick has suffered physical harm, additional treatment, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, worry, humiliation and mental and emotional distress, all in a sum to be determined at the time of trial.

88. As a further proximate result of the aforementioned wrongful conduct by Defendants, and each of them, Nick was compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore, Defendants are liable to Nick for the reasonable attorneys' fees, witness fees, and costs of litigation reasonably necessary and incurred by Nick to obtain the benefits under the Policy, in a sum to be determined at the time of trial. (*Brandt v. Superior Court* (1985) 37 Cal.3d 812.)

89. Defendants', and each of them, conduct described above was intended by them to cause injury to Nick, and/or was despicable conduct carried on by them with a willful and conscious disregard of Nick's rights; and/or or subjected Nick to cruel and unjust hardship in conscious disregard of their rights; and/or constituted intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Nick of property or legal rights or to otherwise cause injury,

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

such as to constitute malice, oppression, or fraud under California Civil Code § 3294, thereby entitling Nick to an award of punitive damages in an amount appropriate to punish Defendants and to set an example for other similarly situated insurers and health plans.

90. Defendants', and each of them conduct described above was undertaken by the corporate defendants' officers or managing agents, who were responsible for claims supervision and operations, underwriting, communications, and/or decisions. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate defendants. Further, said managing agents either had advance knowledge of the actions and conduct of said individuals, whose actions and conduct were authorized and/or approved by the managing agents, or the conduct has been fully ratified by Defendants and/or their managing agents.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**<u>SECOND CAUSE OF ACTION</u>**

**(Breach of Contract Against all Defendants)**

91. Nick refers to each and every paragraph above and incorporates those paragraphs as though set forth in full in this cause of action.

92. Defendants owed duties and obligations to Nick under the Policy.

93. Nick fulfilled and performed all his obligations under the Policy.

94. Defendants, and each of them, breached the terms of the Policy by denying benefits to which Nick was entitled under the Policy.

95. As a direct and proximate result of Defendants' conduct and breach of its policy obligations, Nick has suffered damages in an amount to be determined according to proof at trial.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**THIRD CAUSE OF ACTION**

**(Violations of Bus. & Prof. Code §§ 17200 *et seq.***

**Against all Defendants.)**

96. Nick refers to each and every paragraph above and incorporates those paragraphs as though set forth in full in this cause of action.

97. Business and Professions Code sections 17200 *et seq.*, the unfair competition law ("UCL") precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair, and fraudulent. Business and Professions Code § 17203 permits the Court to issue injunctive relief to prevent a defendant from continuing to engage in conduct that violates the UCL.

98. Business & Professions Code § 17204 permits individuals, such as Nick, to institute an action on behalf of the general public to obtain injunctive and restitutionary relief against persons and entities that engage in unfair business practices and/or unfair competition.

99. Defendants', and each of them, business practices alleged above constitute conduct that violates the UCL because it is (a) unfair to The Standard's subscribers and results in the denial of claims that should be covered under the terms of the EOC; (b) is unlawful because it violates the implied covenant of good faith and fair dealing, as well as various provisions of the Insurance Code § 790.03, subdivision (h); and (c) is fraudulent because it is likely to mislead The Standard's subscribers about the scope of what their health plans cover and exclude, and fails to abide by the regulators' determinations.

100. Nick has suffered injury in fact as a result of Defendants', and each of them, unlawful, unfair, and fraudulent business practices. Defendants' unlawful, unfair and fraudulent business practice of improperly analyzing and disregarding the Policy provisions, utilizing and misapplying extrinsic guidelines, and violations of Insurance Code § 790.03, subdivision (h) have caused Nick to suffer personal physical injury,

economic and consequential damages, plus interest, for a total amount to be proven at the time of trial.

101. Nick has suffered a loss of money or property as a result of Defendants', unlawful, unfair and/or fraudulent business practices. Nick has been denied his legal right to a full, complete and fair handling of their claims in violation of well-established principals of insurance claims handling set forth in statutory and case law.

102. Defendants have committed acts of unfair, unlawful and fraudulent business practices as defined by Business & Professions Code § 17200 *et seq*. by engaging in the following acts:

a. Unlawfully, unfairly and/or fraudulently misrepresenting the terms of the applicable policies to their subscribers;

b. Unlawfully, unfairly and/or fraudulently denying benefits based on based incomplete medical records and failing to conduct a reasonable investigation;

c. Unlawfully and unfairly engaging in unfair claims settlement practices in violation of California Insurance Code § 790.03, subdivision (h); and

d. Other acts of unfair competition of which Nick is presently unaware, and which may be determined through discovery in this action.

103. Plaintiff requests an injunction be issued against Defendants, and each of them, to enjoin them from engaging in the unfair, unlawful and/or fraudulent conduct alleged herein.

104. Plaintiff also requests an award of attorneys' fees upon prevailing in the request for equitable relief pursuant to California Code of Civil Procedure § 1021.5.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**

1. Damages for the delay and failure to provide benefits under the Policy, plus interest, in a sum to be determined at the time of trial;

2. For prejudgment interest on all damages awarded to Plaintiff in accordance with California Civil Code section 3287;

3. For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to obtain the Plan benefits, in an amount to be determined at trial;

4. For economic and consequential damages arising out of Defendants' unreasonable failure to provide benefits under the Plan;

5. For general damages for mental and emotional distress in a sum to be determined at the time of trial;

6. For punitive and exemplary damages in an amount appropriate to punish or set an example of defendants;

7. For costs of suit herein; and

8. For such other relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT:**

1. Damages under the Policy, plus interest, and other economic and consequential damages, in an amount to be determined according to proof at the time of trial;

2. For prejudgment interest on all damages awarded to Plaintiff in accordance with California Civil Code section 3287;

3. For costs of suit herein; and

4. For such other relief as the Court deems just and proper.

<u>**AS TO THE THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *ET SEQ.*:**</u>

1. For an injunction against defendants restraining and enjoining them from engaging in the unfair, unlawful or fraudulent business practices alleged herein;

2. For the attorneys' fees incurred to obtain the equitable relief requested;

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court may deem just and proper.

Date: September 5, 2024

SHERNOFF BIDART ECHEVERRIA LLP

By: ______________________________
RICARDO ECHEVERRIA
DANICA CRITTENDEN
TAYLOR R. PORTER
CLAIRE ARNAIZ
Attorneys for Plaintiff

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a jury trial.

Date: September 5, 2024

SHERNOFF BIDART ECHEVERRIA LLP

By: ______________________________
RICARDO ECHEVERRIA
DANICA CRITTENDEN
TAYLOR R. PORTER
CLAIRE ARNAIZ
Attorneys for Plaintiff

# EXHIBIT 1

Click Approve to proceed with the acceptance process.

You will be prompted if your signature is required.

This page is intentionally left blank.

TheStandard®

**POLICY DELIVERY MEMO**

**DATE:** November 4, 2013
**PROPOSED INSURED:** NICHOLAS MATTHEWS
**PRODUCER:** ANTHONY SCULLY HOVORKA 517179
**AGENCY:** 813
**POLICY NUMBER:** 00CC338770

---

We are pleased to enclose this policy for delivery. The following items are due at The Standard's administrative office no later than **12/16/2013**, the day this offer expires:

- Premium payment of $9,666.14.
- EFT Authorization (Optional).
- MDSA Endorsement (Form 12612).
- Policy Acceptance A.

No premium was submitted with the application. The premium payment listed above represents one annual payment based on the premium frequency and method selected on the application.

Based on a November 4, 2013 effective date, premium payment frequencies (and their corresponding amounts) are available as follows:

**Monthly (EFT):** $845.79 **Quarterly:** $2,561.52 **Semi-Annual:** $4,987.73 **Annual:** $9,666.14

*1100 SW Sixth Avenue*
*Portland OR 97204-1083*
*tel 888.937.4783*



Standard Insurance Company

This page is intentionally left blank.

TheStandard®

November 4, 2013

NICHOLAS MATTHEWS
1019 8TH ST
MANHATTAN BEACH CA 90266

Policy Number: 00CC338770
Insured: NICHOLAS MATTHEWS

Dear MR. MATTHEWS:

Thank you for choosing The Standard and for allowing us to serve your insurance needs. Here is your new disability policy. We encourage you to take some time to review this contract. Once we have received the necessary requirements in our home office, your policy will be put in force and disability coverage will begin.

Please note that the effective date of your coverage will be determined by the date by the date you elect on the Policy Acceptance form or, if you choose not to elect an effective date, the date you sign the Policy Acceptance. New policy data pages will be mailed to you shortly to reflect the actual effective date of coverage. The revised data pages will outline your specific benefits and replace the data pages included in the enclosed policy.

If you have questions or need assistance, you may contact your Standard Insurance Company representative.

We truly appreciate your business and look forward to providing you with excellent and responsive customer service.

Sincerely,

Individual Policy Administration
(800) 247-6888

Enclosure
cc: File

This page is intentionally left blank.

# Privacy Notice

The privacy of your personal information is important to us. To help you understand how we protect the information we receive about you, this notice describes our current privacy policy and practices.

We want you to know that:

- We do not sell or rent the information we have about you to anyone;
- We do not share your information with outside companies for the purpose of selling their products or services to you; and
- We do not offer a right to opt out since we only share information about you with others as permitted or required by law.

**Information We May Collect and From Whom**

We collect your personal information to offer you insurance and financial products and services. The type of information we collect and the extent to which it is used depends on the products and services we provide to you. For example, we may obtain information such as:

- Your name, address, date of birth, telephone number, Social Security number, employment, occupation, assets and income from applications and other forms from you, your employer and others;
- Your policy coverage, claims, premiums and payment history from your dealings with us;
- Your financial and medical history from other insurance companies, insurance support organizations or consumer reporting agencies, if you apply for life or disability insurance or benefits;
- Your current and past health condition from medical providers or facilities, with your authorization, if you apply for life or disability insurance or benefits; and
- Your use of the services offered on our Web sites from online information collection devices.

We may request an insurance support organization to collect information that we need about you. If we do, they will submit a report to us. They may keep a copy of the report and share its contents with others. They will do this only as permitted or required by law.

**Information We May Disclose**

We may share the types of information described above with others. These disclosures are only made as authorized by you or as permitted or required by law. For example, disclosures such as:

- To others that perform business services or functions on our behalf or to serve you;
- To employers and their representatives, to reinsurers, to other insurance companies, and to insurance support organizations for purposes related to insurance you may have or apply for;
- To others that may have a joint marketing agreement with us, unless state law restricts such use;
- To insurance departments or other federal, state or local legal authorities in connection with the regulation of our business or to comply with the laws and regulations;
- To law enforcement agencies to help prevent fraud or illegal activities;
- To authorized persons to respond to a subpoena, warrant or other court order;
- To others for purposes of complying with auditing and reporting requirements; and
- To our affiliates who may provide insurance or financial products and services to you.

When information about you is disclosed to others, we expect them to protect your information. We expect them to use the information only for the limited purpose for which it was shared.

**Your Rights**

We want to make sure that we have accurate information about you. In general, you have the right to review your personal information that we have. If you believe that any of the information about you is not accurate, you may inform us in writing of any changes you believe should be made. We will review your request and respond to it accordingly.

**Confidentiality and Security**

We restrict access to information about you to those employees who need to know that information to provide products or services to you. We safeguard your information through written privacy policies and physical, electronic and procedural protections.

**Further Information**

We will advise you of our privacy policy at least once a year. We may change our privacy policy at any time. As long as you remain a customer, we will inform you of any changes. If your relationship with us ends, we will continue to limit disclosures of your information in accordance with our stated privacy policy.

**The notice applies to:**

StanCorp Financial Group, Inc.
Standard Insurance Company
Standard Retirement Services, Inc.
The Standard Life Insurance Company of New York
StanCorp Mortgage Investors, LLC
StanCorp Real Estate, LLC
Standard Management, Inc.
StanCorp Equities, Inc.

**Please direct inquiries to:**

Privacy Notice (P12B)
P.O. Box 711
Portland, OR 97207-0711

To get more information about StanCorp Financial Group, Inc. and its subsidiaries and/or view this notice online, visit www.stancorpfinancial.com.

9542 (7/13)

This page is intentionally left blank.

## NOTICE OF PROTECTION PROVIDED BY CALIFORNIA LIFE AND HEALTH INSURANCE GUARANTEE ASSOCIATION

This notice provides a brief summary regarding the protections provided to policyholders by the California Life and Health Insurance Guarantee Association ("the Association"). The purpose of the Association is to assure that policyholders will be protected, within certain limits, in the unlikely event that a member insurer of the Association becomes financially unable to meet its obligations. Insurance companies licensed in California to sell life insurance, health insurance, annuities and structured settlement annuities are members of the Association. The protection provided by the Association is not unlimited and is not a substitute for consumers' care in selecting insurers. This protection was created under California law, which determines who and what is covered and the amounts of coverage.

Below is a brief summary of the coverages, exclusions and limits provided by the Association. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations or the rights or obligations of the Association.

### COVERAGE

- **Persons Covered**

Generally, an individual is covered by the Association if the insurer was a member of the Association *and* the individual lives in California at the time the insurer is determined by a court to be insolvent. Coverage is also provided to policy beneficiaries, payees or assignees, whether or not they live in California.

- **Amounts of Coverage**

The basic coverage protections provided by the Association are as follows:

  - **Life Insurance, Annuities and Structured Settlement Annuities**

  For life insurance policies, annuities and structured settlement annuities, the Association will provide the following:

    - Life Insurance
      80% of death benefits but not to exceed $300,000
      80% of cash surrender or withdrawal values but not to exceed $100,000

    - Annuities and Structured Settlement Annuities
      80% of the present value of annuity benefits, including net cash withdrawal and net cash surrender values but not to exceed $250,000

  The maximum amount of protection provided by the Association to an individual, for *all* life insurance, annuities and structured settlement annuities is $300,000, regardless of the number of polices or contracts covering the individual.

  - **Health Insurance**

  The maximum amount of protection provided by the Association to an individual, as of April 1, 2011, is $470,125. This amount will increase or decrease based upon changes in the health care cost component of the consumer price index to the date on which an insurer becomes an insolvent insurer.

## COVERAGE LIMITATIONS AND EXCLUSIONS FROM COVERAGE

The Association may not provide coverage for this policy. Coverage by the Association generally requires residency in California. You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.

The following policies and persons are among those that are excluded from Association coverage:

- A policy or contract issued by an insurer that was not authorized to do business in California when it issued the policy or contract
- A policy issued by a health care service plan (HMO), a hospital or medical service organization, a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society
- If the person is provided coverage by the guaranty association of another state.
- Unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which do not guarantee annuity benefits to an individual
- Employer and association plans, to the extent they are self-funded or uninsured
- A policy or contract providing any health care benefits under Medicare Part C or Part D
- An annuity issued by an organization that is only licensed to issue charitable gift annuities
- Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as certain investment elements of a variable life insurance policy or a variable annuity contract
- Any policy of reinsurance unless an assumption certificate was issued
- Interest rate yields (including implied yields) that exceed limits that are specified in Insurance Code Section 1607.02(b)(2)(C)

## NOTICES

Insurance companies or their agents are required by law to give or send you this notice. Policyholders with additional questions should first contact their insurer or agent. To learn more about coverages provided by the Association, please visit the Association's website at www.califega.org, or contact either of the following:

California Life and Health Insurance
Guarantee Association
PO Box 16860
Beverly Hills, CA 90209-3319
(323) 782-0182

California Department of Insurance
Consumer Communications Bureau
300 South Spring Street
Los Angeles, CA 90013
(800) 927-4357

**Insurance companies and agents are not allowed by California law to use the existence of the Association or its coverage to solicit, induce or encourage you to purchase any form of insurance. When selecting an insurance company, you should not rely on the Association coverage. If there is any inconsistency between this notice and California law, then California law will control.**

STANDARD INSURANCE COMPANY
P.O. Box 711
Portland, Oregon 97207

TheStandard®

INFORMATION FOR INSUREDS IN SELECTED HEALTH CARE OCCUPATIONS

The Standard recognizes the unique challenges some insureds may face today in certain health care occupations. Under certain circumstances, some may find themselves prohibited from performing the substantial and material acts of their occupation due to their HIV-positive status. While they may be physically and mentally able to perform those duties, they may be prevented from doing so because of license restrictions or practice limitations imposed by appropriate licensing or regulatory authorities.

The purpose of this statement is to explain how such a license restriction or limitation would be viewed under your Standard Insurance Company disability income policy. This statement is not an amendment or endorsement to any such policy and does not change any provision or definition therein. All provisions of your policy and any riders, including all exclusions and limitations, remain unchanged.

Your policy's definition of Total Disability / Totally Disabled includes the requirement that, due to your injury or sickness, you are unable to perform with reasonable continuity the substantial and material acts of your regular occupation in the usual and customary way. Subject to all other provisions contained in the policy, you will be considered to have met that part of the policy's definition if you become HIV positive after the effective date of your policy and both of the following conditions are met:

1. You test HIV-positive using the test criteria established by the Centers for Disease Control; and

2. As a result of your HIV-positive status you are restricted or prohibited by your state licensing board from performing the substantial and material duties of your regular occupation.

This interpretation of policy language is not meant to treat HIV-positive status as a presumptive disability. Rather, it is meant to recognize that a license restriction or limitation imposed by the state may render you "unable to perform" the duties of your occupation. It does not guarantee that benefits will be paid under those limited circumstances. All claim decisions will be based upon the facts of each claim and will be made in accordance with the terms and provisions of your policy.

*Standard Insurance Company*
*1100 SW Sixth Avenue*
*Portland OR 97204-1083*
*tel 888.937.4783*

This page is intentionally left blank.

## NOTICE

**Read this outline of coverage carefully. It is not identical to the outline provided upon application and the coverage originally applied for has not been issued.**

**STANDARD INSURANCE COMPANY**
Home Office: P.O. Box 711, Portland, Oregon 97207
(800) 247-6888

INSURED: NICHOLAS MATTHEWS

POLICY NUMBER: 00CC338770

## INDIVIDUAL DISABILITY INCOME INSURANCE OUTLINE OF COVERAGE

## READ YOUR POLICY CAREFULLY

This outline of coverage provides a very brief description of the important features of your policy. This is not the insurance contract and only the actual policy provisions will control. The policy itself sets forth, in detail, the rights and obligations of both you and Standard Insurance Company. It is, therefore, important that you READ YOUR POLICY CAREFULLY!

## DISABILITY INCOME INSURANCE COVERAGE

This is an individual disability income insurance policy. This category of coverage is designed to provide benefits for Disability resulting from a covered Injury or Sickness, subject to any exclusions and limitations set forth in the policy. Benefits do not cover surgical, hospital, or medical expenses.

Date ____________________ Sales Representative ____________________________

Address ____________________________________

____________________________________

Telephone __________________________________

## DEFINITIONS

The following definitions apply to both the policy and this outline of coverage. Other terms are defined in the policy.

**DISABILITY -** This means the same as Total Disability, defined below.

**INJURY -** Injury sustained by You:

1. After the Effective Date; and
2. While this policy is in force.

**REGULAR OCCUPATION -** Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the job You are performing when the Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation.

**SICKNESS -** Your Sickness or disease which first manifests itself:

1. After the Effective Date; and
2. While this policy is in force.

**SUBSTANTIAL AND MATERIAL ACTS -** This means those acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified.

**TERMINATION DATE -** The date the policy ends, unless it ended earlier. This date is shown on the data page.

**TOTAL DISABILITY/TOTALLY DISABLED -** Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to perform Your Regular Occupation in the usual and customary way and You choose not to work in any occupation.

If You choose to work at any job, You will not be considered Totally Disabled under this policy. However, You may qualify for the benefit for Partial Disability found in the Partial Disability Rider. In compliance with California law, the Partial Disability Rider is mandatory and is attached to this policy.

**WAITING PERIOD -** That period, measured from the first day of Your Disability, throughout which You must be Disabled before Disability Benefits become payable.

**WE/OUR -** Standard Insurance Company.

**YOU/YOUR -** The Insured under the policy.

 (THIS FORM CONTINUES ON PAGE 3.) 

## POLICY BENEFITS

**BENEFIT FOR TOTAL DISABILITY -** You will be eligible for the benefit for Total Disability during Your Continuous Total Disability. We will pay the Basic Monthly Benefit. Benefits will begin on the Commencement Date. (This is the day immediately following completion of the Waiting Period.) We will pay the benefit for Total Disability for up to the Maximum Benefit Period, as long as You remain Continuously Disabled.

**Commencement Date:** 91st **Day of Disability**

**Basic Monthly Benefit:** $15,000.00

**Maximum Benefit Period:** To Age 67

**PRESUMPTIVE TOTAL DISABILITY BENEFIT -** We will consider You to be Totally Disabled if Your Injury or Sickness causes You to totally and permanently lose one of the following:

1. Speech;
2. Hearing in both ears, not restorable by hearing aids;
3. Sight in both eyes;
4. Use of both hands;
5. Use of both feet; or
6. Use of one hand and one foot.

**REHABILITATION BENEFIT -** While Disability Benefits are being paid, You may participate in a Rehabilitation Program. We will pay:

1. The reasonable costs of the Program; and
2. The difference, if any, between:
   a. The benefit You would be eligible for if You were Totally Disabled; and
   b. The Disability Benefit for which You are eligible;

for up to 36 months. We will not pay this benefit beyond the Maximum Benefit Period.

 (THIS FORM CONTINUES ON PAGE 4.) 

**PREMIUM WAIVER BENEFIT** – We will waive all premiums due under this policy while benefits are payable. If the Waiting Period is greater than 90 days, We will waive all premiums due and payable after the 90th day of Continuous Disability, up to the Commencement Date, as long as You remain Continuously Disabled. On and after the Commencement Date, policy benefits must be payable for premiums to be waived. After completion of the Waiting Period, We will refund to the Owner any premium due and paid after the date Your Disability began.

## EXCLUSIONS AND LIMITATIONS

We will not pay benefits for:

1. Disability due to an act of War or act incident to War. War includes any declared or undeclared War, whether civil or international, involving nations and/or sovereign territories. Acts of War or acts incident to War do not include acts of terrorism, so long as such acts are isolated in nature and unrelated to and not arising from War, as defined above.
2. The first 90 days of Your Disability due to pregnancy or childbirth;
3. Disability caused or contributed to by Your: (a) committing or attempting to commit a felony; or (b) actively participating in a riot;
4. Intentionally self-inflicted injury; or
5. Any Disability or condition We have excluded by name or specific description in an endorsement made part of the policy.

**PRE-EXISTING CONDITIONS** – For Disabilities caused or substantially contributed to by a Pre-existing Condition, or by a medical or surgical treatment of a Pre-existing condition, We will pay benefits only if, on the date You become Disabled, the policy has been continuously in force for 24 consecutive months.

A Pre-existing Condition is any physical or mental condition, whether diagnosed or undiagnosed, which was misrepresented or not disclosed in your application, and for which:

1. You have received a Physician's advice, treatment or services; or
2. A reasonably prudent person would have sought medical advice, care or treatment for symptoms occurring;

during the 365 day period ending the day before this policy's Effective Date.

If during the first two policy years, we find that any answer in your application is misstated, incorrect or incomplete, we may:

1. Rescind the policy; or
2. Deny a claim;

for Disability starting within the two year period.

 (THIS FORM CONTINUES ON PAGE 5.) 

## CLAIMS

**WRITTEN NOTICE OF CLAIM –** We must receive Written Notice of Claim from You or the Owner within 30 days after a Loss starts, or as soon as reasonably possible after that.

**WRITTEN PROOF OF LOSS –** We must receive written proof of Loss within 90 days after the end of any period for which Disability Benefits are being claimed. If that is not reasonably possible, the claim will not be affected, provided written proof is furnished as soon as is reasonably possible. However, unless You lack legal capacity, We must be given written proof within one year after the 90th day referred to above, for that claim to be valid.

**PAYMENT OF CLAIMS -** We will pay benefits to the Insured unless the Insured names a payee to receive them. We can pay benefits of up to $1,000 to any relative of the Insured or named payee if the Insured or payee lacks legal capacity to give a valid release, or if any benefit is otherwise payable to the Insured's estate.

## POLICY RENEWABILITY

**GUARANTEED RENEWABLE -** If all required premiums are paid, the policy is guaranteed renewable to the Termination Date. We cannot change any part of the policy, except its premium, until the Termination Date. We can change the premium only: (1) after the policy is three years old; and (2) if the change applies to all policies with like benefits insuring the same Risk Class. The policy ends on the Termination Date, except as provided by the Renewal Option (below). The Termination Date is shown on the data page.

**RENEWAL OPTION -** If You are not Disabled, Disability coverage may be continued beyond the Termination Date. Coverage will be for Total Disability only. There will be a limited benefit period. You must be actively and regularly employed for at least 30 hours per week. We may change premium rates.

## PREMIUMS

Premiums may be paid under any of these modes: annual, semi-annual, or quarterly. We may allow for payment under a special monthly mode. The special mode premium is paid through Your bank. There is a 31-day grace period for all premiums due except the first.

The annual premium for this policy is $9,666.14.

**THIS OUTLINE OF COVERAGE IS ONLY A SUMMARY OF THE COVERAGE PROVIDED BY THE POLICY. THIS OUTLINE IS NOT THE CONTRACT AND IS NOT PART OF IT. SEE THE POLICY FOR THE ACTUAL CONTRACT PROVISIONS.**

This page is intentionally left blank.

# Protector+℠ Insurance Policy

## FOR NICHOLAS MATTHEWS

Standard Insurance Company

TheStandard®

This page is intentionally left blank.

Standard Insurance Company

INSURED: NICHOLAS MATTHEWS

POLICY NUMBER: 00CC338770

**DISABILITY INCOME INSURANCE POLICY**

We, Standard Insurance Company, a stock life insurance company, agree with the Owner to pay the benefits of this policy according to its provisions.

This is a Disability Income Insurance Policy. We issued this policy to the Owner in consideration of: (1) The statements made in the application; and (2) Payment of the premium. A copy of the application is attached to and made part of the policy.

GUARANTEED RENEWABLE to the Termination Date, shown on the data page. As long as the premium is paid by the end of each grace period, We cannot change any part of the policy, except its premium, until the Termination Date. Before that date We can change the premium only: (1) After the policy is three years old; and (2) If the change applies to all policies with like benefits insuring the same Risk Class. The policy will end on the Termination Date, except as provided by the Renewal Option After The Termination Date provision. See that provision for premium changes that apply if the policy is continued under the Renewal Option.

RENEWAL OPTION AFTER THE TERMINATION DATE: SUBJECT TO CHANGE IN PREMIUM RATES. You may ask Us to continue this policy beyond the Termination Date, subject to the terms of the Renewal Option After The Termination Date provision.

RIGHT TO RETURN POLICY. If not satisfied with this policy, the Owner may return it for cancellation within 20 days after receipt by the Owner. The policy must be returned to the sales representative who sold it or to Our home office. The policy will then be void from the beginning, and any premium paid for it will be refunded to the Owner.

**READ THIS POLICY CAREFULLY.** It is a legal contract between the Owner and Standard Insurance Company.

**If there are questions or concerns regarding this policy, the owner may contact a Standard Insurance Company agent or its home office at the address and telephone number shown below. The owner may also contact the Consumer Services Division of the California Department of Insurance at 300 S. Spring Street, Los Angeles, California 90013, 800-927-HELP. However, the Consumer Services Division should be contacted only after all contacts between the owner and Standard Insurance Company have failed to produce a satisfactory solution to the problem.**

Signed at Our Home Office
1100 S.W. Sixth Avenue Portland, Oregon 97204
(800) 247-6888

STANDARD INSURANCE COMPANY

By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

## INDEX

Assignment ........ 16
Benefits
    Total Disability ........ 6
    Presumptive Total Disability ........ 6
    Rehabilitation Benefit ........ 7
Claims
    Written Notice of Claim ........ 9
    Claim Forms ........ 10
    Written Proof of Loss ........ 10
    Time of Payment ........ 11
    Payment of Claims ........ 11
Concurrent Disability ........ 8
Definitions ........ 4
Exclusions From Coverage ........ 8
General Provisions ........ 15
Grace Period ........ 12
Owner ........ 16
Policy Data ........ 3
Policy Termination ........ 13
Pre-existing Conditions ........ 8
Premiums
    Schedule of ........ 3
    In General ........ 12
Premium Waiver ........ 7
Reinstatement ........ 12
Renewal Option ........ 14
Time Limit On Certain Defenses ........ 9

## POLICY DATA

**Insured** NICHOLAS MATTHEWS
**Effective Date** **
**Owner At Issue** NICHOLAS MATTHEWS
**Termination Date** **
**Waiting Period** 90 Days

00CC338770 **Policy No.**
35 **Issue Age**
Non-Smoker **Risk Class**
3P **OCC Class**
Male **Sex**

** The Effective Date is the date the insured, and owner if different, elect on the Policy Acceptance for this policy. If no effective date is elected on the Policy Acceptance, this date will be the date the insured, and owner if different, sign the Policy Acceptance for this policy and the required premium is paid. The Termination Date is based on the Effective Date elected. New data pages reflecting these dates will be sent to the owner.

## PREMIUM SUMMARY

| | Annual Premium |
|---|---|
| **Base Policy** | $8,220.62 |
| **Riders** | $1,445.52 |
| **Net Annual Premium:** | $9,666.14* |

* The Net Annual Premium shown above includes a $40 policy fee.

## NONCANCELABLE / GUARANTEED RENEWABLE POLICY

## BASIC POLICY BENEFITS (To Age 67)

| | |
|---|---|
| **Commencement Date** | 91st Day of Disability |
| **Basic Monthly Benefit** | $15,000.00 |
| **Maximum Benefit Period:** | To November 4, 2045, or 24 months, whichever is longer. |

**POLICY DATA**
**(CONTINUED)**

**Insured** NICHOLAS MATTHEWS 00CC338770 **Policy Number**

**ADDITIONAL BENEFITS**

| Rider | Amount Of Benefits | Annual Premium Prior |
|---|---|---|
| **Noncancelable Policy Rider** | | * |
| **Partial Disability Rider*** ** | | * |
| **Own Occupation Rider** | | * |
| **Indexed Cost of Living Rider** | | $1,445.52 |
| **Mental Disorder/Substance Abuse Limitation** | | * |
| **Total Premium for Riders** | | $1,445.52 |

* Premium included in base policy premium and any applicable rider premium.

*** The Partial Disability Rider is automatically included with this policy, per California law.

If this policy was issued with an increased premium, exclusion or other modification, Standard may be contacted if there are any changes to the Insured's health, occupation, avocation or other risk factor that might allow coverage to be continued without the modification. We will review the information You provide plus any other information available to Us regarding all risk factors associated with the Insured as of the time of Our review. Using Our underwriting guidelines then in effect, We reserve the right to offer any change that We think is most appropriate, as well as the right to decline to make any change, regardless of whether the change in risk factor(s) is directly related to the reason for the policy modification.

## DEFINITIONS

**BASIC MONTHLY BENEFIT –** The amount of monthly benefit as shown on the data page issued with the policy, or as later changed by endorsement or by a new data page made part of this policy.

**COMMENCEMENT DATE –** The first day immediately following the completion of the Waiting Period. The following applies to a Presumptive Total Disability: (1) The Waiting Period is waived; and (2) The Commencement Date will be the first day of the total and permanent loss.

**CONCURRENT DISABILITY –** A Disability caused by more than one Injury or Sickness, or from a combination of these.

**CONTINUOUS DISABILITY / CONTINUOUSLY DISABLED –** Recurrent periods of Disability from the same cause or causes are one period of Continuous Disability if separated by Your Recovery of six months or less. However, no Disability Benefits are due or payable during any period of Recovery.

**DISABILITY / DISABLED –** This means the same as Total Disability/Totally Disabled, defined below.

**DISABILITY BENEFIT / DISABILITY BENEFITS –** Any payment or payments for Disability that are made under this policy.

**EFFECTIVE DATE –** The date on which this policy becomes effective. This date is shown on the data page.

**FAMILY MEMBER –** Your spouse, parent, son, daughter, brother or sister.

**INJURY –** Injury sustained by You:

1. After the Effective Date; and
2. While this policy is in force.

**INSURED –** The insured under this policy, as shown on the data page.

**ISSUE AGE –** The age of the Insured on the Effective Date. The Issue Age is shown on the data page.

**LOSS –** This means the same as Disability, defined above.

**MAXIMUM BENEFIT PERIOD –** The maximum period of time We will pay Disability Benefits during and for any one Continuous Disability. This period:

1. Is shown on the data page; and
2. Begins on the Commencement Date.

If the policy is continued beyond the Termination Date under the Renewal Option, payment of Disability Benefits may be limited to a maximum of 12 months for any one Continuous Disability.

**OWNER** – The owner of this policy, as shown on the data page, unless later changed as allowed under the GENERAL PROVISIONS section.

**PHYSICIAN** – Any licensed medical professional, other than You, the Owner, or a Family Member. The Physician must be practicing and diagnosing within the scope of his or her medical or professional license.

**POLICY ANNIVERSARY** – The anniversary of the policy's Effective Date occurring each year the policy remains in force.

**POLICY MONTH** – A month measured from the same date in a month as the policy's Effective Date.

**PRESUMPTIVE TOTAL DISABILITY** – Your total and permanent loss, because of Your Injury or Sickness, of one of the following:

1. Speech;
2. Hearing in both ears, not restorable by hearing aids;
3. Sight in both eyes (see below);
4. Use of both hands;
5. Use of both feet; or
6. Use of one hand and one foot.

Total and permanent loss of sight in both eyes means: Both eyes must measure at or below 20/200, after reasonable efforts are made to correct their vision, using the most advanced medically acceptable procedures and devices available.

You will be considered as Totally Disabled if You become Presumptively Totally Disabled under the policy terms. See the Benefit for Presumptive Total Disability provision.

**RECOVER / RECOVERY / RECOVERED** – This means You are no longer Disabled from the same cause or causes that caused Your most recent Disability.

**REGULAR OCCUPATION** – Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the specific job You are performing when the Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation.

**REHABILITATION PROGRAM / PROGRAM** – A voluntary plan, program or course of vocational training or education, that is intended to prepare You to return to work. A Rehabilitation Program may include assistance for such items or services as: vocational and employment assessment; purchasing adaptive equipment; educational expenses; and evaluation of necessary work site modifications.

**REINSTATEMENT DATE** – The date the policy is made effective when reinstated.

**RISK CLASS** – The Risk Class for this policy, as shown on the data page. It also includes the occupation class and sex shown on the data page.

**SICKNESS –** Your Sickness or disease which first manifests itself:

1. After the Effective Date; and
2. While this policy is in force.

**SUBSTANTIAL AND MATERIAL ACTS –** This means those acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified.

**TERMINATION DATE –** The policy ends on this date, unless it ended earlier as outlined under the Policy Termination provision. This date is shown on the data page.

**TOTAL DISABILITY / TOTALLY DISABLED –** Because of Your Injury or Sickness, You are unable to perform with reasonable continuity the Substantial And Material Acts necessary to perform Your Regular Occupation in the usual and customary way and You choose not to work in any occupation.

If You choose to work at any job, You will not be considered Totally Disabled under this policy. However, You may qualify for the benefit for Partial Disability found in the Partial Disability Rider. In compliance with California law, the Partial Disability Rider is mandatory and is attached to this policy.

**WAITING PERIOD –** That period, measured from the first day of Your Disability, throughout which You must be Disabled before Disability Benefits become payable. The Waiting Period is shown on the data page. More information on the Waiting Period is provided under EXCLUSIONS AND LIMITATIONS.

**WE / US / OUR –** Standard Insurance Company.

**YOU / YOUR –** The Insured under this policy.

## BENEFITS

**BENEFIT FOR TOTAL DISABILITY –** You will be eligible for the benefit for Total Disability during Your Continuous Total Disability. We will pay the Basic Monthly Benefit.

The benefit for Total Disability will begin on the Commencement Date. This benefit will continue while You remain Totally Disabled, but it will not be paid beyond the Maximum Benefit Period. For periods of less than a month We will pay a pro rata portion of this benefit for each day of Total Disability.

**BENEFIT FOR PRESUMPTIVE TOTAL DISABILITY –** We will pay the benefit for Total Disability during Your Presumptive Total Disability. However, We will not pay it beyond the Maximum Benefit Period. The Commencement Date for any Presumptive Total Disability is the first day of that Presumptive Total Disability.

**DISABILITY DUE TO COSMETIC OR TRANSPLANT SURGERY –** We will consider You as Disabled due to Sickness if, more than six months after the Effective Date, You become Disabled from surgery to:

1. Improve Your appearance;
2. Prevent Your disfigurement; or
3. Transplant part of Your body to someone else.

**PREMIUM WAIVER BENEFIT –** We will waive all premiums due under this policy while benefits are payable. If the Waiting Period is greater than 90 days, We will waive all premiums due and payable after the 90th day of Continuous Disability, up to the Commencement Date, as long as You remain Continuously Disabled. On and after the Commencement Date, policy benefits must be payable for premiums to be waived. After completion of the Waiting Period, We will refund to the Owner any premium due and paid after the date Your Disability began.

**REHABILITATION BENEFIT –** While Disability Benefits are being paid, either You or We may propose a Rehabilitation Program. If the Program is approved by Us and accepted by You, We will pay a Rehabilitation Benefit. This benefit will pay:

1. The reasonable costs of a Rehabilitation Program not otherwise covered by any other plan, policy or program; and
2. The difference, if any, between:
   a. The benefit You would be eligible for if You were Totally Disabled; and
   b. The Disability Benefit for which You are eligible;

for up to 36 months according to the terms of the Program. In no case will We pay any Rehabilitation Benefit beyond the end of the Maximum Benefit Period. Payment of this benefit will be in addition to any other payment that may be due under the policy.

We will provide the terms, conditions and objectives of the Program to You in writing after it has been approved by Us, in our sole discretion. The Program must be accepted by You in writing before We pay any Rehabilitation Benefit. We will periodically review the Program and Your progress. We will continue to pay the Rehabilitation Benefit as long as We determine that the Program is meeting the mutually agreed upon objectives.

If You leave the Program We will continue paying Disability Benefits for up to the number of months remaining in Your Maximum Benefit Period, if any, as long as You remain otherwise eligible under the policy. The Program and the Rehabilitation Benefit are voluntary. This policy does not require You to apply for or join any Program.

## EXCLUSIONS AND LIMITATIONS

**EXCLUSIONS FROM COVERAGE** – We will not pay benefits for:

1. Disability due to an act of War or act incident to War. War includes any declared or undeclared War, whether civil or international, involving nations and/or sovereign territories. Acts of War or acts incident to War do not include acts of terrorism, so long as such acts are isolated in nature and unrelated to and not arising from War, as defined above.
2. The first 90 days of Your Disability due to pregnancy or childbirth.
3. Disability caused or contributed to by Your:
   a. Committing or attempting to commit a felony; or
   b. Actively participating in a riot. "Actively participating" does not include Your being at the scene of a riot while performing Your official duties.
4. Intentionally self-inflicted injury.
5. Any Disability or condition We have excluded by name or specific description in an endorsement made part of the policy.

**WAITING PERIOD LIMITATION** – No Disability Benefits are payable during the Waiting Period. Disability Benefits start after the Waiting Period ends, on the Commencement Date, if You are Disabled on that date. The Waiting Period is shown on the data page.

Regardless of the number or length of any periods of Recovery that may occur during Your Disability, for any Disability Benefit to become payable, the Waiting Period must be satisfied within the total number of consecutive days which equals:

1. For Waiting Periods of 180 days or less: Two times the Waiting Period shown on the data page; or
2. For Waiting Periods longer than 180 days: One and one-half times the Waiting Period shown on the data page.

This limitation does not apply to the benefit for Presumptive Total Disability.

**CONCURRENT DISABILITY** – We will pay benefits for a Concurrent Disability as if there were only one Injury or Sickness. In no event will You be considered to have more than one Disability at the same time. Once a continuous period of Disability starts, it will be one period of Continuous Disability no matter what Injuries or Sicknesses, or how many, caused the Disability or cause it to continue.

**PRE-EXISTING CONDITIONS** – For Disabilities caused or substantially contributed to by a Pre-existing Condition, or by a medical or surgical treatment of a Pre-existing condition, We will pay benefits only if, on the date You become Disabled, the policy has been continuously in force for 24 consecutive months.

A Pre-existing Condition is any physical or mental condition, whether diagnosed or undiagnosed, which was misrepresented or not disclosed in your application, and for which:

1. You have received a Physician's advice, treatment or services; or
2. A reasonably prudent person would have sought medical advice, care or treatment for symptoms occurring;

during the 365 day period ending the day before this policy's Effective Date.

**TIME LIMIT ON CERTAIN DEFENSES –** After two years from this policy's Effective Date, no misstatements, except fraudulent misstatements, made by You or the Owner, in the application for the policy shall be used to:

1. Rescind the policy; or
2. Deny a claim;

for Disability starting after the end of such two year period.

For Disability starting after two years from the policy's Effective Date, no claim will be reduced or denied because a disease or physical condition existed before such date, unless it is specifically excluded or there was a fraudulent misstatement in the application for the policy.

## CLAIMS

**TIME OF LOSS –** We will pay benefits under this policy only for a Loss which occurs while this policy is in force. Except as noted in the definition of Maximum Benefit Period, Termination of the policy will not affect any claim for Disability provided that:

1. Your Disability begins within 30 days after the date of the Injury or Sickness causing Your Disability; and
2. Your Injury or Sickness occurs while this policy is in force. (See Policy Termination.)

**WRITTEN NOTICE OF CLAIM –** We must be given written notice of claim by You or the Owner:

1. Within 30 days after a Loss starts; or
2. As soon as is reasonably possible.

Written notice must be given:

1. To Us at Our home office; or
2. To any of Our authorized sales representatives.

Written notice must include Your name and the policy number.

**CLAIM FORMS –** We will send the Owner a claim statement within 15 days after We receive written notice of claim. If You do not receive Our forms within 15 days after You ask for them, You will be deemed to have complied with the requirements of this policy as to Written Proof of Loss upon submitting to Us, within the time period for filing Written Proof of Loss written proof covering:

1. The occurrence; and
2. The character and extent of the Loss for which claim was made.

The time period for filing Written Proof of Loss is shown in the Written Proof of Loss provision, below.

**WRITTEN PROOF OF LOSS –** We must receive written proof of Loss within 90 days after the end of any period for which Disability Benefits are being claimed. If that is not reasonably possible, the claim will not be affected, provided written proof is furnished as soon as is reasonably possible. However, unless You lack legal capacity, We must be given written proof within one year after the 90th day referred to above, for that claim to be valid.

**DOCUMENTATION OF LOSS –** Each of the following elements of proof of Loss must be provided to Us at Your expense. We will not pay any Disability Benefits until We receive satisfactory written proof of all of the following:

1. You became Disabled while You were insured under this policy and while it was in force;
2. Your Disability was a Continuous Disability through the Waiting Period and the Commencement Date; and
3. We receive such additional information as We may reasonably require in connection with Your claim, including but not limited to:
   a. Information as outlined under Income Documentation, below;
   b. Vocational data such as documentation of work duties and activities. Examples might include Your job description and appointment calendar, and documentation of Your court appearances or medical services You provided; and
   c. Supplementary claims questionnaires and forms, such as pre-existing condition and vocational statements, and special authorizations for obtaining certain information, such as medical, financial and benefits records.

You must also submit all of the following documents at Your expense:

1. A completed claim statement signed by You.
2. A completed claim statement signed by Your Physician.
3. A written authorization, signed by You and on Our form, for Us to obtain records and information needed to determine Your eligibility for Disability Benefits.
4. Such other documents and information as We may reasonably require in connection with Your claim.

In any event if any required documentation is not provided within 45 days after We send Our request for such documentation, Your claim may be denied.

Once Your claim is approved, no Disability Benefits will be continued beyond the end of the period for which You have provided Us with satisfactory written proof of Loss.

We will require You to submit additional documentation of Your claim at Your expense at reasonable intervals while You are receiving Disability Benefits, where the condition requires such proof.

**INCOME DOCUMENTATION** – We can require proof to establish Your current and prior incomes. We have the right to examine Your financial records, including Your tax returns, as often as We may require. These financial records may cover any period for which You claim to be Disabled.

**INVESTIGATION OF YOUR CLAIM** – We will conduct a prompt investigation of Your claim. We will not pay any Disability Benefits until: (1) We have had a reasonable time to conduct any investigation of Your claim; and (2) We have determined that Disability Benefits are payable.

**MEDICAL EXAM** – We can have Physicians or specialists examine You, at Our expense, as often as reasonably necessary while You claim to be Disabled. Any such examination will be conducted by one or more Physicians or specialists We choose.

We may defer or suspend payment of benefits if: (1) You fail to attend an examination; or (2) You fail to cooperate with the person conducting the examination. Benefits may be resumed, provided that the required examination occurs within a reasonable time and benefits are otherwise payable.

**TIME OF PAYMENT** – After We receive satisfactory written proof of Loss and all other conditions are met: (1) We will immediately pay benefits then due that are not payable periodically; and (2) We will pay any benefits that are payable periodically at the end of each month of Disability. Payment will be subject to our receipt of continued written proof of Loss.

Any benefits that may remain due and unpaid after Our liability ends for that Disability will be paid immediately upon Our receipt of written proof of Loss for such remaining benefits.

**PAYMENT OF CLAIMS** – We will pay all benefits to the Insured (except for any premium returned as a result of the Insured's death) unless the Insured names a payee to receive such benefits. Designation of a payee, or change of a previously named payee, must be in writing and signed by the Insured. At the Insured's request We will provide a form for naming or changing a payee.

We can pay total benefits of up to $1,000 to any relative of the Insured We believe is entitled to them, if:

1. Any benefit is payable to the Insured's estate; or
2. The Insured or any payee lacks legal capacity to give a valid release.

We will not be liable to anyone to the extent We make payment in good faith.

**OVERPAYMENT OF BENEFITS** – We have the right to be reimbursed for any overpayment of benefits under this policy. We will notify the Owner promptly upon the discovery of any overpayment. After such notice, any and all overpayments that have not been reimbursed will become a debt due and payable to Us. We will offset the unreimbursed portion of any overpayments against any benefit payments due under the policy, regardless of the payee, until all overpayment amounts are repaid in full.

**REVIEW PROCEDURE –** If We deny all or part of Your claim, You may request a review. You must make the request within 180 days after receiving notice of the denial. Your request must be in writing.

If We deny Your claim:

1. You may send Us written comments or other items to support Your claim; and
2. You may review any non-privileged information that relates to Your request for review.

We will review Your claim promptly after We receive Your request. We will send You a notice of Our decision within 60 days after We receive Your request. If special circumstances require an extension We will send it to You within 120 days. We will state the reasons for Our decision; and We will refer You to the relevant parts of the policy.

## PREMIUMS, REINSTATEMENT, AND POLICY TERMINATION

**PREMIUMS –** The premium is the amount We charge at regular intervals to keep this policy in force. The premium is shown on the data page. Before the Termination Date We can change the premium only: (1) After this policy is three years old; and (2) If the change applies to all policies with like benefits insuring the same Risk Class. Premiums are payable at Our home office. The first premium is due on the Effective Date. If the first premium is not paid, the policy is never in force.

Premiums may be paid on an annual, semi-annual or quarterly basis. Also, the Owner may request a special monthly premium mode, subject to Our rules and approval. We may terminate this special mode at any time by writing to the Owner.

The Owner may request a change of premium mode by writing to Us. The change is subject to Our rules and approval. No change of premium mode will be allowed while You are Disabled.

**GRACE PERIOD –** A 31-day grace period to pay premiums follows the due date of each premium except the first. The policy will continue in force during the grace period. If a premium is not paid by the end of its grace period, the policy will terminate. If You become Disabled during the grace period, We will deduct any due and unpaid premiums from any benefits paid. (See UNPAID PREMIUM.) If this policy is being renewed under the Renewal Option After The Termination Date provision, and We have notified the Owner within at least five days before the due date of the unpaid premium of Our intent not to renew this policy, this provision will not apply to this policy. Our notice of nonrenewal under this provision must be in writing and delivered or mailed to the Owner at the Owner's last address in Our records.

**UNPAID PREMIUM –** Upon the payment of a claim under this policy, any premium then due and unpaid, or covered by any note or written order, may be deducted from the payment.

**REINSTATEMENT –** If this policy ends because a premium is not paid by the end of the grace period, the Owner may request that it be reinstated. The request must be made any time within six months after termination.

If Our requirements for reinstatement are met, the policy will be reinstated as follows:

1. If We receive the required premium and do not require a reinstatement application: Our acceptance of the required premium will reinstate the policy.
2. If We receive the required premium, but We require an application for reinstatement and issue a conditional receipt for the premium tendered:
   a. Reinstatement is subject to Our approval; and
   b. Reinstatement will be effective on the date We approve the application.

However, if We disapprove the application, We must mail notice of Our disapproval to the Owner within 45 days after the date of the conditional receipt. If We do not mail notice of Our disapproval before that time, the policy will be reinstated as of the 45th day.

Except for those reinstatements for which We do not require an application for reinstatement, the reinstated policy will not cover any Disability except Disability due to:

1. Injury sustained after the Reinstatement Date; or
2. Sickness that began more than ten days after the Reinstatement Date.

We may add or change provisions or limitations by way of endorsement when We reinstate the policy. Except for the provisions that may be added or changed, the Owner's rights and Our rights will be the same as before the policy terminated.

**POLICY TERMINATION –** If a premium is not paid by the end of its grace period, the policy will terminate. This policy will also terminate on the earliest of:

1. 12:01 a.m. on the Termination Date shown on the data page, unless this policy is being continued under the Renewal Option After The Termination Date provision;
2. The date You are no longer actively and regularly employed for at least 30 hours per week, if this policy is continued under the Renewal Option, unless You are Disabled on that date under the policy terms;
3. The date You Recover from Your Disability covered by the Renewal Option, if the policy is continued under that Option; or
4. The date of Your death.

After We receive notice of Your death, We will refund to the Owner or the Owner's estate any premium paid beyond the date of death.

We will refund up to 12 months' premium paid for the period beyond the date the policy terminates if termination occurs due to number 2, above.

In addition, the Owner may terminate this policy by sending Us a written request. Such termination will be effective on the date the request is received at Our home office, or on the date the Owner requests, subject to Our approval. We will refund any unearned premium to the Owner.

## RENEWAL OPTION AFTER THE TERMINATION DATE

**RENEWAL OPTION** – The Owner may request that Total Disability coverage under this policy continue beyond the Termination Date. The request must be in writing and is subject to Our approval. At the time of the request and after the Termination Date, to continue this policy We will require proof satisfactory to Us that:

1. You remain actively and regularly employed for at least 30 hours per week; and
2. You are not Disabled at the time We receive the Owner's written request at Our home office.

If We approve the request and the policy is continued under this Option, You must remain actively and regularly employed for at least 30 hours per week for the policy to remain in force. We have the right to ask You at least once a year for proof satisfactory to Us that You are meeting this requirement. In addition, We have the right to ask for this information more often than once a year if We reasonably believe that such information is necessary for this policy to continue under this Option.

You must notify Us as soon as is reasonably possible if at any time:

1. Your employment fails to meet this requirement; or
2. You cease employment altogether.

This Option and policy, and all coverage, will end on the date You cease being actively and regularly employed at least 30 hours per week, unless:

1. You are Disabled on that date under the policy terms; or
2. The policy and Option ended earlier under the Policy Termination provision.

**RENEWAL OPTION REQUEST** – The Owner may request this Option by writing to Us at Our home office. We must receive the request at least 30 days prior to the Termination Date. The policy must be in force with all due premiums paid on the date We receive the request.

**RENEWAL BENEFIT** – Under the Renewal Option, only the benefit for Total Disability will continue beyond the policy's Termination Date. All other policy benefits and all riders and rider benefits end at 12:01 a.m. on the Termination Date, unless a rider states otherwise. Except as shown below, the same provisions, exceptions, exclusions and limitations in this policy continue to apply if the Renewal Option is elected.

The Maximum Benefit Period for a policy continued under this Option is as follows:

For Total Disabilities with Commencement Dates falling on or before the Policy Anniversary immediately following Your 75th birthday: The Maximum Benefit Period under this Option is 24 months.

For Total Disabilities with Commencement Dates after the Policy Anniversary immediately following Your 75th birthday: The Maximum Benefit Period is 12 months.

The policy's definition of Regular Occupation as applied to any Disability covered by this Option is changed to read: "REGULAR OCCUPATION – Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the specific job You are performing when the Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Occupation."

The policy's definition of Continuous Disability/Continuously Disabled as applied to any Disability covered by this Option is changed to read: "Continuous Disability/Continuously Disabled means the same as Total Disability/Totally Disabled as defined in the policy." Under this Option, payment of benefits will be made for only one Disability. No Disability Benefits are due or payable during any period of Recovery. The policy, this Option and all coverage will end on the date You Recover from Your Disability under this Option.

**RENEWAL PREMIUM –** The premium to continue the policy under the Renewal Option will be based on the rate in effect for all policies with like benefits insuring the same age and Risk Class as of the Termination Date. We can change the premium at any time, but only if We change it for everyone who:

1. Has this policy form;
2. Has like benefits;
3. Is Your age; and
4. Is in Your Risk Class.

We will refund to the Owner any premium paid after the Termination Date, unless the policy is in force under the Renewal Option. Payment or receipt of any premium after the policy ends for any reason will not continue it in force, unless the policy is being continued under the Renewal Option.

## GENERAL PROVISIONS

**CHANGES –** This insurance is provided in consideration of Our receipt of: (1) The completed application; and (2) Payment of all required premiums. This policy and all attachments, including any benefits, riders, endorsements and copies of the application and application supplements, make up the whole contract. No one, including Our sales representative, has the right to change or waive any part of this policy unless the change is approved in writing by Our president and corporate secretary.

**CONFORMITY WITH STATE LAWS –** Any provision in this policy which, on its Effective Date, conflicts with the laws of the state where the Insured resides as of such date, is amended to meet the minimum requirements of such laws.

**LEGAL ACTION –** Legal action cannot be brought against Us until at least 60 days following the date written proof is received by Us under Written Proof Of Loss. Also, legal action may not be brought against Us after three years from the date written proof is required under Written Proof Of Loss.

**MISSTATEMENTS –** If Your Issue Age or sex has been misstated, any benefits will equal those that the premiums paid would have purchased at Your correct Issue Age and sex.

**NOTICE –** Changes, assignments, designations of payees and other requests will not affect Us until:

1. They have been signed by the Owner;
2. We have received them at Our home office; and
3. Where required, We have approved them.

**ASSIGNMENT –** The Owner may assign ownership of this policy at any time while the policy is in force and while the Insured is not Disabled. We will be bound by an assignment only after it is received at Our home office and only if it meets these requirements:

1. It is in writing and is signed by the Owner; and
2. It clearly identifies the policy and the assignee.

On receipt at our home office, an assignment meeting the above requirements will take effect as of the date it was signed by the Owner, or if no date of execution is shown, as of the date it is received at Our home office. We are not responsible for the validity of an assignment, and We will not be liable for any action taken by Us, or for any payment We may make, before an assignment meeting the above requirements is received at Our home office.

**OWNER –** The Owner of this policy is the Insured unless:

1. A different owner is named on the application; or
2. The Owner is changed under the Assignment provision, above.

The Owner may name a successor owner who will become the new owner if the Owner dies before You. If no named successor owner is living when the Owner dies, and if You are not the Owner, the Owner's estate will become the new owner.

This page is intentionally left blank.

Standard Insurance Company

## INDEXED COST OF LIVING BENEFIT RIDER

### DEFINITIONS

**ADJUSTMENT RATE** – The percentage used to determine the Cost of Living Benefit.

**BASE AMOUNT** – The Base Amount for any month is the total amount of Disability benefits payable under the policy and any other riders made part of the policy, except this Cost of Living Benefit Rider, for that month. Returned premium is not considered to be "benefits" for purposes of this definition.

**CALENDAR YEAR** – A year measured inclusively from January 1 to December 31.

**CHANGE DATE** – Each anniversary of the date Your Disability starts.

**COST OF LIVING BENEFIT** – The monthly amount We will pay under this rider. We will determine this amount each month You qualify for this benefit.

**CPI-U** – The average Consumer Price Index For All Urban Consumers published by the United States Department of Labor for a given year. If the CPI-U is discontinued or changed, We may use a comparable index.

### BENEFITS

We will pay the Cost of Living Benefit under this rider during Your Continuous Disability if:

1. Your Disability begins before the policy Termination Date;
2. Your Disability continues for more than 365 days; and
3. Disability Benefits, other than those payable under this rider, are payable during the month for which this benefit is claimed.

We will pay the Cost of Living Benefit each month after the first Change Date while Disability Benefits, as described in number 3 above, remain payable. Payment of this benefit will be made according to the terms of the policy and this rider and is in addition to any other payment that may be due under the policy or any other rider made part of the policy. The Cost of Living Benefit for any month is the Base Amount multiplied by the Adjustment Rate in effect for that month.

The Adjustment Rate is determined on each Change Date. The rate is effective on the first of the month following the Change Date, and remains constant for twelve full months following the Change Date. For the first Change Date it is the lesser of: (1) 3%; or (2) The CPI-U for the Calendar Year in which Your Disability started divided by the CPI-U for the previous Calendar Year, minus 1. For the second and all other Change Dates, if any, it is the lesser of:

1. The CPI-U for the Calendar Year immediately prior to the Change Date in question, divided by the CPI-U for the Calendar Year immediately prior to the start of Your Disability, minus 1; or
2. $1.03^x$; minus 1, where x equals the number of full years You have been Continuously Disabled.

If the Adjustment Rate in any year should decrease, We will use the Adjustment Rate for the year immediately prior. If the Adjustment Rate on the first Change Date is negative, the Adjustment Rate for that Change Date will equal zero. If Disability Benefits continue beyond the Termination Date for any reason, any Cost of Living Benefit payable after that date will equal the Cost of Living Benefit payable for the month in which the Termination Date falls.

## RECOVERY PURCHASE OPTION

Within 90 days after Your Continuous Disability ends and while this policy is in force, the Owner may apply for an increase in the policy's Basic Monthly Benefit. To qualify for the increase, a Cost of Living Benefit must be payable under this rider at the time Your Continuous Disability ends. Evidence of Your health is not required.

The amount available to the Owner for purchase is the greater of: (1) The Cost of Living Benefit at the time Your Continuous Disability ends; or (2) $100. Any amount of purchase will be subject to our issue limits and requirements at the time of purchase. Any amount of increase remaining after the purchase will not be available for later purchase.

The effective date of the purchased increase is the Policy Anniversary day falling in the next Policy Month starting after Your Continuous Disability ends. The purchased increase will apply only to Disabilities starting after that effective date.

The Owner's written application for the increase must be received at Our home office within 90 days after Your Continuous Disability ends. In addition, the required premium for the increase must be received within 31 days after Our receipt of the application. The purchase will be in the form of an increase to this policy or a new policy, as determined by Us.

## GENERAL PROVISIONS

**RIDER PREMIUM –** The annual premium for this rider is shown on the data page. We can change the Rider Premium only:

1. After the rider is three years old; and
2. If the change applies to all policies with like benefits insuring the same Risk Class.

 (THIS FORM CONTINUES ON PAGE 3.) 

**RIDER EFFECTIVE DATE** – The effective date for this rider is the same as the policy Effective Date, unless a different effective date has been given to this rider by an endorsement signed by You and the Owner, if different.

**TIME LIMIT ON CERTAIN DEFENSES** – The policy's Time Limit On Certain Defenses provision will apply to this rider as of the Rider Effective Date.

**TERMINATION OF RIDER** – This rider will end on the earlier of:

1. The policy Termination Date; or
2. The date the policy ends for any reason.

In addition, the Owner may terminate this rider by sending Us a written request. Such termination will be effective on the date the request is received at Our home office, or on the date the Owner requests, subject to Our approval. Termination of this rider may require termination of other riders.

**PART OF POLICY** – This rider is part of the policy to which it is attached. All policy terms and conditions will apply to this rider if they:

1. Have not been changed by this rider; and
2. Do not conflict with this rider.

STANDARD INSURANCE COMPANY

By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

This page is intentionally left blank.

Standard Insurance Company

## PARTIAL DISABILITY RIDER

In compliance with California law, this rider is mandatory and is attached to the policy.

### DEFINITIONS

For purposes of this rider, the definition of Disability/Disabled in the policy is changed to read:

**DISABILITY/DISABLED –** (1) Total Disability, as defined in the policy; and (2) Partial Disability, as defined below.

When used in this rider, these terms are defined as follows:

**ANNUAL EARNINGS –** This means all income of Yours for any full tax year used to calculate Prior Monthly Earnings. Annual Earnings includes all income from any vocational activity of Yours including:

1. Salary and fees;
2. Commissions and bonuses; and
3. Income reported on Your personal and business tax returns.

We can require any proof We consider necessary to establish Your Annual Earnings for each full tax year. Such proof may include, but is not limited to the following amounts as reported on the applicable Form W-2 and on the applicable Partnership Schedule K-1, Schedule C and S-Corporation Schedule K-1 of Your federal income tax return:

1. Your ordinary income (loss) from trade or business activity(ies);
2. Your guaranteed payments, if You are a partner;
3. Your net profit from business;
4. Your compensation (as an officer), salary, or wages, if You are an S-Corporation shareholder;
5. Other Income as reported on Your: (a) IRS form 1040; (b) Partnership Schedule K-1; or (c) S-Corporation Schedule K-1, and
6. Amounts deducted on Your federal income tax return as Section 179 Expenses.

**CALENDAR YEAR –** A year measured inclusively from January 1 to December 31.

**CPI-U –** The average Consumer Price Index For All Urban Consumers published by the United States Department of Labor for a given year. If the CPI-U is discontinued or changed, We may use a comparable index.

**INDEXED PRIOR MONTHLY EARNINGS –** This means Your Prior Monthly Earnings adjusted by the applicable rate of increase in the CPI-U. During Your first year of Disability, Indexed Prior Monthly Earnings is the same as Prior Monthly Earnings. After that, Indexed Prior Monthly Earnings is determined on each anniversary of the date Your Disability starts by increasing the previous year's Indexed Prior Monthly Earnings by the rate of increase in the CPI-U for the prior Calendar Year. If there is no increase in the prior Calendar Year's CPI-U, there will be no increase in the Indexed Prior Monthly Earnings for the current year. However, Indexed Prior Monthly Earnings will not decrease even if the CPI-U decreases.

**LOSS OF INCOME –** Your Indexed Prior Monthly Earnings less Your Monthly Earnings. Loss Of Income is determined for each month for which a benefit for Partial Disability is claimed.

**MONTHLY EARNINGS –** This means all income received by You in the particular month for which You are claiming the benefit for Partial Disability. Monthly Earnings includes all income from any vocational activity of Yours, including:

1. Salary and fees;
2. Commissions and bonuses; and
3. All income from all of those sources of income used to determine Prior Monthly Earnings.

We will subtract from Monthly Earnings all business expenses which You are allowed to deduct for federal income tax purposes. However, We will not deduct any expenses shown on Your federal income tax return as IRC Section 179 expenses. Monthly Earnings does not include income from any of the following:

1. Rent or royalties;
2. Annuities, savings or investments;
3. Deferred compensation or retirement plans;
4. Disability income policies; or
5. Your nonvocational activities.

We will use the accounting method used on Your federal income tax return for Your tax year immediately prior to Your tax year in which the Disability began. We will use the same method throughout the duration of Your claim. If the cash method is used, We will exclude from Monthly Income that income which is both:

1. Earned prior to the date Your Disability began; and
2. Received after the date Your Disability began.

If You receive any income in a lump sum or on a basis other than monthly, We will prorate that income over the period of time to which it applies. If an appropriate period of time is not provided, We will use what We consider to be a reasonable period, based on the circumstances involved.

**PARTIAL DISABILITY/PARTIALLY DISABLED –** You are not Totally Disabled, and while actually working in an occupation, as a result of Your Injury or Sickness You are unable to earn 80% or more of Your Indexed Prior Monthly Earnings.

**PRIOR MONTHLY EARNINGS –** The sum of Your highest Annual Earnings for any two full tax years within the three full tax years preceding the day Your Disability began, divided by 24.


(THIS FORM CONTINUES ON PAGE 3.)

## BENEFITS

**BENEFIT FOR PARTIAL DISABILITY –** You will be eligible for the benefit for Partial Disability during Your Partial Disability if Your Partial Disability begins before the Termination Date. The amount of Disability Benefit We will pay under this section for each month is determined as follows:

1. The sum of: (a) The Basic Monthly Benefit; plus (b) Any amount that would have been payable under the Supplemental Social Insurance Benefit Rider (if part of the policy) if You had been Totally Disabled during the month for which this benefit for Partial Disability is being determined; times
2. Your Loss Of Income for that month divided by Your Indexed Prior Monthly Earnings.

If You are unable to earn at least 20% of Your Indexed Prior Monthly Earnings, We will pay the Basic Monthly Benefit. For any one Continuous Disability, each of the first six monthly payments will not be less than 50% of the Basic Monthly Benefit.

The benefit for Partial Disability will begin on the later of:

1. The Commencement Date; or
2. The day after Your Total Disability ends.

This benefit will continue while You remain Partially Disabled. We will not pay this benefit beyond the Maximum Benefit Period, as outlined in the policy.

**RECOVERY BENEFIT –** You will be eligible for a lump sum Recovery Benefit, if immediately after Your Partial Disability ends:

1. You are not eligible for a Disability Benefit; and
2. Immediately following a Disability for which benefits for Partial Disability were paid under this rider, You are engaged at least 30 hours per week in: (a) Your Regular Occupation; or (b) Any other occupation.

The amount of the Recovery Benefit is a lump sum equal to the lesser of:

1. Six times the Basic Monthly Benefit; or
2. The total amount of benefits for Partial Disability paid during Your Continuous Disability immediately preceding payment of this benefit; or
3. The number of months remaining in the Maximum Benefit Period as of the time of Your Recovery, times the Basic Monthly Benefit.

No more than one Recovery Benefit will be paid for any one period of Continuous Disability.

## CLAIMS

For purposes of this rider, the INCOME DOCUMENTATION provision under CLAIMS in the policy is changed to read as follows:

**INCOME DOCUMENTATION –** We can require any proof We consider necessary to establish Your current and prior incomes. We have the right to examine Your financial records, including Your tax returns, as often as We may require. These financial records may cover:

1. Any period for which You claim to be Disabled; and
2. Any period needed by Us to determine Your Prior Monthly Earnings

## GENERAL PROVISIONS

**RIDER EFFECTIVE DATE –** The effective date for this rider is the same as the policy Effective Date.

**TIME LIMIT ON CERTAIN DEFENSES –** The policy's Time Limit On Certain Defenses provision will apply to this rider as of the Rider Effective Date.

**TERMINATION –** This rider will end on the date the policy ends for any reason.

**PART OF POLICY –** This rider is part of the policy to which it is attached. All policy terms and conditions will apply to this rider if they:

1. Have not been changed by this rider; and
2. Do not conflict with this rider.

STANDARD INSURANCE COMPANY
By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

Standard Insurance Company

**NONCANCELABLE POLICY RIDER**

This rider changes the policy and all riders made part of the policy from Guaranteed Renewable to Noncancelable and Guaranteed Renewable.

The entire paragraph on the policy face page, starting with "GUARANTEED RENEWABLE to the Termination Date", is replaced with the following:

> NONCANCELABLE AND GUARANTEED RENEWABLE to the Termination Date, shown on the data page. NO CHANGE IN PREMIUM RATES. As long as the premium is paid by the end of each grace period, until the Termination Date, We cannot change: (1) The policy; or (2) Its premium. The policy will end on that date, except as provided by the Renewal Option After The Termination Date provision. See that provision for premium changes that apply if the policy is continued under the Renewal Option.

The first paragraph of the Premiums provision in the policy under PREMIUMS, REINSTATEMENT, AND POLICY TERMINATION is replaced with the following:

> **PREMIUMS –** The premium is the amount We charge at regular intervals to keep this policy in force. It is shown on the data page. We cannot change the premium while this policy is in force, prior to the Termination Date. Premiums are payable at Our home office. The first premium is due on the Effective Date. If the first premium is not paid, the policy is never in force.

The Benefit For Presumptive Total Disability provision under BENEFITS in the policy is changed to read:

> **BENEFIT FOR PRESUMPTIVE TOTAL DISABILITY –** For Maximum Benefit Periods of five years or less, We will pay the benefit for Total Disability during Your Presumptive Total Disability but not beyond the Maximum Benefit Period. For Maximum Benefit Periods longer than five years, so long as Your Presumptive Total Disability continues We will pay the benefit for Total Disability:
>
> 1. Beyond the Maximum Benefit Period; and
> 2. During your lifetime.
>
> The Commencement Date for any Presumptive Total Disability is the first day of that Presumptive Total Disability.

On any riders issued with this policy, other than this rider, the Rider Premium provision under GENERAL PROVISIONS is changed to read:

> **RIDER PREMIUM –** The annual premium for this rider is shown on the data page. We cannot change the Rider Premium.



(THIS FORM CONTINUES ON THE OTHER SIDE.)

## GENERAL PROVISIONS

**RIDER PREMIUM –** The annual premium for this rider is included on the data page as part of the base policy premium.

**RIDER EFFECTIVE DATE –** The effective date for this rider is the same as the policy Effective Date, unless a different effective date has been given to this rider by endorsement signed by You and the Owner, if different.

**TIME LIMIT ON CERTAIN DEFENSES –** The policy's Time Limit On Certain Defenses provision will apply to this rider as of the Rider Effective Date.

**TERMINATION –** This rider will end on the earlier of:

1. The Termination Date; or
2. The date the policy ends for any reason.

In addition, the Owner may terminate this rider by sending Us a written request. Such termination will be effective on the date the request is received at Our home office, or on the date the Owner requests, subject to Our approval. Termination of this rider may require termination of other riders.

**PART OF POLICY –** This rider is part of the policy to which it is attached. All policy terms and conditions will apply to this rider if they:

1. Have not been changed by this rider; and
2. Do not conflict with this rider.

STANDARD INSURANCE COMPANY

By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

## OWN OCCUPATION BENEFIT RIDER

This rider changes the definition of Total Disability/Totally Disabled in the policy's DEFINITIONS section to read as follows:

**TOTAL DISABILITY/TOTALLY DISABLED –** Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial And Material Acts of Your Regular Occupation in the usual and customary way.

## GENERAL PROVISIONS

**RIDER PREMIUM –** The annual premium for this rider is shown on the data page. We can change the Rider Premium only:

1. After the rider is three years old; and
2. If the change applies to all policies with like benefits insuring the same Risk Class.

**RIDER EFFECTIVE DATE –** The effective date for this rider is the same as the policy Effective Date, unless a different effective date has been given to this rider by endorsement signed by You and the Owner, if different.

**TIME LIMIT ON CERTAIN DEFENSES –** The policy's Time Limit On Certain Defenses provision will apply to this rider as of the Rider Effective Date.

**TERMINATION –** This rider will end on the earlier of:

1. The Termination Date; or
2. The date the policy ends for any reason.

In addition, the Owner may terminate this rider by sending Us a written request. Such termination will be effective on the date the request is received at Our home office, or on the date the Owner requests, subject to Our approval. Termination of this rider may require termination of other riders.

**PART OF POLICY –** This rider is part of the policy to which it is attached. All policy terms and conditions will apply to this rider if they:

1. Have not been changed by this rider; and
2. Do not conflict with this rider.

STANDARD INSURANCE COMPANY
By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

This page is intentionally left blank.

**Standard Insurance Company**
Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

**Application for Disability Income Insurance**

## Proposed Insured

Nicholas Matthews
1. Full Name (Last, First, Middle)

M
2. Sex

521572576
3. Social Security Number

1019 8th St. Manhattan Beach CA 90266
4. Home Address City, State Zip Code

5. Email Address

2.22.73
6. Date of Birth

CA
7. State of Birth

Life
8. Length of US Residence

D1144644
9. Driver's License No./State of Issue

HOME( ) WORK 310 780 7007
10. Phone Numbers

☐ AM ☐ PM
11. Best Time to Call

☐ H ☐ W ☐ OTHER
Best Place to Call

## Insurance Applied

12. Plan Type and Features:

**A. Disability Income**

BASIC MONTHLY BENEFIT $ 15,000
WAITING PERIOD 90 DAYS
BENEFIT PERIOD 67
SUPPL. SOC. INS. $_____
SSI WAITING PERIOD _____ DAYS
☑ PARTIAL DISABILITY
☑ NONCANCELABLE
☑ OWN OCCUPATION
☐ MENTAL DISORDER/ SUBSTANCE ABUSE LIMITATION
☑ INDEXED COST OF LIVING ☑ 3% ☐ 6%
☑ FUTURE PURCHASE OPTION (IF NEEDED)
$_____ POOL AMOUNT
OTHER_____

**B. Business Overhead Expense**

BASE AMOUNT $_____
WAITING PERIOD _____ DAYS
BENEFIT MULTIPLE _____ MONTHS
☐ PARTIAL DISABILITY
☐ FUTURE PURCHASE OPTION $_____
OTHER_____

**C. Disability Buy-Out**

WAITING PERIOD _____ DAYS
AGGREGATE BENEFIT LIMIT $_____
FUNDING METHOD (SELECT ONE):
☐ LUMP SUM AMOUNT $_____
☐ MONTHLY AMOUNT $_____
FOR _____ YEARS
☐ DOWN PAYMENT AMOUNT
$_____ LUMP SUM; AND
$_____ MONTHLY
FOR _____ YEARS
☐ FUTURE BUY-OUT EXPENSE RIDER
AGGREGATE BENEFIT LIMIT $_____
FUNDING METHOD (MUST BE SAME AS BASE)
SELECT ONE:
☐ LUMP SUM AMOUNT $_____
☐ MONTHLY AMOUNT $_____
☐ DOWN PAYMENT AMOUNT/MO. $_____
☐ EXTENDED BENEFIT OPTION
OTHER_____

13. Occupation Class: ☐ 5A ☐ 4A ☐ 4P ☐ 3A ☐ 3P ☐ 2A ☐ A ☐ B

14. Premium Mode: ☐ EFT (MONTHLY) ☐ ANNUAL ☐ LIST BILL (MONTHLY) ☐ OTHER

15. Other Coverage: EXPLAIN YES ANSWERS IN THE TABLE BELOW. USE STATUS AND TYPE CODES PROVIDED.
a. Have you applied for any disability insurance in the last 12 months?.................☐ YES ☑ NO
b. Is there any other disability insurance currently in force or pending on you? ......☐ YES ☑ NO
c. Will you become eligible for any disability insurance in the next 12 months?......☐ YES ☑ NO

STATUS CODES: NOW IN FORCE (N); PENDING (P); APPLIED FOR IN THE LAST 12 MONTHS (A); WILL BECOME ELIGIBLE IN THE NEXT 12 MONTHS (F).
TYPE CODES: INDIVIDUAL (I); SOCIAL SECURITY SUBSTITUTE (S); GROUP (G); ASSOCIATION (X); OVERHEAD EXPENSE (OE); OTHER (O - EXPLAIN).

| COMPANY | STATUS: | TYPE: | YEAR APPLIED FOR | MONTHLY AMOUNT: | BENEFIT PERIOD: | WAITING PERIOD: | WILL COVERAGE BE REPLACED OR REDUCED? |
|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ YES ☐ NO |
| | | | | | | | ☐ YES ☐ NO |
| | | | | | | | ☐ YES ☐ NO |



RECEIVED AM
OCT 07 2013
IND POLICY ADMIN

EX01-051

Proposed Insured (print): Nick Matthews

**Application for Disability Income Insurance**
Standard Insurance Company - Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

## General Information

The Dental Spot Dentist — 7 yrs — 3 yrs
16. Current Primary Occupation 17. Years in Current Primary Occ. 18. Years with Current Employer

The Dental Spot 2700 Marine Ave #105 Redondo Beach CA 90278
19. Current Employer 20. Employer Address City, State Zip Code

21. Describe the substantial and material duties of your current primary occupation in the REMARKS. Give percent of time spent at each duty.

22. Do you work in your current primary occupation less than 30 hours per week? ☐YES ☒NO

23. Do you perform any of your current primary occupational duties at your place of residence? If yes, explain and give % of time. ☐YES ☒NO

24. Except for commuting, do you travel for business purposes? If yes, explain the nature of your travel, including whether it is local or long distance; and give the average number of days per month and miles per day. ☐YES ☒NO

25. Do you own any part of the business where you work? If yes, answer a, b and c. If no, go to question 26. ☒YES ☐NO
   a. Percent owned 100% years owned 3 yrs
   b. Number of employees: full time 25, part time ____
   c. Business type: ☐C Corp ☐S Corp ☐LLC ☐LLP ☒Sole Proprietor ☐Partnership ☐Other____

26. Will your employer pay for this requested insurance? If yes, answer a, b and c. If no, go to question 27. ☐YES ☒NO
   a. What percentage of premium?________
   b. Will employer's contribution be included in your taxable income? ☐YES ☐NO
   c. Will you reimburse employer for any premium? ☐YES ☐NO

27. Your current annual earned income from your current primary occupation is $ 600,000. For last year, it was $ 600,000. "Earned income" means salary, other compensation for services rendered or commissions. If you are self-employed, earned income is after business expenses, but before personal income taxes. Explain any significant fluctuations between years. Do not include any income that is not reported to the IRS. Exclude investment or other unearned income.

28. Do you have any other part-time or full-time occupation or employment? If yes, list annual earned income, duties and percent of time spent at each duty. ☐YES ☒NO

29. Do you intend to change any occupations or employers within the next 6 months? If yes, please explain. ☐YES ☒NO

REMARKS AREA. EXPLAIN ALL YES ANSWERS. GIVE ADDITIONAL INFORMATION REGARDING ANY QUESTIONS AND RESPONSES SHOWN ON THIS APPLICATION.

| QUESTION NUMBER | |
|---|---|
| | DENTIST |
| 21. | 90% PATIENT |
| | RELATED DENTISTRY |
| | WORK W/ PATIENTS |
| | 10% ADMIN/OFFICE |



EX01-052

Proposed Insured (print): Nicholas Matthews

**Application for Disability Income Insurance**
Standard Insurance Company - Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

30. Complete questions a. and b. only if the amount of disability coverage currently in force plus amount applied for exceeds $4,000 per month:
    a. Does your annual unearned income exceed either $30,000 or 25% of your annual earned income? ☐YES ☑NO
    b. Is your net worth (assets less liabilities) more than $3,000,000? ☐YES ☑NO

31. When was your last previous application or medical examination for life or disability income insurance?
    MONTH______ YEAR 2015 COMPANY______
    ☐ No prior applications or examinations

32. Have you ever applied for life, disability or health insurance and had it declined, postponed or withdrawn; or has any such policy issued on you been modified, rated up or canceled; or has renewal of any such policy been refused? If yes, please explain. ☐YES ☑NO

33. In the last 10 years have you applied for, received or been denied disability benefits from Worker's Compensation, Social Security or any other disability insurance? If yes, please explain. ☐YES ☑NO

34. In the last 5 years have you participated, or do you intend to participate:
    a. As a pilot, student pilot, or crew member in any type of aircraft? If yes, complete application supplement. ☐YES ☑NO
    b. In parachuting, hang gliding, or other aeronautics; rock climbing, underwater diving, motor sports or other hazardous sport? If yes, complete application supplement. ☐YES ☑NO

35. In the last 5 years have you traveled, worked or lived outside the USA or Canada for more than one continuous month; or do you plan to do so in the next 2 years? If yes, please explain. ☐YES ☑NO

36. In the last 5 years have you personally, or has any business owned in whole or in part by you, filed for bankruptcy? If yes, give details. Include whether discharged and date discharged. ☐YES ☑NO

37. Have you used tobacco or nicotine in any form in the last 5 years? If yes, circle types below and complete table: ☐YES ☑NO

| | HOW LONG | AMT. PER DAY | DATE LAST USED |
|---|---|---|---|
| a. CIGARETTES | | | |
| b. PIPE, CIGAR | | | |
| c. SMOKELESS | | | |
| d. GUM, PATCH, OTHER | | | |

REMARKS AREA. EXPLAIN ALL YES ANSWERS. GIVE ADDITIONAL INFORMATION REGARDING ANY QUESTIONS AND RESPONSES SHOWN ON THIS APPLICATION.

| QUESTION NUMBER: | |
|---|---|
| | |



EX01-053

Proposed Insured (print): Nicholas Matthews

**Application for Disability Income Insurance**
Standard Insurance Company - Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

## Medical History

38. Height: 5 FT. / 0 IN.
39. Weight: 164 LBS.
40. Weight Loss in Last Year: ____ LBS.
41. Explain if more than 10 pounds

42. Name of Your Physician or Health Care Facility: NO PRIMARY - INS EXAM @ 2013 WAS LAST TEST
43. Phone Number: (     )

44. Address of Your Physician or Health Care Facility | City, State | Zip Code

45. Date Last Seen: 2013
46. Reason Seen: INS. EXAM
47. Results: WAS LAST EXAM
48. Treatment or Medication Prescribed: NONE ALL OK

49. In the last 10 years have you had, been told you had, been treated for or been diagnosed by a medical practitioner as having:

| Question | Yes | No |
|---|---|---|
| a. Disorder of the eye, ear, nose or throat? | ☐ | ☑ |
| b. Anxiety, depression, nervousness or stress; or other mental, emotional or psychiatric disorder? | ☐ | ☑ |
| c. Stroke, dizziness, fainting, convulsion, recurrent headaches, paralysis or mental deficiency; or any other brain or nervous system disorder? | ☐ | ☑ |
| d. Fibromyalgia, chronic fatigue, chronic fatigue syndrome or Epstein-Barr virus? | ☐ | ☑ |
| e. Asthma, bronchitis, emphysema or pneumonia; or other lung or respiratory disorder? | ☐ | ☑ |
| f. High blood pressure, chest pain or heart attack? | ☐ | ☑ |
| g. Irregular heart beat, anemia or murmur; or other disorder of heart, blood or blood vessels? | ☐ | ☑ |
| h. Colitis, bleeding or recurrent indigestion; or other disorder of liver, intestines, esophagus, stomach or pancreas? | ☐ | ☑ |
| i. Diabetes; sugar, albumin, blood or pus in urine; or any unexplained fevers? | ☐ | ☑ |
| j. Disorder of kidney, bladder, prostate, breasts, menstrual cycle or reproductive organs? | ☐ | ☑ |
| k. Disorder of skin, lymph nodes or thyroid? | ☐ | ☑ |
| l. Cyst, growth, polyp, tumor, leukemia or cancer? | ☐ | ☑ |
| m. Any type of spinal, neck or back disorder or injury, including sprain, strain or disc disorder? | ☐ | ☑ |
| n. Neuritis, rheumatism or arthritis; or other disorder or injury of muscle, nerve, bone or joint? | ☐ | ☑ |
| o. Miscarriage, C-section or complication of pregnancy? | ☐ | ☑ |
| 50. Are you currently pregnant? | ☐ | ☑ |
| 51. Other than as stated in other answers, have you within the last 5 years: | | |
| a. Been hospitalized or been seen by a physician, chiropractor, counselor, psychiatrist, therapist or other medical practitioner? | ☑ | ☐ |
| b. Had an EKG or blood test (not for HIV); or other medical procedure, study or test? | ☐ | ☑ |
| c. Been advised to have any medical test, surgery or hospitalization that was not completed? | ☐ | ☑ |

REMARKS AREA. PLEASE EXPLAIN ALL YES ANSWERS. GIVE DATE, REASON, DIAGNOSIS, DURATION, SEVERITY, TREATMENT, RESULTS AND NAMES AND ADDRESSES OF ALL PHYSICIANS AND MEDICAL FACILITIES.

| QUESTION NUMBER | |
|---|---|
| | 2011 LITTLE COMPANY OF MARY ACCIDENT BRUISED RIBS |



EX01-054

Proposed Insured (print): Nicholas Mathews

**Application for Disability Income Insurance**
Standard Insurance Company - Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

52. In the last 10 years have you:
   a. Had recommended any treatment, or received treatment for the use of a controlled substance, drug or alcohol? ☐YES ☒NO
   b. Been told you had, been treated for or been diagnosed as having: any sexually transmitted disease, HIV, AIDS, AIDS-Related Complex or immune system disorder? ☐YES ☒NO
   c. Had a positive (unfavorable) HIV or AIDS test which was taken in connection with an application for insurance? ☐YES ☒NO

53. Do you now take, or in the last 3 years have you taken any prescription medicine? ☐YES ☒NO

54. In the last 3 years have you had any symptom or disorder lasting more than 30 days for which you have taken any non-prescription medication or natural or herbal supplement? ☐YES ☒NO

55. In the last 3 years have you had any physical or mental condition or symptom that has not been treated or diagnosed? ☐YES ☐NO

56. In the last 10 years, have you:
   a. Used cocaine, barbiturates, amphetamines, narcotics, hallucinogens or any other controlled or illegal substance? ☐YES ☐NO
   b. Been cited or arrested for driving under the influence of a controlled substance, drug or alcohol? ☐YES ☐NO

57. Do you drink alcoholic beverages? If no, give month and year last used:________. If yes, complete table: ☒YES ☐NO

| | | AMOUNT PER WEEK | |
|---|---|---|---|
| a. | WINE | | GLASSES |
| b. | BEER | 1 | BOTTLES |
| c. | LIQUOR | | DRINKS |

REMARKS AREA. PLEASE EXPLAIN ALL YES ANSWERS. GIVE DATE, REASON, DIAGNOSIS, DURATION, SEVERITY, TREATMENT, RESULTS AND NAMES AND ADDRESSES OF ALL PHYSICIANS AND MEDICAL FACILITIES.

| QUESTION NUMBER | |
|---|---|
| | |



EX01-055

**Application for Disability Income Insurance**
Standard Insurance Company - Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

## Agreement

I, THE UNDERSIGNED, AGREE TO THE FOLLOWING: This application includes pages 3 through 8 and all signed application supplements and amendments. I understand that Standard Insurance Company (Standard) will rely on the information I have provided in this application in considering the proposed insured's eligibility for insurance and for various premium rates. This application will not be effective unless signed and dated by the proposed insured and the owner, if different. In this application, "you" and "your" mean the proposed insured unless otherwise specified. No insurance will be in force until the date a policy has been issued and delivered to the owner and the first full premium is paid while all answers in this application remain true and complete. The only exceptions are as provided in a Disability Insurance Conditional Receipt, issued at the same time as and in connection with this application. In either case, premium will be calculated to begin on the policy's Effective Date. No sales person or medical examiner is authorized to judge insurability or change any of Standard's requirements. Any corrections or amendments under HOME OFFICE USE ONLY will be ratified when the policy is accepted. However, changes as to amount, classification, plan or benefit may not be made without written owner approval. We may require that any disability policy(s) listed in answer to Question 15 be permanently terminated or reduced. Standard will rely on the information in this answer in determining the amount, if any, of disability insurance it will issue. If such insurance is not terminated or reduced, any policy issued and accepted pursuant to this application may be rescinded and all premiums returned. If any insurance applied for is intended to replace other insurance in force with Standard, the Standard policy(s) being replaced will end the moment the insurance applied for becomes effective. I have read this application and I understand that any false statements or misrepresentations may result in loss of coverage. I DECLARE that all answers in this application are correctly recorded and are complete and true to the best of my knowledge and belief. Any and all answers I have provided verbally to a Standard agent or other Standard representative have also been recorded in this application.

[signature] Signed at Newport Beach CA on 10/7/13
Signature of Proposed Insured — City, State

_______ Signed at _______ on ___/___/___
Signature of Owner (If Other than Proposed Insured) — City, State

Print Name and Title of Owner — Owner's Tax ID Number (If Other than Proposed Insured)

Owner's Address — City, State — Zip Code — Owner's Email Address

[signature] Signed at Newport Beach CA on 10/7/13
Signature of Soliciting Producer — City, State

NOTE: A person commits a fraudulent act when that person knowingly files an application for insurance which either contains materially false information or conceals material information with intent to mislead.

HOME OFFICE USE ONLY — CORRECTIONS AND AMENDMENTS

RECEIVED AM
OCT 07 2013
IND POLICY ADMIN



EX01-056

Standard Insurance Company

**DISABILITY INCOME POLICY LIMITATION**
**FOR MENTAL DISORDER AND/OR SUBSTANCE ABUSE**
**POLICY ENDORSEMENT**

This endorsement is part of the policy shown below.

Insured: NICHOLAS MATTHEWS Policy Number: 00CC338770

Policyowner: NICHOLAS MATTHEWS

Effective Date of this Endorsement: The effective date of policy number 00CC338770.

We, Standard Insurance Company, issue this policy on the express condition or conditions that this policy is changed as noted below.

The following provisions are added to the **EXCLUSIONS AND LIMITATIONS** section of the policy:

**LIMITATION FOR MENTAL DISORDER –** Except as noted below, payment of Disability Benefits is limited to a total of 24 months during Your entire lifetime for Disability caused or contributed to by a Mental Disorder, or by medical or surgical treatment for a Mental Disorder. This limitation does not apply to any period during which You are confined in a Hospital solely because of a Mental Disorder.

**LIMITATION FOR SUBSTANCE ABUSE –** Payment of Disability Benefits is limited to a total of 24 months during Your entire lifetime for any Loss sustained or contracted in consequence of Your being intoxicated or under the influence of any controlled substance. The proper use of intoxicants and/or controlled substances administered on the advice of a Physician is not included within this limitation.

The following provisions are added to the **DEFINITIONS** section of the policy:

**HOSPITAL –** A legally operated hospital providing:

1. Full-time medical care and treatment; and/or
2. Full-time psychiatric care and treatment;

under the direction of a full-time medical director who is also a Physician. These are not considered to be "hospitals" under this definition: rest homes and nursing homes; convalescent homes; homes for the aged; and facilities primarily affording:

1. Custodial care;
2. Educational care; or
3. Rehabilitative care.

**MENTAL DISORDER –** This is any:

1. Mental disorder or condition;
2. Emotional disorder or condition; or
3. Behavioral disorder or condition;

regardless of the cause (including biological or biochemical disorder or imbalance of the brain) and regardless of the presence of physical symptoms. For purposes of this definition, Mental Disorder includes any diagnosis or condition listed in the most current publication of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychological Association. If this publication is no longer available, We reserve the right to use another nationally published manual of: similar scope; and similar purpose. However, Severe Cognitive Impairment, as defined below, is not a Mental Disorder for purposes of this definition.

**SEVERE COGNITIVE IMPAIRMENT –** A loss of or deterioration in intellectual capacity that:

1. Is comparable to (and includes) Alzheimer's Disease and similar forms of irreversible dementia, including dementia resulting from: (a) Stroke or trauma; or (b) Infectious conditions; and
2. Is measured by clinical evidence and standardized tests approved by Us that reliably measure impairment in: (a) Short-term or long-term memory; (b) Orientation as to people, places, or time; and (c) Deductive or abstract reasoning.

**TERMINATION OF ENDORSEMENT –** This endorsement will end on the earlier of:

1. The policy Termination Date; or
2. The date the policy ends for any reason.

In addition, the Owner may ask to terminate this endorsement by sending Us a written request. Termination will be subject to Our approval and will be based on Our underwriting guidelines then in effect. Termination of this endorsement may require termination of some riders.

**PART OF POLICY -** This endorsement is part of the policy to which it is attached. All policy terms and conditions will apply to this endorsement if they:

1. Have not been changed by this endorsement; and
2. Do not conflict with this endorsement.

____________________________ ________________
Signature of Proposed Insured Date

____________________________ ________________
Signature of Owner (If Other than Proposed Insured) Date

STANDARD INSURANCE COMPANY

By

J. Greg Ness
Chairman, President and CEO

Holley Y. Franklin
Corporate Secretary

**Standard Insurance Company**
Individual Disability Insurance
1100 SW Sixth Avenue Portland OR 97204-1093

# Disability Insurance Policy Acceptance and Application Supplement

**Policy Number:** 00CC338770

**Proposed Insured:** NICHOLAS MATTHEWS

NICHOLAS MATTHEWS: **If any of the Required Questions below are answered "YES" or left blank:**

1. **Provide details in REMARKS section**
2. **Reject delivery**
3. **Contact your insurance representative**
4. **Do not remit payment; your insurance representative will contact the underwriting department for instructions.**

All references to "Standard" mean "Standard Insurance Company."

This application supplement is part of the application for insurance on **NICHOLAS MATTHEWS**.

**REQUIRED QUESTIONS:** Since the date of the latest application, application supplement, or policy change request, has the proposed insured:

| | Yes | No |
|---|---|---|
| 1. Consulted with or been treated or examined by any physician, chiropractor or other medical practitioner, or counselor, psychiatrist or therapist? | ______ | ______ |
| 2. Had any illness, injury or change in health? | ______ | ______ |
| 3. Become aware of any current physical or mental condition or symptom that has not previously been diagnosed, treated or disclosed to Standard? | ______ | ______ |
| 4. Changed occupation or employer, or had a material change in job duties? | ______ | ______ |
| 5. Applied for any other disability or life insurance policy; or had any such policy rated up, modified or declined? | ______ | ______ |

**REMARKS:** Explain any YES answer below. Give details of any medical consultations where applicable. Include the following: practitioner's name and address, date, reason, diagnosis, severity, treatment and results.

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

**POLICY CHANGES:** I accept, ratify and acknowledge the changes made by Standard to my policy application or policy change request, including any benefit, endorsement or agreement added to or deleted from the policy. These changes are shown below:

Policy Effective Date: The date the insured, and owner if different, have both signed this Policy Acceptance and the required premium is paid. Occupation Class: 3P. Insured (First, Middle, Last): NICHOLAS MATTHEWS. Future Purchase Option Rider not issued. Issued with Mental Disorder/Substance Abuse Limitation.

Question 40: None. Question 46: Check-up. Question 47: All okay. Question 48: Nothing prescribed. Question 55: No. Question 56a: No. Question 56b: No.

I DECLARE THAT: All answers to the REQUIRED QUESTIONS on this form are correctly recorded, true and complete to the best of my knowledge and belief; THE ANSWERS TO ALL QUESTIONS IN THE APPLICATION OR POLICY CHANGE REQUEST REMAIN TRUE. I agree that this application supplement shall become part of any contract of insurance based on such application.

PROVIDED all REQUIRED QUESTIONS on this form are answered NO, I ACCEPT and acknowledge receipt of policy number **00CC338770** offered by Standard, including any policy changes made by Standard shown on this form.

______________________________ Signed at ________________, ______ on ____________
Signature of Proposed Insured City State

______________________________ Signed at ________________, ______ on ____________
Signature of Owner (If Other than Proposed Insured) City State

______________________________ Signed at ________________, ______ on ____________
Signature of Soliciting Producer City State

The Policyowner must sign AFTER the Proposed Insured and retain a copy.

This page is intentionally left blank.

**THIS IS A DISABILITY INCOME INSURANCE POLICY.**

**Standard Insurance Company**
Individual Disability Insurance
1100 SW Sixth Avenue, Portland OR 97204-1093

**Recurring Electronic Funds Transfer (EFT) Authorization**

**Proposed Insured: NICHOLAS MATTHEWS**

Our Electronic Funds Transfer (EFT) payment plan allows you to authorize a recurring electronic debit of your checking or savings account as a convenient way to pay your policy premiums.

☐ Yes Indicate "Yes" here and complete this form to establish the EFT method of payment.

| RECURRING PAYMENT OPTIONS: | POLICY NUMBER | DAY OF MONTH FOR WITHDRAWAL (Choose from the 1st thru the 28th) | DEDUCTION AMOUNT |
|---|---|---|---|
| ☐ Monthly | 00CC338770 | | |
| ☐ Quarterly<br>☐ Semi-Annually | EXISTING POLICY NUMBER * | DAY OF MONTH FOR WITHDRAWAL (Choose from the 1st thru the 28th) | DEDUCTION AMOUNT |
| ☐ Annually<br>Note: If no payment option is selected recurring deductions will be made monthly. | EXISTING POLICY NUMBER * | DAY OF MONTH FOR WITHDRAWAL (Choose from the 1st thru the 28th) | DEDUCTION AMOUNT |

*Use these sections if you have existing policies with Standard Insurance Company that you would like to include in the EFT method of payment.

| NAME OF FINANCIAL INSTITUTION | ACCOUNT TYPE<br>☐ Checking ☐ Savings | TYPE OF FINANCIAL INSTITUTION<br>☐ Bank ☐ Credit Union ☐ Savings & Loan |
|---|---|---|
| NAME(S) ON ACCOUNT | ROUTING TRANSIT # | ACCOUNT # *(Ignore spaces, but include dashes, if any)* |

Here's an example of how to locate the "Routing Transit #" and "Account #" on your check (not a deposit slip.)
Please note: Money market checks or credit card "Cash Transfer" checks cannot be used for this authorization.

Examples of where to find your Transit Routing and Account numbers:




By my signature below, I ask and authorize Standard Insurance Company to debit my account electronically, to pay premium(s) as indicated below. I authorize the financial institution named above to debit the account indicated.

By my signature below, I request and agree as follows:

1. Initiation of such debit entries is notice of premiums due.
2. This authorization will remain in full force and effect until Standard Insurance Company has received adequate written notification from me (or from either of us) of its termination. Written notice must be received by Standard Insurance Company at least **three business days** before this payment is scheduled to be made in order to afford Standard Insurance Company and the depository a reasonable opportunity to act. Standard Insurance Company may discontinue this EFT plan for any reason and at any time without prior notice. Premium payments thereafter will be payable on any premium payment plan then offered by Standard Insurance Company.
3. This authorization applies to any increase or decrease in premium (debit amount) that results from authorized and approved changes to the corresponding policy.
4. I will maintain a balance in the above designated account adequate to cover insurance premium payments. Additionally, I will notify Standard Insurance Company of any account or debit agreement changes at least three business days before payment is scheduled. I understand that any returned item from my former account will immediately be re-drafted from the new account. I also understand that, in the event a withdrawal is dishonored, the policy may lapse for non-payment of premium.

________________________ Signed on ____________
Authorized Signature Date

15612 (05/11)

This page is intentionally left blank.

**Standard Insurance Company**
Individual Disability Insurance
1100 SW Sixth Avenue, Portland OR 97204-1093

**Automatic Initial Premium Debit Authorization**

**Proposed Insured: NICHOLAS MATTHEWS** **Policy Number: 00CC338770**

The last step in accepting this policy is to authorize the draft of the initial premium which is required to put the policy in force. To complete the payment process, we will make a one-time debit of the initial premium from the checking or savings account that you have identified below.

Please select one of the following premium payment options:

☐ Monthly* ☐ Quarterly ☐ Semi-Annual ☐ Annual

*Monthly billing available only with Electronic Fund Transfer (EFT) payment plan

The amount of initial premium we deduct will be determined by the premium payment option you have chosen above and by the Policy Effective Date.

Please provide the following information for the account from which payment will be made:

| NAME(S) ON ACCOUNT | ACCOUNT TYPE | TYPE OF FINANCIAL INSTITUTION |
|---|---|---|
| | ☐Checking ☐Savings | ☐Bank ☐Credit Union ☐Savings & Loan |
| ROUTING TRANSIT # *(the 9 digits to the left of your account number)* | ACCOUNT # *(Ignore spaces, but include dashes, if any)* | |
| | | |

Here's an example of how to locate the "Routing Transit #" and "Account #" on your check (not a deposit slip.)
**Please note:** Money market checks or credit card "Cash Transfer" checks cannot be used for this authorization.

Examples of where to find your Transit Routing and Account numbers:

| Memo | | | Memo | | |
|---|---|---|---|---|---|
| :080989430 | 01440984321 ‖" | 1249 | 1249 | :080989430 | 01440984321 ‖" |
| Routing Transit # | Account # | Check # | Check # | Routing Transit # | Account # |

By my signature below, I request and authorize Standard Insurance Company to automatically debit, via electronic transfer, my initial premium from the account designated above. I also request and authorize the financial institution named above to accept and honor such transfer. This authorization applies only to one debit from my account for the amount of premium due to put the policy in force. Once the amount is debited from my account, this authorization will terminate. I understand that, in the event the withdrawal is dishonored, the policy will not be put in force and no coverage will be provided to me under the policy.

________________________________________ Signed on____________
Authorized Signature Date

This page is intentionally left blank.

# EXHIBIT 2

TheStandard®

January 26, 2021

Nicholas Matthews, DDS
1514 Curtis Avenue
Manhattan Beach, CA 90266

RE: Individual Disability Income Policy: 00CC338770
Claim Number: 00WA0352

Dear Dr. Matthews,

We are writing in regard to your Individual Disability Income (IDI) claim with Standard Insurance Company (The Standard). We have recently completed a review of your claim to determine if you continue to meet your policy's definition of Disability and other provisions. Based on the available information, reviewed in the context of your claim file as a whole, we find you no longer meet the definition of Disability. A summary of our findings and an explanation of the basis of our determination is below.

In order to remain entitled to benefits, you must satisfy all the requisite provisions of your policy. This includes, but is not limited to, the definition of Disability. As you have reported not working in your Regular Occupation in any capacity, we have been reviewing and administering benefits under the definition of Total Disability. Your policy defines Total Disability as:

***TOTAL DISABILITY/TOTALLY DISABLED*** *– Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial And Material Acts of Your Regular Occupation in the usual and customary way.*

Regular Occupation and Substantial And Material Acts are defined as:

***REGULAR OCCUPATION*** *– Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the specific job You are performing when the Disability begins. If you have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation.*

***SUBSTANTIAL AND MATERIAL ACTS*** *– This means those acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified.*

You claimed disability beginning April 26, 2019 due to closed left calcaneal fracture with open reduction and internal fixation as well as labral tear. Your Insured Statement signed on July 2, 2019 documented the injury occurred due to a fall from a ladder. Your claim was assigned to me for review on August 7, 2019 and your claim was approved for Total Disability under the Own Occupation Rider on September 9, 2019.

Standard Insurance Company
900 SW Fifth Avenue
Portland OR 97204-1235
tel 888.937.4783

LTR

**Vocational Information:**

According to the Insured Statement you were/are the sole owner of Nicholas Matthews DDS Inc. with the following duties:

| | |
|---|---|
| Diagnosing oral disease/Treatment planning | 10% |
| Diagnostic Testing | 10% |
| Procedures on teeth | 50% |
| Surgical procedures on teeth, bone, soft tissue | 30% |

In a detail call with you on August 19, 2019 you reiterated the above information. When asked of the legal form of the business entity you were unable to provide that information and referred us to your accountant. Your Insured Statement identified the business entity as an S-Corporation.

In an Initial Pending Letter dated August 16, 2019 we requested CDT codes to confirm your Regular Occupation. This requested documentation is used to verify and document the specific procedures performed prior to your date of disability. Additionally, we requested the following financial documentation which further allows us to confirm your Regular Occupation:

- Copies of your complete 2016 through 2018 Federal Tax Returns, personal and business, including all schedules, attachments, W-2s, 1099s and K-1s.

We informed you the above information was being requested proactively given your expectation to return to work in a reduced capacity in the future before ultimately returning to full-time. We noted the information was not necessary for the initial determination on your claim, but, if not received, could cause a delay in future benefits being paid. To date, this information was not received.

The information available to us was submitted to our Vocational Case Manager (VCM) to opine on your Regular Occupation as defined by the policy. The VCM determined your Regular Occupation most reasonably corresponded to that of Dentist under the U.S. Department of Labor *Dictionary of Occupational Titles*, Fourth Edition, revised 1991. The occupation of Dentist is considered to be of a light strength level which is described as:

> Light Work – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

Specific to your claimed limitations and restrictions we focused on the following physical demands associated with the occupation of Dentist:

| | | |
|---|---|---|
| Reaching | - | Constant |
| Handling | - | Constant |
| Fingering | - | Constant |
| Sitting | - | Frequent |
| Standing | - | Occasional |
| Walking | - | Occasional |

Reaching is generally performed at patient level, though may occur up to shoulder level when completing certain procedures. Above-shoulder would not be expected except for intermittently to adjust an overhead light.

Use of Foot Controls:

According to an article entitled *The Ergonomics of Dental Foot Controllers* from the xo-care.com website, foot controllers are used almost constantly during clinical procedures. This article also referenced a study which looked at four different types of foot controls and the resulting spinal position and foot pressure impacts of each. The foot controls include the following: universal pedal controller, the combined sliding pedal controller, and the XO CARE sliding rotation pedal controller.

The results of this study found the following:

- During the use of the *universal pedal controller,* the foot undergoes a bend (flexion) followed by a stretch (extension).
- To actuate the *combined sliding pedal controller,* the foot must operate in a combined vertical and horizontal motion. During this motion, the foot is bent and applies pressure onto the pedal.
- Operation of the *pedal controller* the foot undergoes the least amount of movement. This happens primarily due to the horizontal foot movement, and the fact that the foot is on the floor most of the time. It has also the lowest pressure load of all the tested foot controllers.

You completed an Activities and Capabilities Questionnaire on May 19, 2020 which asked whether you were currently employed or self-employed. You reported you were employed by The Dental Spot but not presently working.

When asked about your monthly sources of income and whether you were part-owner of any business, you reported the following:

> List all your current sources of income and the amount received from each source:
>
> The Standard - $15,000.00 / Month (disability benefit)
> Nicholas Matthews DDS, Inc – K1- estimated $20,000.00 / Month
> Jn Builds, Inc. – K1 – estimated $50,000.00 / Month
>
> Are you owner or part-owner of any business? [YES]
> If yes, do you actively engage in the operation of the business? [NO]
> JN Builds, INC. – 222 N Pacific Coast Highway Unit 2000, El Segundo, CA 90245

How many hours each week do you work for the business? 0 – 20 hours

What duties do you perform? Networking/Phone

Is a business being operated within your home by you or anyone else? [NO]

Upon further review into JN Builds, Inc we discovered you and others registered the corporation with the California Secretary of State on March 4, 2019. The corporation was registered with the California Contractor's State Licensing Board on July 5, 2019 with you listed as an officer. As of July 28, 2020, the business address for JN Builds, Inc. was the same as your residence and affiliated with the construction of a building located at 2221 Park Place, El Segundo, CA.

To understand your connections with JN Builds, Inc. we conducted a public records search which appeared to document the purchase of a new Heavy-Duty Dodge Ram pickup with commercial license plates on March 18, 2020. You were observed on Thursday, June 11, 2020 at 11:05 am driving this vehicle to a construction site where two signs could be viewed stating, "JN Builds: Architectural Steel" and "JN Builds: Architectural Framing"

At the job site, you were seen speaking with one unknown male looking at paperwork laid out on the tailgate of the pickup. During this time, you would, at times, alternate bearing your weight on your right leg and then the left leg. Together, you were pointing at certain areas of the structure under construction.

Except for a couple periods when you stepped out of the investigator's view, you were standing or walking. This period began at 12:52 pm and continued until approximately 2:33 pm. At 2:33 pm, you jogged a very short distance to your pickup truck. You were at the construction site for approximately 3.5 hours.

On Monday, June 29, 2020, you were observed driving your pickup to the construction job site and, after arriving, wearing a hard hat and spending approximately 2.5 hours at the site. On July 6, 2020, you were observed at the job site for approximately 5 hours.

As it relates to your dental practice, as of July 29, 2020, your Facebook profile noted The Dental Spot was closed due to COVID-19 until August 15, 2020. Current searches of The Dental Spot indicate it is now open for business.

Dr. Matthews, we accept your Regular Occupation as a Dentist; however, one can have dual occupations. Based on our review it appears you have a material part in the construction of the building located in El Segundo, CA and your activities with the construction company appear to be greater than taking telephone calls and networking.

**Medical Information:**

According to your Insured Statement and our initial detailed call, you claimed to have fallen from a ladder on April 25, 2019 injuring your left shoulder and causing a left calcaneal (heel bone) fracture for which you underwent surgical repair of the left heel.

As of October 3, 2019, it was reported the heel injury was healing slowly and you experienced subluxations with the right shoulder (partial shoulder dislocation). These occurred while putting on a shirt or sneezing. It was also noted that home exercises were not improving your symptoms.
A November 7, 2019 MRI of the left shoulder found evidence of a tear in the left shoulder labrum.

On March 3, 2020, you treated at UCLA Health. At that time, it was reported you were doing well and had returned to work. You reported recent inversion injury (sprain to the ligaments to the outer ankle) and were experiencing residual pain.

On your completed May 19, 2020 Activities and Capabilities Questionnaire you reported beginning minimal weight bearing in December 2019 and continued to show very gradual improvement. You sought treatment at Westside Wellness & Rehab one to two times a week for inflammation and pain until March 2020 when you ceased attending due to COVID-19. You also reported a decrease in function since March 2020.

On May 28, 2020, you returned to Dr. Nelson Soohoo at UCLA Health. This was a one-year post-op visit following the surgical repair of your heel bone. It was reported you were doing well but continued to report resolving pain from the earlier ankle sprain. You also reported some pain over the lateral ankle radiating to the Achilles. In this visit it was reported you were unable to walk on toes but were able to walk on your heel with difficulty. You were recommended to continue physical therapy and advance activity as tolerated, with follow up as needed.

A June 1, 2020 Musculoskeletal Questionnaire completed by Dr. Nelson Soohoo reported you continued to report left foot heel pain and discomfort with some inflammation. He reported you were unable to walk, stand or bend for long periods due to pain and swelling. Per the Questionnaire, he anticipated your return to work by September 10, 2020 and noted you were to follow up within three months.

Regarding your left shoulder, you reported two to four shoulder separations each week during normal activity. You also claimed to experience intermittent numbness in the pinky finger, ring finger and medial side of the palm extending to your elbow. Surgery was recommended but was not to be conducted until your left heel bone allowed you to be steady on your feet, so as not to have to use your left shoulder with crutches. You were to schedule the shoulder surgery following COVID-19.

You offered some glimpse in your ability to stand when you stated you had a chair in your shower, so you would not need to stand too long. You reported you limited your total daily steps – but did not offer the limited quantity. You stated the injury limited your ability to assist around the house and you identified you were unable to lift greater than 15 pounds with your left shoulder.

Dr. Matthews, your attestation and medical records appeared inconsistent with observation conducted in the months of June and July 2020. In our observation of June 9, 2020, you were observed walking in front of your house and did not appear to ambulate with difficulty at the time. Later, you were seen leaving your residence and, upon return, exited your lifted pickup and appeared to come down on your left heel in an abnormal manner. You immediately began limping and favoring your left foot. Thereafter, you were observed with a limp; but the limp appeared to decrease over the days you were observed. In addition, the length of time you were observed walking at the construction site was much longer than medical records noted.

On June 11, 2020 you were observed in front of your residence where you carried a case of plastic water bottles with both hands to a concrete wall. You then placed the case of water into your pickup and drove to the construction site.

Your medical records were requested and reviewed by a Physician Consultant, Board certified, Orthopedic Surgery, to obtain an opinion on your limitations and restrictions, if any. Attempted outreach was made to Dr. SooHoo at 310-319-1234 to give him an opportunity to provide additional information regarding your condition(s). The Physician Consultant was unable to reach Dr. SooHoo and was unable to leave a message given hold times exceeded 15 minutes with no option to leave a voicemail.

After review of the medical records and recorded observation the Physician Consultant provided the following summary:

> The claimant was reported to have suffered an accidental fall on 4/25/2019 where he sustained injury to his left ankle and left shoulder. On Prior Reports and Peer-Nurse Review date 1/27/2020 it was noted that diagnosis of fractured left calcaneus s/p ORIF on 5/8/2019 and subluxation of left shoulder was supported by medical documentation. The review also noted the claimant's condition warranted restrictions. Since review the claimant has undergone physical therapy and medical management for pain in the ankle and shoulder. On 5/18/2020 phone consultation with Frank A. Petrigliano, MD / Orthopedic Surgery, AP noted that the claimant has failed non-surgical management of his left shoulder and would like to proceed with surgery. In a 10/5/2020 consultation with Dr. Petrigliano the claimant was seen for persistent left shoulder pain and instability. On 11/17/2020, the claimant's left shoulder was worked up with Bradley M. Thomas, MD / Orthopedic Surgery. AP's (Attending Physician's) assessment was instability of the left shoulder joint, superior glenoid labrum leasion of the left shoulder, cervical disc disorder with radiculopathy and cubital tunnel syndrome on left. Dr. Thomas noted that he recommended surgical management of the left shoulder.
>
> Notably, APS dated 11/18/2020 claimed that the claimant had diagnosis of left calcaneus fracture and left ankle sprain. The claimant was reported to be unable to walk, stand or bend for short periods of time. It was noted that the claimant would be anticipated to be able to return to work on 3/1/2021. This has been juxtaposed with surveillance taken 6/2020 which showed the claimant being able to walk, with antalgic gait, for short distances to his vehicle and being able to carry small loads. With review of the claimant's medical records, prior to the date of surveillance, his condition warrants placement of restrictions and limitations; but not beyond 6/29/2020 for the foot fracture; the only restrictions that carry forward are those for the Hill-Sachs lesion

The Physician Consultant opined you had no sustainable capacity for work following open reduction and internal fixation of the left ankle for the time period of May 8, 2019 to June 8, 2019. After June 8, 2019, the following limitations and restrictions were associated with the left calcaneal fracture with ORIF to June 29, 2020:

> Sitting: Unrestricted
> Standing: 1 hour at a time, 4 hours total per day
> Walking: 1 hour at a time, 4 hours total per day
> Lifting: Occasionally 40 lbs. Both Upper Extremities (BUE)
> Carrying: Occasionally 40 lbs. BUE
> Pushing: Occasionally 40 lbs. BUE
> Pulling: Occasionally 40 lbs. BUE
> Climbing stairs: Unrestricted
> Balancing: Unrestricted
> Stooping: Unrestricted
> Kneeling: Unrestricted
> Crouching: Unrestricted
> Crawling: Frequently
> Reaching: Unrestricted at all levels
> Use lower extremities for foot controls: Unrestricted
> Fine manipulation: Unrestricted
> Simple and firm grasping: Unrestricted

From June 30, 2020 through to present the Physician Consultant found there would be no continued restrictions related to your left calcaneal fracture.

In regard to your left pan labral tear with small Hill-Sachs legion, specific limitations and restrictions would include the following:

> Lifting: Occasionally 20 lbs. Left Upper Extremity (LUE), Occasionally 50 lbs. Right Upper Extremity (RUE)
> Carrying: Occasionally 20 lbs. LUE, Occasionally 50 lbs. RUE
> Pushing: Occasionally 20 lbs. LUE, Occasionally 50 lbs. RUE
> Pulling: Occasionally 20 lbs. LUE, Occasionally 50 lbs. RUE
> Reaching: Unrestricted all levels RUE, Frequently all levels LUE
> Use lower extremities for foot controls: Unrestricted
> Fine manipulation: Unrestricted
> Simple and firm grasping: Unrestricted

**Determination**

Please understand, although a medical professional may indicate you are unable to work, we consider whether the information in your file supports this recommendation and your stated level of impairment. It is also important to understand, while we consider your physician's opinions and your statements in our evaluation, all information is reviewed collectively and in the context of the entire record. Merely having a diagnosis, living with a medical condition, and/or receiving treatment does not necessarily entitle someone to continued benefits.

We have carefully reviewed and considered all of the available information and find it does not support continued Disability as defined in your policy. Specifically, when we compare the physical demands presented by the VCM, and noted above, to the medically supported limitations and restrictions opined by the Physician Consultant, it does not appear you would have been restricted from performing the Substantial And Material Acts of your Regular Occupation beyond June 29, 2020. This is further supported by your observed activity in June and July 2020. Subsequently, you no longer meet your policy's definition of Disability and your claim has been closed with our payment to you through the date of this letter, January 26, 2021.

**Right to Review**

***REVIEW PROCEDURE*** *– If We deny all or part of Your claim, You may request a review. You must make the request within 180 days after receiving notice of the denial. Your request must be in writing.*

*If We deny Your claim:*

1. *You may send Us written comments or other items to support Your claim; and*
2. *You may review any non-privileged information that relates to Your request for review.*

*We will review Your claim promptly after We receive Your request. We will send You a notice of Our decision within 60 days after We receive Your request. If special circumstances require an extension We will send it to You within 120 days. We will state the reasons for Our decision; and We will refer You to the relevant parts of the policy.*

As it is unclear at the present time if you met the definition of Total or Partial Disability during periods of your claim in which we were unaware of your participation in JN Builds, if you request a review, please include the following information:

- Signed statement noting your involvement and duties in JN Builds beginning March 4, 2019 through the present.
- Copies of your complete 2016 through 2018 Federal Tax Returns, personal and business, including all schedules, attachments, W-2s, 1099s and K-1s.
- Profit and Loss on a monthly basis from JN Builds and Nicholas Matthews DDS, Inc.
- CDT codes on a monthly basis with the associated charges/billing information for the period of January 1, 2018 through present.
- Pay Statements from all sources beginning January 1, 2018 through current.

If you are experiencing hardship due to the Covid-19 pandemic which makes it difficult for you to request a review within the 180-day timeframe, you may contact us in writing and ask for an additional 30 days to submit your written request.

Lastly, since you are insured under a policy issued in the State of California, you may also wish to have this matter reviewed by the State of California Department of Insurance. You may contact the Department of Insurance, Consumer Communications Bureau, at 300 South Spring Street, South Tower, Los Angeles, California 90013. That office can also be reached by calling 213-897-8921 or toll-free 800-927-4357.

Should you have any questions pertaining to your claim or this letter please contact me.

Sincerely,

*Kim Sparrow*

Kim Sparrow
Sr. Disability Claim Specialist
Individual Disability Claims
(800) 628-9797 Ext. 4489
(971) 321-5609 Fax

# EXHIBIT 3

**Nicholas Matthews, DDS**
**1514 Curtis Ave**
**Manhattan Beach, CA 90266**

July 16, 2021

Sent via Electronic Mail (kim.sparrow@standard.com) and U.S. Mail

Kim Sparrow
Sr. Disability Claim Specialist
The Standard Insurance Company
900 SW Fifth Ave
Portland, OR 97204-1235

RE: Individual Disability Income Policy: 00CC338770
Reconsideration of Disability Claim #: 00WA0352

Dear Ms. Sparrow:

This is a response to yours dated January 26, 2021. This shall also serve as my formal request for a review/reconsideration of your decision to terminate the benefit in connection with the above referenced claim.

As you are fully aware, I sustained a closed left calcaneal fracture with open reduction and internal fixation as well as left shoulder labral tear on or about April 25, 2019. At the time of termination of policy benefits, I was still classified, among other things, as ACTIVELY possessing the following problems with the ***left foot injury***:

a. Tightness and TTP throughout L leg/foot
b. Weakness
c. Decreased balance
d. Gait deviations
e. Pain
f. Overall is Moderate complexity
g. Ongoing persistent subtalar arthritis in left foot
h. Tenderness and pain noted by medical doctor during clinical exams
i. Recommendation of possible subtalar fusion as operative management since December 2020

As to the ***left shoulder labral tear*** confirmed by MRI (11/7/19), there were additional tests and specialist appointments, in progress to explore symptoms of numbness, tingling, headaches, weakness and pain weakness, parathesia in neck, left shoulder, left arm and hand.

Furthermore, a medical professional has deemed that I have ***"radiculopathy in left upper extremity."*** Physical examination by medical doctor deemed symptoms, clinical tests and MRI findings to support ***thoracic outlet syndrome (TOS) and pectoralis minor syndrome in left upper extremity***. Dr Hugh Gelabert further noted that "instability of [his] left shoulder which is progressively worsening." Physician recommendations is to proceed with PT for TOS and *pectoralis minor syndrome.*

Notes from Westside Wellness & Rehabilitation has clearly classified my disability level as **COMPLETE DISABILITY.** Summary notes from professional physical therapy sessions indicate, ***"At this time pt does not have the muscle control, strength or dexterity to perform his skill set as a dentist, let alone do it safely."***

Throughout this claim process, the Standard led me to believe that the medical opinions and findings were important and crucial to the process – hence, the requests for updated medical reports, notes, charts, etc.. Nevertheless, my policy benefits were terminated on the ground that *"although a medical professional may indicate you are unable to work, we consider whether the information in your file supports this recommendation and your stated level of impairment."*

More particularly, your letter justifies the termination on the fact that your agent – Physician Consultant, had difficulty getting Dr. SooHoo on the phone *("Your medical records were requested and reviewed by a Physician Consultant, Board certified, Orthopedic Surgery, to obtain an opinion on your limitations and restrictions, if any. Attempted outreach was made to Dr. SooHoo at 310-319-1234 to give him an opportunity to provide additional information regarding your condition(s). The Physician Consultant was unable to reach Dr. SooHoo and was unable to leave a message given hold times exceeded 15 minutes with no option to leave a voicemail.")*. However, please note that I have never had any problem getting in touch with Dr. SooHoo personally, even during the pandemic.

Your letter also contains other factual inaccuracies, upon which the decision to terminate was based. I reserve the right to address the factual inaccuracies as outlined in your letter at a later time.

With all due respect, I strongly disagree with your decision to ignore the medical opinions in deciding to terminate my disability claim benefits on January 26, 2021. At this time, I request that my disability claim be reinstated and all applicable payments to be paid immediately. Additionally, a refund be issued for the two payments for premium that I made on February 25, 2021 and May 21, 2021 (total of $5,123.04).

I have included medical notes, MRI results and rehabilitation notes for your review and reconsideration from the following healthcare providers:

- MRI Results (11/07/2019)
- Westside Wellness & Rehabilitation (11/09/2020)
- Dr. Nelson SooHoo (12/10/2020)
- Dr. Nelson SooHoo (12/15/2020)
- MRI Results (12/17/2020)
- Dr. Hugh Gelabert (03/03/2021)
- Westside Wellness & Rehabilitation (04/26/2021)
- Dr. Hugh Gelabert (05/19/2021)

I hope you and your loved ones are well in these unprecedented trying times.

Respectfully,

Nicholas Matthews, DDS

# MR SHOULDER ARTHROGRAM W INTRA-ARTICULAR C...

## Study Result

### Impression

IMPRESSION:
There is tearing of the superior, anterior superior and anterior inferior labrum. There is a cleft through the anterior inferior glenoid labral cartilage through the anterior inferior labral tear compatible with a GLAD lesion.

Signed by: Johnathan Chen 11/7/2019 3:37 PM

### Narrative

1. MR Arthrogram of the left Shoulder
2. Fluoroscopic guided injection of the left Shoulder for Arthrogram

Date: 11/7/2019

Comparison: None available

Clinical indication: left shoulder instability (MD1)

Technique:
After discussion of the risks, benefits and alternatives to the procedure, the patient gave both oral and written consent.

Patient was placed supine on the fluoroscopic procedure table. The left shoulder was prepped and draped in the usual sterile fashion. Adequate local anesthesia was obtained with 1% lidocaine. A 22-gauge spinal needle was then advanced into the left
shoulder joint under fluoroscopic guidance.

Approximately 2 cc of Omnipaque 180 was then injected into the joint to confirm adequate placement of the needle into the left shoulder joint. Then approximately 12 cc of a mixture of 10 cc of normal saline, 5 cc of 0.5% ropivacaine and 0.1 cc of
Gadavist was injected into the left shoulder joint. The needle was then removed and adequate hemostasis achieved. The patient was then escorted to the MRI suite for MRI arthrogram of the shoulder.

The following pulse sequences were obtained:

Axial T1 and DESS; coronal T2 fat sat and T1 fat sat; sagittal T1 with and without fat saturation

Total fluoroscopy time: 3 seconds

FINDINGS:

AC joint and subacromial subdeltoid bursa: Normal

Rotator cuff: Intact

Biceps tendon: There is mild tendinosis of the intra-articular long head biceps tendon.

Labrum: There is tearing of the superior, anterior superior and anterior inferior labrum. There is a cleft through the anterior inferior glenoid labral cartilage through the anterior inferior labral tear compatible with a GLAD lesion.

Bones and articular cartilage: As above

Others: Mild synovitis.

## Component Results

There is no component information for this result.

## General Information

Ordered by Frank A. Petrigliano, MD

Collected on 11/07/2019 1:17 PM

Resulted on 11/07/2019 3:37 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Nelson Soohoo MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

# Physical Therapy Initial Evaluation

Visit No: 1
Date of Initial Evaluation: 11/09/2020
Insurance Name: OSCAR

Date of Original Evaluation: 11/09/2020

Medical Diagnosis: M25.672: Stiffness of left ankle, not elsewhere classified; M25.675: Stiffness of left foot, not elsewhere classified ; M79.672: Pain in left foot; M62.81: Muscle weakness (generalized); R26.2: Difficulty in walking, not elsewhere classified; S92.032S: Displaced avulsion fracture of tuberosity of left calcaneus, sequela
Treatment Diagnosis: M25.672: Stiffness of left ankle, not elsewhere classified; M25.675: Stiffness of left foot, not elsewhere classified ; M79.672: Pain in left foot; M62.81: Muscle weakness (generalized); R26.2: Difficulty in walking, not elsewhere classified; S92.032S: Displaced avulsion fracture of tuberosity of left calcaneus, sequela

Start Time: 12:00pm
End Time: 01:00pm
Place of Service: 11 — Office

## SUBJECTIVE

### Patient Presentation

**Primary Concern:** pain and overall decreased ability to use L foot/ankle
**History of Present Condition:** Pt had a L calcaneus fx surgery 5/8/19 and was in PT from sept'19 through feb'20 until COVID lockdown. Pt was unable to put weight through L foot at all at the eval in Sept'19, but progressed a significant amount prior to lockdown. There were a lot of pain regulation difficulties that had slowed recovery and increase of function. Since lockdown, pt had a severe sprain on L ankle in July and more recently, rolled L ankle again, in a more minor way on uneven ground. Pt reports that this is the worst he has been since last fall/winter due to the sprain. Saw MD recently, who said maybe the hardware needs to be removed and he intends on getting a second opinion.
**Date of Injury/Onset:** 05/08/2019
**Start of Care:** 11/09/2020
**Patient/Caregiver Goals:** reduce pain, gain function

### Past Medical History

#### Previous/Current Conditions

No Known Significant PMH to Affect Treatment

#### Complicating/Personal Factors

**Previous Therapy**
**Complicating Medical Factors:** severe, complicated fracture

#### History of Falls

Has patient fallen at least once and been injured, or has fallen at least twice, in last 12 months?No

### Pain Presentation

**Pain Location(s):** anterior ankle, around ATFL, 2-8/10
**Pain Description:** sharp

### Current Medications

No Known Medications

## OBJECTIVE

### Inspection

EX03-005

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Nelson Soohoo MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Description: Pt has no visible bruising or swellings, scars are well healed, no signs of infection

## Standardized Tests

### Lower Extremity Functional Scale

Description: The Lower Extremity Functional Scale is used to evaluate the impairment of a patient with lower extremity musculoskeletal condition or disorders.
1: Any of your usual work, housework, or school activities. Quite a bit of difficulty. (1)
2: Your usual hobbies, recreational, or sporting activities. Quite a bit of difficulty. (1)
3: Getting into or out of the bath. A little bit of difficulty. (3)
4: Walking between rooms. A little bit of difficulty. (3)
5: Putting on your shoes or socks. A little bit of difficulty. (3)
6: Squatting. Quite a bit of difficulty. (1)
7: Lifting an object, like a bag of groceries from the floor. No difficulty. (4)
8: Performing light activities around your home. A little bit of difficulty. (3)
9: Performing heavy activities around your home. Quite a bit of difficulty. (1)
10: Getting into or out of a car. A little bit of difficulty. (3)
11: Walking 2 blocks. Moderate difficulty. (2)
12: Walking a mile. Extreme difficulty or unable to perform activity. (0)
13: Going up or down 10 stairs (about 1 flight of stairs). Moderate difficulty. (2)
14: Standing for 1 hour. Quite a bit of difficulty. (1)
15: Sitting for 1 hour. No difficulty. (4)
16: Running on even ground. Extreme difficulty or unable to perform activity. (0)
17: Running on uneven ground. Extreme difficulty or unable to perform activity. (0)
18: Making sharp turns while running fast. Extreme difficulty or unable to perform activity. (0)
19: Hopping. Extreme difficulty or unable to perform activity. (0)
20: Rolling over in bed. No difficulty. (4)

Total Score: 36 /80

Additional Comments: initial eval 11/9/20 36/80

### Range of Motion I Ankles

| Bilaterally | Active (Right) | Passive (Right) |
|---|---|---|
| Dorsiflexion at 0° Knee Flexion | 11 | 5 |
| Plantarflexion | 66 | 54 |
| Inversion | 18 | 2 |
| Eversion | 12 | unable |

Additional Comments: Pt has really poor motor control in inversion and eversion on L foot. uncomfortable, no bad pain with L foot motions

### Strength

Description: Not formally tested due to time, but pt has overall gross atrophy due to inactivity from pain in L ankle.

### Neurovascular

Description: Pt has significantly improved sensation throughout foot compared to last PN on Jan '20. although still has areas that are altered.

### Balance

Tandem Stance: R in front: 30 sec, increased pain

EX03-006

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Nelson Soohoo MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

L in front: 14 sec, increase sway
R SLB: 30 sec
L SLB: unable, attempted 3 times

## Gait Assessment

### Observation

**Left Side:** Increased hip hike during swing; Antalgic gait; Circumduction; Lacks proper heel strike/toe-off; occasional calcaneal whip on L, shifts weight to R to clear floor sometimes
**Assessment:** also has L hip external rotation throughout gait cycle
**Additional Comments:** Stairs: up: shifts weight in order to perform at more normal pace and reciprocal
Stairs down: L one at a time and increase pain in DF

## Palpation

**Description:** Pt is very TTP over ATFL and lateral achilles/calcaneus, swelling is much more controlled then previously. tightness throughout L leg/foot

## Additional Comments

Tx:
1) assessment: see eval
2) review HEP
3) STM/MFR L foot/leg

# ASSESSMENT

## Diagnosis

### Medical Diagnoses

1. M25.672: Stiffness of left ankle, not elsewhere classified
2. M25.675: Stiffness of left foot, not elsewhere classified
3. M79.672: Pain in left foot
4. M62.81: Muscle weakness (generalized)
5. R26.2: Difficulty in walking, not elsewhere classified
6. S92.032S: Displaced avulsion fracture of tuberosity of left calcaneus, sequela

### Treating Diagnoses

1. M25.672: Stiffness of left ankle, not elsewhere classified
2. M25.675: Stiffness of left foot, not elsewhere classified
3. M79.672: Pain in left foot
4. M62.81: Muscle weakness (generalized)
5. R26.2: Difficulty in walking, not elsewhere classified
6. S92.032S: Displaced avulsion fracture of tuberosity of left calcaneus, sequela

**Precautions:** no E-stim due to hardware quantity and location per surgeon

## Summary

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Nelson Soohoo MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

**Summary of Findings:** Pt is a 42 y. o male s/p L calcaneal fx 5/8/19 who has had a complicated recovery from a complicated surgery. Pt reports feeling his best since his incident at the beginning of 2020. but due to COVID lockdown had to stop PT and then had a severe L ankle sprain in JUly and a more minor one recently, all of which has caused him to regress. Pt currently has tightness and TTP throughout L ankle/foot/leg, decreased strength, AROM and balance. These impairments are causing pain, gait deviation and decreased function. PT recommended to restore what has been lost and further progress patient towards return to PLOF and min pain levels.

## Problems & Goals

1. **Problem:** tightness and TTP throughout L leg/foot
   **Status:** Active
   Goals
   1. **Type:** Short term
      **Description:** Pt to have reduction of tightness and TTP by 50%
      **Target Timeframe:** Six weeks
   2. **Type:** Long term
      **Description:** Pt to have minimal tightness and min-mod TTP
      **Target Timeframe:** Three months

2. **Problem:** weakenss
   **Status:** Active
   Goals
   1. **Type:** Long term
      **Description:** Pt tot have no less then 4+/5 on B LE MMT
      **Target Timeframe:** Three months
   2. **Type:** Long term
      **Description:** Pt to score no less then 70/80 on LEFS
      **Target Timeframe:** Three months

3. **Problem:** decreased balance
   **Status:** Active
   Goals
   1. **Type:** Long term
      **Description:** Pt to be able to perform SLB on L for 30 sec, min pain
      **Target Timeframe:** Three months

4. **Problem:** gait deviations
   **Status:** Active
   Goals
   1. **Type:** Short term
      **Description:** Pt to be able to ambulate up to .5 mile, min gait deviations and pain
      **Target Timeframe:** Six weeks
   2. **Type:** Long term
      **Description:** Pt to be able to ambulate up to 2 miles, min pain, only minor gait deviations
      **Target Timeframe:** Three months

5. **Problem:** pain
   **Status:** Active
   Goals
   1. **Type:** Short term
      **Description:** Pt to be able to perform ADL's with no more then 3/10 pain
      **Target Timeframe:** Six weeks
   2. **Type:** Long term
      **Description:** Pt to be able to have no more then 3/10 pain majority of the time
      **Target Timeframe:** Three months

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Nelson Soohoo MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

**Rehabilitation Potential:** Good

## Patient/Caregiver Education

**Education Provided:** HEP

## Clinical Complexity

**Overall Rating of Evaluation:** Moderate complexity

## PLAN

### Planned Treatment and Schedule

**Approach:** Begin/continue plan as outlined
**Frequency:** Once per week
**Duration:** 12 weeks
**Patient Education Plan:** Activity modification; Home exercise program; Home and community safety
**Planned Procedures:** Therapeutic Exercise; Manual Therapy Techniques; Neuromuscular Re-education; Gait Training; Self-care/Home Management; Hot/Cold Packs; Ultrasound

### Consent To Treat

**Given:** Yes
**Relationship to Patient:** Self

### Plan of Care Dates

#### Plan of Care Effective Dates

**From:** 11/09/2020
**To:** 02/01/2021

## CHARGE SUMMARY

| CPT® Code | Modifier | Minutes | Units |
|---|---|---|---|
| 97162 - PT Evaluation: Moderate Complexity | | | 1 |
| 97140 - Manual Therapy | 59 | | 2 |
| 97112 - Neuromuscular Re-Education | | | 1 |

Kim Livas, DPT
License #36460
Electronically signed by Kim Livas, DPT on November 23, 2020 at 6:24 am

EX03-009

# Appointment Details (Nicholas)

## Clinical Notes

**Note to patients:** This note is a short description of your symptoms and current health condition. This note will not have all details of your visit and may contain abbreviations. Your care provider's treatment recommendations may be listed.

### Progress Notes

**Nelson F. SooHoo, MD at 12/10/20 1200**

History:

Nicholas Matthews returns for follow-up for persistent pain after ORIF left calcaneus. He notes pain is deep to the sinus tarsi area and is limiting his ability to walk and sleep. He has undergone physical therapy without resolution of the pain.

Review of Systems: There are no changes in the review of systems relevant to today's visit.

Physical Examination:

Patient identifies area deep to the sinus tarsi as location of pain.

Wound well-healed.

Minimal swelling visible.

Tenderness and gait exam deferred on video visit.

Assessment:

Patient s/p calcaneus fracture ORIF with possible subtalar arthritis.

Plan:

Mr. Matthews will followup for physical exam to evaluate subtalar arthritis. We could consider diagnostic and therapeutic injection as well as eventual subtalar fusion.

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

# Appointment Details (Nicholas)

## Clinical Notes

**Note to patients:** This note is a short description of your symptoms and current health condition. This note will not have all details of your visit and may contain abbreviations. Your care provider's treatment recommendations may be listed.

### Progress Notes

**Nelson F. SooHoo, MD at 12/15/20 0830**

History:

Nicholas Matthews returns for follow-up for left foot pain. He underwent an open reduction and internal fixation and reports the pain has been worsening. The pain interferes with his activities of daily living as it limits his ability to walk. He has tried physical therapy but did not find it helped resolve the pain.

Review of Systems: There are no changes in the review of systems relevant to today's visit.

Physical Examination:

TENDERNESS: Tenderness to palpation over left subtalar joint. Pain with forced flexion.

No ankle tenderness.

Assessment:
Left post-traumatic subtalar arthritis after prior ORIF calcaneus.

Plan:

The patient underwent CSI to the left subtalar joint today which he tolerated well with no adverse reaction. This was performed under sterile conditions with 40mg of depomedrol and 3 cc of 1% plain lidocaine with good temporary relief of symptoms.
We discussed a subtalar fusion as operative management. We discussed the nature of surgery along with the risks and post operative process. The patient will contact me if he decides to proceed with surgery.

**Scribe Attestation**
I, Cameron Speyer, was the scribe for patient Nicholas Matthews on 12/15/2020 in the presence of Dr. Nelson F. Soohoo.

**Physician Signature:**
I, Dr. Soohoo, personally performed the services described in this documentation, as scribed by Cameron Speyer in my presence, and it is both accurate and complete.

## Patient Instructions

**Nelson F. SooHoo, MD at 12/15/20 0830**

Please call the office if you experience redness at the injection site, have increased pain or fevers.

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

# MRI SHOULDER LEFT - Details (Nicholas)

## Study Result

### Impression

IMPRESSION:

1. Mild contour irregularities in the labrum as detailed above, most prominent in the anteroinferior chondral labral junction on this study, seen to better advantage on the prior MRI arthrogram compatible with prior tears. Small focus of signal heterogeneity in the anteroinferior glenoid cartilage corresponding to previously seen fissure, also more conspicuous on prior MRI arthrogram.
2. Mild supraspinatus tendinopathy. Mild subscapularis tendinopathy with possible focal mild fraying of the superior deep fibers.
3. Intra-articular long head of the biceps tendinopathy.

I, Varand Ghazikhanian, M.D., have reviewed this radiological study personally and I am in full agreement with the findings of the report presented here.

Dictated by: Bennett Davis, M.D.

Signed by: Varand Ghazikhanian 1/14/2021 3:27 PM

### Narrative

MR SHOULDER WO CONTRAST LEFT

INDICATION: Acquired subluxation.

COMPARISONS: MRI arthrogram of 11/7/2019.

TECHNIQUE: Axial proton-density fat-saturated, coronal T2 fat saturated, sagittal T2 fat saturated, and sagittal T1 MR imaging of the left shoulder was performed without contrast.

FINDINGS:
TENDONS:

Supraspinatus tendon: Intact with mild tendinopathy.

Infraspinatus tendon: Intact with mild tendinopathy of the anterior fibers.

Subscapularis tendon: Intact with tendinopathy superiorly and with possible focal mild deep surface fraying.

Teres minor tendon: Intact.

Long head biceps tendon: Mildly thickened and intermediate in signal consistent with tendinopathy.

MUSCLES: Normal in size and signal intensity. No significant fat infiltration or edema.

LABRUM AND CARTILAGE: Focal intermediate signal in the superior labrum with irregularities at the biceps anchor and posterosuperior labrum better seen on prior MRI. Additional contour irregularity of the anteroinferior glenoid with intermediate chondral
labral junction signal (3:20-21) also better seen on prior MRI arthrogram. Thin focus of signal heterogeneity in the anteroinferior glenoid cartilage (3:18-20) in the region of previously seen deep fissure. Additionally there is focal signal hyperintensity at the posterior capsule labral junction (3:16).

INFERIOR CAPSULE: Not thickened or torn.

ACROMIOCLAVICULAR JOINT: No significant degenerative changes.

SUBACROMIAL-SUBDELTOID BURSA: No bursitis.

ROTATOR INTERVAL: No scar, edema or obliteration of fat.

BONES: No abnormal marrow signals. Possible minimal focal flattening of the posterior lateral superior humeral head.

ADDITIONAL COMMENTS: The skin and superficial soft tissues are normal.

## Images

The following images associated with this result cannot be displayed in myUCLAhealth:
Scan on 12/17/2020 12:00 AM

## Component Results

There is no component information for this result.

## General Information

Ordered by BROURMAN,STEVEN N, MD

Collected on 12/17/2020 12:00 AM

Resulted on 01/14/2021 3:27 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

# Appointment Details (Nicholas)

## Clinical Notes

**Note to patients: This note is a short description of your symptoms and current health condition. This note will not have all details of your visit and may contain abbreviations. Your care provider's treatment recommendations may be listed.**

### Progress Notes

**Hugh A. Gelabert, MD at 03/03/21 1200**

**TODAY 3/03/2021**

**TOS CONSULT**

Referring Physician:
Michael Jablom, MD

PCP
Roseann Chu, MD
General, Family Medicine
310-546-4599

Reason for Consultation: Evaluation of thoracic outlet syndrome.

HPI: This is a very pleasant 43-year-old, right handed man who presents for evaluation of thoracic outlet syndrome.

The presenting symptoms are referable to the left side.
The right side is asymptomatic.
The most prominent symptom is parestehsia in the left arm and hand.

The current symptoms include:
Pain is located in the head, the neck, the shoulder, the arm, the forearm, the hand, and fingers (4,5).
Using a 10-point somatic pain scale, the current pain is scored at 3-9.
Numbness and tingling are located in the head, the neck, the shoulder, the arm, the forearm, hand, and fingers (4,5).

Color changes are not a problem.
Cold sensation are noted in his hand and fingers.

Weakness is noted in the arm, the forearm, the hand, and fingers.
Grip strength is noted to be reduced. He drops things.

Swelling is not a problem.
Headaches are noted on the both side: mostly towards the back.

ONSET:
He informs me that the date of onset is 4/19. He believes it is accident related - he fell. When he fell he injured his left heel and his left shoulder.

He notes that his sx are constant.
Has pain and tingling from left neck to shoulderr then to the hand and fingers.
Has pain in occiput to scapula. Has pain in clavicle, pectoral and axilla.
He developed a tick in his neck.
He has treated with PT and his PT thought he had TOS.

When he fell he fracture his left heel. This has been operated but he is anticipating another operation for his heel.

He has been treating with Dr Petrigliano at Cedars who has diagnosed instability of his left shoulder. His left shoulder dislocates frequently. He has planned possible shoulder surgery.

Work. He is a dentist.

Triggers.
Certain movement, pressure, touch, holding arm up overhead, holding arms out in front, ADLs, driving, typing.

Treatment.
Physical therapy has been tried with little benefit. - was for neck and not for TOS.

The QUICK DASH score today is 65.9

PAST MEDICAL HISTORY:
No history of diabetes, hypertension, or cardiac problems.
No history of fibromyalgia, myositis, lupus, auto-immune disorders, or arthritis.

PAST SURGICAL HISTORY:
Left calcaneous surgery 2019

MEDICATIONS:
Ibuprophin 800mg

ALLERGIES: NKDA

SOCIAL HISTORY: Does not smoke. Does not drink alcohol. He is married and has three children.

FAMILY HISTORY: Family history is negative for TOS or other related conditions.

Review of Systems:
Exceptions noted in HPI or PMH.
A 14 point review of symptoms was completed and reviewed and is appended to his medical record.

REVIEW OF RECORDS

MRI scan of the cervical spine.
MRI scan of the cervical spine has not been done, is pending.

EMG/NCS.
Nerve conduction studies show no conduction delays, no f-wave prolongation.

Anterior Scalene Muscle block (ASMB).
ASMB block has not been done.

PYHSICAL EXAMINATION

VITAL SIGNS:
Afebrile, VS Stable
GENERAL: Patient is well-nourished, well-developed, in no acute distress. HEENT: Without gross lesions ears, nose, mouth and throat.
NECK: Supple, non-tender, no masses.
CHEST: Unlabored respiration. HEART: Regular rate and rhythm.
ABDOMEN: Soft, non-tender, non-distended. EXTREMITIES: Good range of motion; without clubbing, cyanosis or edema. Vascular Examination: Pulses are noted to be full and equal in the radial, bilaterally. Color, temperature, and capillary refill are normal. There are no lesions, ulcers, or gangrene.

NEURO-VASCULAR EXAMINATION OF THE UPPER EXTREMITIES:

Inspection.
Posture:
On inspection it is noted that the posture carries the left shoulder below the right one.

There is no winging of the scapula.

HAND/ARM COLOR/SIZE:
There is no evidence of venous congestion or venous prominence across the shoulders.

Hands:
Inspection of the hands reveals no atrophy or faciculations.
There is no evidence of arterial insufficiency.
Capillary refill, color, temperature, pulses are normal.

SENSORY EXAM.
Sensory examination is performed with light touch for all dermatomes (C-6 through T1), bilaterally.
Exam is essentially normal.

MOTOR EXAM:
Motor function is tested bilaterally:
Specific testing of brachioradialis, biceps, triceps, deltoids, trapezius, and sterno-cleido-mastoids reveals all muscles function well with symmetric strength.

Tests of hand and digits.
The motor function dorsal and palmar interossei is normal.
The hand grip strength is normal, on right and reduced on left.
Tests of opponens function of thumb and fifth finger is normal on right and reduced on left.

Deep tendon reflexes are tested for biceps, triceps, and brachioradialis. The reflexes are normal bilaterally.

TESTS OF NERVE SENSITIVITY.

Erbs Point Palpation: Palpation was performed over the scalene muscles.
Right: Positive.
Left: Positive.

Tinnel testing with percussion over the median nerve at the wrist, the ulnar nerve at the cubital tunnel, and the brachial plexus beneath the scalene muscles is performed.

Scalene:
Right: Normal.
Left: Positive.

Cubital tunnel:
Right: Normal.
Left: Positive.

Carpal tunnel:
Right: Normal.
Left: Positive.

Phalen testing with flexion and extension of the wrist is performed bilaterally.
Right: Normal.
Left: Positive.

Costo-clavicular compression is performed bilaterally.
Right: Normal.
Left: Positive.

Pectoralis / Subclavius palpation
Right: Normal.
Left: Positive.

AER . Abduction external rotation (AER) maneuver with deep breath holding and head turning is performed bilaterally. Pulse assessed
Right: Normal.
Left: Normal.

EAST . The Roos Elevated Arm Stress Test (EAST) is performed by having patient elevate arms and open and close hands repeatedly.
Right: Normal.
Left: Positive.

Upper Extremity Limb Tension Test (UELTT) - arms extended, hands extended, neck tilting
Right: Normal.
Left: Positive.

Wright hyperabduction testing is performed bilaterally.
Right: Normal.
Left: Positive.

Neck Flexion: has tightness and pulling in left neck.

ROM of shoulder: intact on right and restricted on left (about 80% of normal).

IMPRESSION:
He has radiculopathy in his left upper extremity.

The symptoms are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.
The findings from physical examination are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.

He has not tried formal physical therapy for TOS.

He also has instability of his left shoulder which is progressively worsening.

We discussed the diagnosis, evaluation and surgery for TOS. I have provided with written information outlining these issues.

PLAN:
I will ask him to proceed with the PT. for TOS.
He should proceed with left shoulder stabilization with Dr Petrigliano.
He needs a MRI of cervical spine to assess radiculopathy.

If his sx persist after PT will then proceed to obtain left anterior scalene muscle block and possible pec minor block.

We will meet again in office once the testing is completed.

CC

Referring Physician:
Michael Jablom, MD

PCP
Roseann Chu, MD
General, Family Medicine
310-546-4599

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Hugh Gelabert A MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

WESTSIDE WELLNESS & REHABILITATION

# Physical Therapy Progress Note

Visit No: 8
Date of Progress Note: 04/26/2021
Insurance Name: OSCAR

Date of Original Evaluation: 03/15/2021

Medical Diagnosis: G54.0: Brachial plexus disorders; M54.2: Cervicalgia; M54.10: Radiculopathy, site unspecified; R51.9: Headache, unspecified; M25.60: Stiffness of unspecified joint, not elsewhere classified; M62.81: Muscle weakness (generalized)
Treatment Diagnosis: G54.0: Brachial plexus disorders; M54.2: Cervicalgia; M54.10: Radiculopathy, site unspecified; R51.9: Headache, unspecified; M25.60: Stiffness of unspecified joint, not elsewhere classified; M62.81: Muscle weakness (generalized)

Start Time: 10:25am
End Time: 11:20am
Place of Service: 11 — Office

## SUBJECTIVE

### Patient Presentation

**Patient/Caregiver Report:** Pt is not doing well. Overall, PT tends to aggravate symptoms regardless of what combo of tx is used. Also, pt is still not sleeping well at all which is adding to the physical impairments as well as causing mental angst. Pt has cont PT because neck MRI will not be authorized without a valiant attempt at PT first. Since eval, pt has also seen two new orthos, one for his foot and one for his shoulder. The shoulder ortho stressed the need for him to get the neck MRI and that his shoulder repair could get done at any time and is secondary to the other ailments that are of more pressing need to be addressed. MD also made a point in saying he needed to try and strengthen as much as possible, because he has atrophied considerably.
**Primary Concern:** severe pain, N/T in neck and L UE
**History of Present Condition:** Pt had a fall in April'19 in which he shattered his calcaneus and dislocated his L shoulder. At the time, the foot was the priority and he had surgery to repair the foot followed by a long recovery. During that time his shoulder started subluxing and dislocating more and more frequently and he had numbness/pain in the approx. medial half of his L hand. He saw two shoulder surgeons who said to get his foot in a better place before having shoulder surgery and also said his hand symptoms were not due to his dislocations. Then COVID hit and he received no further tx or evaluations of any kind until more recently because the pain/N/T in L UE had become debilitating. Pt has had MRI's, nerve conduction and seen several MD's. Current diagnosis is TOS and MD wants PT for 6 weeks leading up to a neck MRI in mid april.
**Date of Injury/Onset:** 04/25/2019
**Patient/Caregiver Goals:** decrease pain for improvement of QOL, return to denistry

### Pain Presentation

**Pain Location(s):** ***all the following is still true, except the twitch has decreased, but with an increase in medial triceps pain, posterior triangle pain and HA in L eye *****side of neck and entire L UE, area of pain varies day to day, most consistent is around scalene and axillary area 2-10/10 combo of throbbing/achey to sharp/searing
Also has constant N/T throughout UE, also varies, but medial palmar half of hand/fingers is most consistent.
HA are increasing, were not present previously
also reports a " twitch" and constant need to move neck around
**Alleviating Factors:** sometimes position change

### Current Medications

1. **Medication Type:** Over the Counter
   **Name:** Ibprofen
2. **Medication Type:** Prescription
   **Name:** Oxy/Tremadol ( as needed)

## OBJECTIVE

EX03-022

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

## Standardized Tests

### Disabilities of Arm, Shoulder, Hand (DASH)

The DASH is designed to evaluate disorders and measure disability of the upper extremities, and monitor change or function of time.

Please rate your ability to do the following activities.

1. Open a tight or new jar: (5) Unable
2. Write: (1) No difficulty
3. Turn a key: (3) Moderate difficulty
4. Prepare a meal: (3) Moderate difficulty
5. Push open a heavy door: (5) Unable
6. Place an object on a shelf above your head: (4) Severe difficulty
7. Do heavy household chores (e.g. wash walls, wash floors): (5) Unable
8. Garden or do yard work: (4) Severe difficulty
9. Make a bed: (4) Severe difficulty
10. Carry a shopping bag or briefcase: (4) Severe difficulty
11. Carry a heavy object (over 10 lbs): (4) Severe difficulty
12. Change a light bulb overhead: (5) Unable
13. Wash or blow dry your hard: (3) Moderate difficulty
14. Wash your back: (5) Unable
15. Put on a pullover sweater: (3) Moderate difficulty
16. Use a knife to cut food: (3) Moderate difficulty
17. Recreational activities which require little effort (e.g, card playing, knitting, etc.): (4) Severe difficulty
18. Recreational activities in which you take some force or impact through your arm, shoulder or hand (e.g, golf, hammering, tennis, etc.): (5) Unable
19. Recreational activities in which you move your arm freely (e.g. playing frisbee, badminton, etc.): (4) Severe difficulty
20. Manage transportation needs (getting from one place to another): (3) Moderate difficulty
21. Sexual activities: (3) Moderate difficulty
22. During the past week, please rate if your arm, shoulder or hand problem interfered with your normal social activities with family, friends, neighbors or groups: (5) Extremely
23. During the past week, please rate if you were limited in your work or other regular daily activities as a result of your arm, shoulder or hand problem: (4) Very limited
24. Arm, shoulder or hand pain within the last week: (4) Severe
25. Arm, shoulder or hand pain when you performed any specific activity within the last week: (4) Severe
26. Tingling (pins and needles) in your arm, shoulder or hand within the last week: (3) Moderate
27. Weakness in your arm, shoulder or hand within the last week: (5) Extreme
28. Stiffness in your arm, shoulder or hand within the last week: (3) Moderate
29. During the past week, please rate the difficulty you had while sleeping due to the pain in your arm, shoulder or hand: (5) So much difficulty that I can't sleep
30. I feel less capable, less confident or less useful because of my arm, shoulder or hand problem: (4) Agree

Total Score: 73

Additional Comments: Pt scored the same on eval, certain individual questions changed slightly better or worse

### Neck Disability Index

Description: The Neck Disability Index is used to determine how neck pain affects a patient's daily life, and to assess the self-rated disability of patients with neck pain.

Section 1: Pain Intensity: The pain is moderate at the moment. (2)
Section 6: Reading: I can hardly read at all because of severe neck pain. (4)
Section 2: Personal Care (Washing, Dressing, etc.): It is painful to look after myself, and I am slow and careful. (2)
Section 7: Work: I can't do any work at all. (5)
Section 3: Lifting: I can lift only very light weights. (4)
Section 8: Sleeping: My sleep is completely disturbed (5-7 hr sleep loss). (5)
Section 4: Headaches: I have severe headaches, which come infrequently. (4)

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Hugh Gelabert A MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

Section 9: Concentration: I have a lot of difficulty concentrating when I want. (3)
Section 5: Recreation: I can hardly do any recreational activities because of neck pain. (4)
Section 10: Driving: I can't drive my car as long as I want because of moderate pain. (3)
Total Score: 36
Disability Level: Above 34 out of 50: Complete disability
Additional Comments: Pt had 31/50 on neck index on eval
Outcomes Disability/Symptom Score 31/50

## Observation

Description: **still exists, but appears better at times, also pt has improved posture. additional observation is pt holds L fingers in flexion at all times now***Pt demonstrates extreme fatigue physically and mentally from lack of sleep secondary to pain.

## Range of Motion I Cervical Spine

All AROM findings are: within normal limits (WNL)
Additional Comments: ***L SB is horrible now, increase medial elbow and pinky finger nerve pain***Neck AROM is WNL, but had increased pain with extension, R SB and R rot

## Range of Motion I Shoulders

All AROM findings are: within functional limits (WFL)
Additional Comments: WFL, however has lost some ROM in R shoulder

## Range of Motion I Wrists

Additional Comments: Pt has decreased AROM in L wrist in flexion >>extension, pronation>>supination

## Strength

Description: *not formally tested due to ease of sublux on L shoulder and pain levels. Pt has atrophied due to inactivity from pain levels.
*wrist flex/ext on R is 5/5 on L ext: 3+/5 and flex 4-/5
* triceps R : 5/5, L 4-/5
* grip R is significantly stronger then L in both large and small grip
* on L pt can perform opposition to digits 2 and 3 with no difficulty, however digit 4 and 5 are very difficult

## Neurovascular

Description: ** all still exists, now also feels sensation change in L mandible and has increased consistent pain in posterior neck triangle. Pt demonstrates a spectrum of outcomes and intermittent difficulties with ulnar>>median and radial nerve testing.*****Pt has pain and N/T throughout L neck/UE, varied in presentation, worst and most consistent L UE symptom is medial palmar hand/fingers. Pt also has HA. Pt denies dizziness, tinnitus, diplopia, dysphagia, dysphasia. Pt has normal reflexes and sensation is altered( per pt's subjective statement) randomly, but he could feel everything during testing.

## Palpation

Description: ***all still exists, however tightness throughout neck had improved enough to access accessory motion in C/S a couple visits ago. was completely stuck in L C/S facets, able to get motion and pt felt good in neck at the time, however, it triggered increased symptoms down arm and into head that varied for the next approx. 48 hours before sort of going back to his normal fluctuations of symptoms. have not touched neck since that visit due to flare up **** Pt has extreme tightness throughout neck musculature from guarding and postural changes. Unable to access accessory motion in C/S due to muscles in spasm, will assume hypombile. 1st rib is hypomobile as well as T/S and ribs.
Scalenes and pec are most TTP and trigger arm symptoms along with L costotransverse joints

## Additional Comments

Tx:
1) STM/MFR per flowsheet

EX03-024

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Hugh Gelabert A MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

2) NM re Ed per flowsheet

## ASSESSMENT

### Diagnosis

#### Medical Diagnoses

1. G54.0: Brachial plexus disorders
2. M54.2: Cervicalgia
3. M54.10: Radiculopathy, site unspecified
4. R51.9: Headache, unspecified
5. M25.60: Stiffness of unspecified joint, not elsewhere classified
6. M62.81: Muscle weakness (generalized)

#### Treating Diagnoses

1. G54.0: Brachial plexus disorders
2. M54.2: Cervicalgia
3. M54.10: Radiculopathy, site unspecified
4. R51.9: Headache, unspecified
5. M25.60: Stiffness of unspecified joint, not elsewhere classified
6. M62.81: Muscle weakness (generalized)

### Summary

**Summary of Findings:** Pt is a 43 y.o male with significant neck and L UE symptoms secondary to a fall in April of 2019. Since starting PT in mid march, pt has had very little improvement in any of his symptoms and in some respects has more awareness of various pain and sensation changes that vary in intensity and pattern almost daily. Pt has been able to improve his posture and have decreased tightness in neck musculature, however this has not offered any relief of symptoms or allowed for more sleep. Pt has significant nerve pain throughout L UE, (with some sensation alterations), with posterior neck triangle and medial arm through forearm and medial hand being the worst and most consistent. Pt has decreased AROM in neck and throughout L UE, significant decreased strength, postural changes in L fingers and neck/upper back, hypomobility and tight and tender musculature. These impairments are causing severe pain, decreased function and a significant decrease in sleep. Pt requires further imaging/testing to pinpoint the probable multiple sources of debilitation that he is experiencing. PT is attempting to prevent further loss of function in the meantime, as pt can not tol manual work and it has proven to not improve symptoms, but in fact irritate them. At this time pt does not have the muscle control, strength or dexterity to perform his skill set as a dentist , let alone do it safely.
**Response to Exercise/Training:** fair
**Recommendations:** MRI for neck

### Problems & Goals

1. Problem: postural dysfunction
   Status: Active
   Goals
   1. Type: Short term

EX03-025

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

**Description:** Pt to demonstrate improved head position
**Target Timeframe:** Four weeks
**Status:** 81-85%

2. **Type:** Long term
   **Description:** Pt to demonstrate improved postural endruance
   **Status:** 56-60%

2. **Problem:** pain
   **Status:** Active
   Goals
   1. **Type:** Short term
      **Description:** Pt to report decreased incidence of higher pain levels
      **Target Timeframe:** Six weeks
      **Status:** 26-30%
   2. **Type:** Short term
      **Description:** Pt to report no more then 2 hours of disturbance a night in sleep due to pain
      **Target Timeframe:** Six weeks
      **Status:** 0%
   3. **Type:** Long term
      **Description:** Pt to no longer report that sleep is disrupted on a weekly basis.
      **Target Timeframe:** Three months
      **Status:** 0%
   4. **Type:** Long term
      **Description:** Pt to no longer report more then 4/10 in pain at all times, decreased N/T
      **Target Timeframe:** Three months
      **Progress:** has some moments, if doing nothing that the medial hand N/T is better
      **Status:** 11-15%

3. **Problem:** weakness
   **Status:** Active
   Goals
   1. **Type:** Long term
      **Description:** Pt to score no less then 4/5 on B UE and core MMT
      **Target Timeframe:** Three months
      **Status:** 0%
   2. **Type:** Long term
      **Description:** Pt to score no greater then 20% disability on DASH
      **Target Timeframe:** Three months
      **Status:** 0%

4.

**Rehabilitation Potential:** Good
**Additional Comments:** several unknowns still and pt requires L shoulder surgery as well

## Patient/Caregiver Education

**Education Provided:** postural education, bed mobility, heat, pain and sleep meds( speak to MD about)

## Clinical Complexity

**Overall Rating of Evaluation:** High complexity

# PLAN

## Planned Treatment and Schedule

Patient Name: Nicholas Matthews
Date of Birth: 02/22/1978
Referring Physician: Hugh Gelabert A MD

Westside Wellness & Rehabilitation
1448 15th Street
Suite 101
Santa Monica CA 90404-2756
Tel: (310) 393-1703 Fax: (310) 943-0462

Westside Wellness & Rehabilitation

**Approach:** Progressing patient next visit
**Frequency:** Twice per week
**Duration:** 12 weeks
**Planned Procedures:** Therapeutic Exercise; Manual Therapy Techniques; Neuromuscular Re-education; Self-care/Home Management; Hot/Cold Packs; Electrical Stimulation (Unattended); Ultrasound

## Plan of Care Dates

Plan of Care Effective Dates
**From:** 04/26/2021
**To:** 07/19/2021

## CHARGE SUMMARY

| CPT® Code | Modifier | Minutes | Units |
|---|---|---|---|
| 97140 - Manual Therapy | | | 3 |
| 97112 - Neuromuscular Re-Education | | | 1 |

Kim Livas, DPT
License #36460
Electronically signed by Kim Livas, DPT on May 12, 2021 at 7:02 am

EX03-027

# Appointment Details (Nicholas)

## Clinical Notes

**Note to patients:** This note is a short description of your symptoms and current health condition. This note will not have all details of your visit and may contain abbreviations. Your care provider's treatment recommendations may be listed.

### Progress Notes

**Hugh A. Gelabert, MD at 05/19/21 1430**

**TODAY 5/19/21**

**TOS FOLLOW UP NOTE**

Presenting 3/03/210
HPI: This is a very pleasant 43-year-old, right handed man who presents for evaluation of thoracic outlet syndrome.

The presenting symptoms are referable to the left side.
The right side is asymptomatic.
The most prominent symptom is parestehsia in the left arm and hand.

The current symptoms include:
Pain is located in the head, the neck, the shoulder, the arm, the forearm, the hand, and fingers (4,5).
Using a 10-point somatic pain scale, the current pain is scored at 3-9.
Numbness and tingling are located in the head, the neck, the shoulder, the arm, the forearm, hand, and fingers (4,5).

Color changes are not a problem.
Cold sensation are noted in his hand and fingers.

Weakness is noted in the arm, the forearm, the hand, and fingers.
Grip strength is noted to be reduced. He drops things.

Swelling is not a problem.
Headaches are noted on the both side: mostly towards the back.

ONSET:
He informs me that the date of onset is 4/19. He believes it is accident related - he fell. When he fell he injured his left heel and his left shoulder.

He notes that his sx are constant.

Has pain and tingling from left neck to shoulder then to the hand and fingers.
Has pain in occiput to scapula. Has pain in clavicle, pectoral and axilla.
He developed a tick in his neck.
He has treated with PT and his PT thought he had TOS.

When he fell he fracture his left heel. This has been operated but he is anticipating another operation for his heel.

He has been treating with Dr Petrigliano at Cedars who has diagnosed instability of his left shoulder. His left shoulder dislocates frequently. He has planned possible shoulder surgery.

Work. He is a dentist.

PAST SURGICAL HISTORY: Left calcaneous surgery 2019
MEDICATIONS: Ibuprophin 800mg
ALLERGIES: NKDA

IMPRESSION:
He has radiculopathy in his left upper extremity.

The symptoms are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.
The findings from physical examination are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.

He has not tried formal physical therapy for TOS.

He also has instability of his left shoulder which is progressively worsening.

PLAN: 3/3/21
I will ask him to proceed with the PT. for TOS.
He should proceed with left shoulder stabilization with Dr Petrigliano.
He needs a MRI of cervical spine to assess radiculopathy.

If his sx persist after PT will then proceed to obtain left anterior scalene muscle block and possible pec minor block.

**TODAY 5/19/21 VIDOE VISIT**

Dr. Matthews returns for follow up of his trial of PT.
The therapy did not help. He developed pain in his left eye and visual changes as well. He had a shadow over his left eye.
He notes pain in his axilla to his elbow.

Has had shock crampy pain in left scapula which has been intermitted.
Has not had MRI or new EMG

QUICK DASH score today is NA (5/19/21)
The QUICK DASH score today is 65.9 (3/3/21, consultation)

PYHSICAL EXAMINATION 3/3/21
TESTS OF NERVE SENSITIVITY.

Erbs Point Palpation: Palpation was performed over the scalene muscles.
Right: Positive.
Left: Positive.

Tinnel testing with percussion over the median nerve at the wrist, the ulnar nerve at the cubital tunnel, and the brachial plexus beneath the scalene muscles is performed.

Scalene:
Right: Normal.
Left: Positive.

Cubital tunnel:
Right: Normal.
Left: Positive.

Carpal tunnel:
Right: Normal.
Left: Positive.

Phalen testing with flexion and extension of the wrist is performed bilaterally.
Right: Normal.
Left: Positive.

Costo-clavicular compression is performed bilaterally.
Right: Normal.
Left: Positive.

Pectoralis / Subclavius palpation
Right: Normal.
Left: Positive.

AER . Abduction external rotation (AER) maneuver with deep breath holding and head turning is performed bilaterally. Pulse assessed
Right: Normal.
Left: Normal.

EAST . The Roos Elevated Arm Stress Test (EAST) is performed by

having patient elevate arms and open and close hands repeatedly.
Right: Normal.
Left: Positive.

Upper Extremity Limb Tension Test (UELTT) - arms extended, hands extended, neck tilting
Right: Normal.
Left: Positive.

Wright hyperabduction testing is performed bilaterally.
Right: Normal.
Left: Positive.

IMPRESSION: 5/19/21
He has radiculopathy in his left upper extremity.

The symptoms are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.
The findings from physical examination are consistent with thoracic outlet syndrome and pectoralis minor syndrome in left upper extremity.

He has not tried and failed formal physical therapy for TOS.

He also has instability of his left shoulder which is progressively worsening.

PLAN: 5/19/21
Will proceed to obtain left anterior scalene muscle block and left pec minor block.

I have asked him to see his Ophthalmologist to evaluate his visual changes.

Will meet again after his testing.

CC
Referring Physician:
Michael Jablom, MD

PCP
Roseann Chu, MD
General, Family Medicine
310-546-4599

Referring Physician:
Michael Jablom, MD

PCP
Roseann Chu, MD
General, Family Medicine
310-546-4599

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

# EXHIBIT 4

**From:** Kim Sparrow
**To:** Nick Matthews
**Subject:** Claim No. 00WA0352
**Date:** Monday, September 19, 2022 4:01:08 PM

Dr. Matthews,

I am acknowledging receipt of Mr. Jonathan Nguyen's letter to me dated September 19, 2022. I received the letter by email at 2:51 this afternoon. As you are aware, The Standard will do what it reasonably can to accommodate the wishes of an insured with regard to an IME or FCE, and we attempted to accommodate your wishes in this case. Accordingly, we reached out to our vendor to see if accommodations could be made to allow a witness to attend the examination and to determine if the FCE provider would allow any recording of the exam. We confirmed that a witness would be allowed to attend but no recording of the exam would be allowed. (Including both video and audio recordings.) The FCE is still scheduled for 12:30 to 4:30 tomorrow afternoon. Again, while the examiner will allow a witness to attend they will not allow any recording of the exam and we have been told that any attempt to record the FCE will result in the exam being immediately terminated. If the FCE is terminated due to an attempt to record it, The Standard will consider that to be a lack of cooperation under the policy.

The Standard needs to respond to assertions made in Mr. Nguyen's letter. First of all, there was never any plan or expectation for the FCE to be conducted in a common area. Any inference that the exam would be conducted in a common area is absurd. Second, The Standard has never prohibited Dr. Christine Matthews from attending the FCE. We did not previously realize Dr. Christine Matthews expected both to attend the exam as a witness and to record the exam, but once The Standard was made aware of these requests we worked with our FCE provider to see if those wishes could be accommodated. As you are aware, we have been able to arrange for Dr. Christine Matthews attendance at the FCE as a witness but the FCE examiner will not allow a recording.

Finally, we object to your characterization that The Standard has bullied you in any way. We have set up an FCE to assist in the evaluation of your claim, and we have attempted to accommodate your requests for a witness to be present and record the exam. As you know, we have obtained the examiner's consent to having a witness attend but no recording will be allowed. We firming believe we have acted responsibly with regard to the scheduling and conditions of the FCE. Your failure to attend tomorrow's FCE, or any termination of the FCE due to an attempt to record it would represent your unreasonable failure to cooperate under the policy. I can assure you The Standard is aware of the implied duty of good faith and fair dealing in every contract in California, including insurance policies. We would point out that this duty applies both to the insurance company and the insured.

Respectfully,
*Kim Sparrow*
**Kim Sparrow| Sr. Disability Claim Specialist**
The Standard
Standard Insurance Company
900 SW Fifth Avenue | Portland, OR 97204

Phone 800.628.9797 EXT 4489 | Fax 971.321.5609
kim.sparrow@standard.com | www.standard.com

# EXHIBIT 5

# GILBERT & NGUYEN

ATTORNEYS AT LAW

WRITER'S EMAIL:
JON@GNLAW.ORG

222 N. PACIFIC COAST HIGHWAY
SUITE 2000
EL SEGUNDO, CA 90245

MAIN: (310) 552-9001
DIRECT: (310) 740-1121


September 19, 2022

The Standard
Kim Sparrow, Sr. Disability Claim Specialist
900 SW Fifth Avenue
Portland, OR 97204

| | | | |
|---|---|---|---|
| RE: | Our Client / Insured | : | Nicholas Matthews |
| | Policy No. | : | 00CC338770 |

Dear Ms. Sparrow:

Please be advised that this office represents Dr. Nicholas Matthews regarding the above referenced matter.

It is our understanding that on January 26, 2021, the Standard wrongfully discontinued Dr. Matthews' disability benefit. Said decision was overturned by your Administrative Review Unit on or about January 12, 2022.

Dr. Matthews acknowledges that the Standard has the right to request periodic medical records and/or medical examinations, to be performed by licensed professionals of its choice. Dr. Matthews has always cooperated with the Standard fully by providing all required documentation pertaining to this claim. In fact, Dr. Matthews' medical records reveal that his medical condition has gotten worse. However, we are not aware of any outstanding request for medical records. Therefore, medical record is not at issue.

As for the requested medical examination, there are three (3) issues.

First, Dr. Matthews strenuously objected to the scheduled examination where he will be humiliated by discussing his medical condition in a common area as scheduled. This is a blatant violation of Dr. Matthews' privacy right. We thank you for making the adjustment and your confirmation that the examination will be conducted in a private room.

Second, you prohibited Dr. Matthews' wife, Dr. Christine Matthews to attend the examination as an observer, but provided absolutely no justification for said prohibition. Nevertheless, you changed your mind and have confirmed that Dr.

Christine Matthews is allowed to attend the examination as observer. We also thank you for that.

Third, in order to preserve the integrity of the medical examination, and/or in anticipation of litigation, an observer designated by Claimant and his counsel, and the documentation of such via audio recording is always permitted, as a matter of law. Therefore, we are placing you on notice that Dr. Nicholas Matthews is ready, willing and able to attend the FCE as scheduled for tomorrow (September 20, 2022) as scheduled. Dr. Christine Matthews is hereby designated as an observer of this defense medical examination, and she is instructed to document this proceeding via audio recording for our office.

In California, there is an implied duty of good faith and fair dealing in every contract. Given the past wrongful termination of policy benefit, Dr. Matthews wishes to protect himself by documenting this defense medical exam and he has placed you on notice of same for at least a month now. If this particular examiner does not wish the examination to be documented for fairness and honesty reasons, then perhaps, the Standard should find one who does. Again, this is not a novelty. Defense medical examinations are being observed by an observer, and documented with audio recording are routinely permitted, as a matter of law. The examiner is qualified to perform functional capacity tests, to which Dr. Matthews will comply. The examiner is not qualified to adjudicate what is a compliance with the policy provisions. Hence, we must respectfully disagree with your determination that Dr. Matthews failed to "cooperate with the person conducting the examination" just because he intends to preserve the integrity and honesty of the examination for the protection of both – himself and the Standard.

We will not allowed our client to be bullied. As previously requested on several occasions, if you have the legal authorities and/or policy provision, in which Dr. Matthews is prohibited from protecting his privacy and the integrity of the examination, please so provide for our consideration. Otherwise, Dr. Matthews will present himself for the FCE as scheduled, with Dr. Christine Matthews as an observer designed by my office, and Dr. Christine Matthews shall document the examination by audio recording for our office.

If you have any questions, please do not hesitate to call or write.

Kindest Regards,

GILBERT & NGUYEN

Jonathan T. Nguyen
Attorney At Law

# EXHIBIT 6

**From:** Kim Sparrow
**To:** Nick Matthews
**Subject:** Re: FCE
**Date:** Monday, September 19, 2022 12:44:20 PM

Dr. Matthews,

I received confirmation that audio recording is not allowed either. The PT will terminate the exam if any type of recording is attempted and we will consider termination of the exam failure to cooperate with the person conducting the examination.

Thank you,

*Kim Sparrow*

**Kim Sparrow| Sr. Disability Claim Specialist**
The Standard
Standard Insurance Company
900 SW Fifth Avenue | Portland, OR 97204
Phone 800.628.9797 EXT 4489 | Fax 971.321.5609
kim.sparrow@standard.com | www.standard.com

---

**From:** Nick Matthews <nmatthews@gmail.com>
**Sent:** Monday, September 19, 2022 9:23 AM
**To:** Kim Sparrow <Kim.Sparrow@standard.com>
**Subject:** [External] Re: FCE

** This email originated from an external source. If you do not know the sender, please do not reply to the email, click on embedded links or open attachments **

Dear Ms. Sparrow:

First and foremost, as stated in my email dated September 14, 2022, the FCE will be documented via AUDIO taping, not video.

Second, I assure you that I'm ready, willing and able to attend the FCE as scheduled on September 20, 2022. I expect the Standard not to impose illegal restrictions, whether or not through its Agent (FCE examiner). To be clear, I will attend the FCE. My wife will accommodate me as an observer, and she will assist me documenting the defense medical examination, via audio recording (not video).

Thank you,

Nicholas Matthews

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

On Sep 16, 2022, at 1:25 PM, Kim Sparrow <Kim.Sparrow@standard.com> wrote:

Dr. Matthews,

I am responding to address the issues raised in your email. First of all, The Standard works with third party providers to conduct FCEs as part of the claim administration process. While The Standard does not ultimately control the conditions of such an FCE, such as the possibility of having an exam videotaped, we expect and insist that any third party provider conducting an examination follow all regulatory and legal requirements for such an exam. I am certain no FCE would be conducted in a common area or done in a manner that conflicts with your right to privacy.

As for your request that the exam be videotaped and that your wife be allowed to witness the exam, allowing a videotape of an exam or a third party witness are issues ultimately up to the discretion of the third party provider. I know from experience that some providers do not allow third parties to attend an exam and many (if not most) providers do not allow videotaping. We did work with our vendor who sets up these exams to see if we could identify an FCE provider who is willing to have the exam videotaped, without success. We did, however, confirm that your wife will be able to attend the exam without videotape. As we were unable to identify an FCE provider who will permit the exam to be videotaped, we still expect you to attend the scheduled examination. Your policy does provide that The Standard may have you examined, and it provides that benefits may be deferred or suspended if you fail to attend an examination or fail to cooperate with the person conducting the examination.

Respectfully,

*Kim Sparrow*

**Kim Sparrow| Sr. Disability Claim Specialist**
The Standard
Standard Insurance Company
900 SW Fifth Avenue | Portland, OR 97204
Phone 800.628.9797 EXT 4489 | Fax 971.321.5609

kim.sparrow@standard.com | www.standard.com

**From:** Nick Matthews <nmatthews@gmail.com>
**Sent:** Wednesday, September 14, 2022 10:00 PM
**To:** Kim Sparrow <Kim.Sparrow@standard.com>
**Subject:** [External] Re: FCE

** This email originated from an external source. If you do not know the sender, please do not reply to the email, click on embedded links or open attachments **

Ms Sparrow,

Thank you for your letter. I do have a few questions hopefully you can clarify.

You stated that "the examining facility was unable to staff your FCE as scheduled because they do not allow anyone to attend with you and videotape due to HIPAA and the violation to other patients that are being treated." Based on the above statement I assume that my FCE will be performed in a common area, and in the presence of other patients. Please note that I was under the impression that a private room or facility would be provided to accommodate this 4-hour examination, during which the examiner will undoubtedly discuss my medical condition in details. The presence of other patients in the same room, during this 4-hour examination is in itself a violation of my HIPPA and privacy rights. Additionally, I have no intention of taping any other patients. **My sole purpose of documenting this defense medical exam is to maintain the integrity of the FCE**.

You further stated that "we (The Standard Ins Co) expect that you will attend alone and there will be no video recording of the examination." Would you please direct me to that provision in my Policy that prohibits my wife who will assist me documenting this defense medical exam?

In short, I am ready, willing and able to attend the 4-hour FCE on September 20, 2022 as required by The Standard. However, I expect the Standard to respect my HIPPA and privacy rights by providing the proper accommodation (no common area or in the presence of other people). And for the purpose of maintaining the integrity of the defense medical exam, my wife is my observer, who will assist me documenting it by audio recording. Again, please provide me with the

Policy's provision, if any, that would prohibit my wife from audio documenting the examination.

Thank you,

Nicholas Matthews

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

On Aug 31, 2022, at 1:08 PM, Kim Sparrow <Kim.Sparrow@standard.com> wrote:

Dr. Matthews,

I have confirmed with ECN that the examining facility was unable to staff your FCE as scheduled because they do not allow anyone to attend with you and videotape due to HIPAA and the violation to other patients that are being treated. We concur with this and consider your statement of videotaping the FCE as a condition precedent to the exam. We are actively working with ECN to reschedule your visit with the original facility at their earliest opening in their schedule. We do expect you to attend the FCE as required by the following provision of your policy. Further, we expect that you will attend alone and there will be no video recording of the examination.

***MEDICAL EXAM –*** *We can have Physicians or specialists examine You, at Our expense, as often as reasonably necessary while You claim to be Disabled. Any such examination will be conducted by one or more Physicians or specialists We choose.*

*We may defer or suspend payment of benefits if: (1) You fail to attend an*

*examination; or (2) You fail to cooperate with the person conducting the examination. Benefits may be resumed, provided that the required examination occurs within a reasonable time and benefits are otherwise payable.*

Respectfully,

Kim Sparrow

**Kim Sparrow| Sr. Disability Claim Specialist**
The Standard
Standard Insurance Company
900 SW Fifth Avenue | Portland, OR 97204
Phone 800.628.9797 EXT 4489 | Fax 971.321.5609
kim.sparrow@standard.com | www.standard.com

**From:** Kim Sparrow
**Sent:** Friday, August 26, 2022 11:55 AM
**To:** Nick Matthews <nmatthews@gmail.com>
**Subject:** RE: [External] FCE Confirmed update

Dr. Matthews,

Thank you for this information. We are following-up with the vendor and you will be contacted shortly for rescheduling.

Kim Sparrow

**Kim Sparrow| Sr. Disability Claim Specialist**
The Standard
Standard Insurance Company
900 SW Fifth Avenue | Portland, OR 97204
Phone 800.628.9797 EXT 4489 | Fax 971.321.5609
kim.sparrow@standard.com | www.standard.com

**From:** Nick Matthews <nmatthews@gmail.com>
**Sent:** Friday, August 26, 2022 10:13 AM
**To:** Kim Sparrow <Kim.Sparrow@standard.com>
**Subject:** [External] FCE Confirmed update

** This email originated from an external source. If you do not know the sender, please do not reply to the email, click on embedded links or open attachments **

Ms Sparrow,

Good morning. I just wanted to updated you that ECN called this morning to cancel the FCE—as I was walking out the door to attend. They did not offer/give rescheduled date for FCE. The only reason I was given for the cancellation was that they "could not staff the event."

Furthermore, I did ask if I needed to do anything at this point to obtain an appointment. I was instructed to just wait for a call back or instruction from your company.

Thank you,

Nicholas Matthews

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

Begin forwarded message:

> **From:** nmatthews@gmail.com
> **Date:** August 24, 2022 at 4:27:51 PM PDT
> **To:** Kim Sparrow <Kim.Sparrow@standard.com>
> **Subject: FCE Confirmed**
>
> Hello Ms Sparrow,
>
> The FCE is confirmed for 8/26/2022 @ 9 am with Samantha at 879 W 190th street suite 400 Gardena.
>
> My wife will be accompanying me and please note our intent to document the FCE via video taping on her phone.
>
> Thank you,
> Nicholas Matthews

# EXHIBIT 7

ECN

Corporate Office
[illegible]

A division of [illegible] Services, LLC



September 16, 2022

Carissa L Beyer, PT

Re:

| | |
|---|---|
| Claimant: | Nicholas Matthews |
| Claim No.: | 00WA0352 |
| ECN No.: | 165512-4 |
| Case Type: | Long Term Disability, Any Occupation |
| Client: | The Standard Insurance Co. |
| Due Date: | 9/27/2022 |

**Case Summary:** Nicholas Matthews is a 44-year-old Dentist who ceased work on 4/26/2019 due to Left Calcaneal Fracture. Later diagnoses given of posttraumatic left subtalar arthritis, left shoulder pan labral tear and thoracic outlet syndrome.

Dear Ms. Beyer:

Thank you for agreeing to conduct an Independent Functional Capacities Evaluation (FCE), with validity testing, of Nicholas Matthews on **Tuesday, September 20, 2022 from 12:30 PM to 4:30 PM at the following location:**

**879 W. 190th Street, Suite 400**
**Gardena, CA 90248**

Please see the attached addendum with client-specific guidelines and report requirements.

**Numerical Q&A format, including the questions verbatim, is required.**

**Please test the claimant with heart rate and blood pressure monitoring throughout the evaluation, and based on your findings, prepare a detailed report addressing the following:**

We are requesting an Independent Functional Capacities Evaluation to determine the claimant's functional capacities and limitations, if any. Please test ability to perform ANY OCC – describe the claimant's ability for an 8 hour workday on a full-time basis to sit, stand, walk, lift, push, pull, carry, reach, handle, finger, and perform fine motor control, with stamina and validity testing. Monitor blood pressure and pulse during the testing to assess endurance and effort, as appropriate.

**Issues to Address:**

1. Please refer to Dr. Marvin Pietruska's 5/3/2022 review and his listed limitations in Question 1b. The claimant is right-handed and performs the duties of a Dentist. With the limitations noted, please determine whether the claimant can successfully manipulate dental tools and perform required oral examinations and procedures with the combination of both upper extremities.

2. In order to investigate other possible diagnoses, please focus on the claimant's ability to reach below, at and above shoulder level.

3. Please determine the claimant's upper extremity functionality including duration an activity can be performed at one time as well total length of time an activity can be performed in an 8-hour day.

4. Please use validity testing in your exam.

5. Please ask about the claimant's daily living activities and what a typical day looks like. (i.e. What does a day in the life of the claimant look like in regards to: bathing, dressing, housework, shopping, meal preparation, etc.).

6. Please perform a musculoskeletal screen.

7. Please ask the claimant for a list of all of their current medications.

8. Please ask if the claimant drove to the evaluation and make a note in the report.

We would appreciate submission of your report within 3 business days from the date of the FCE. To assist with timeliness, please forward a copy of your completed report and invoice to BocaReports@genexservices.com, or fax to 561-392-5881, prior to mailing.

Please note that during the QA process, certain administrative edits may be made to your Word document. Common edits made during the QA process are as follows:

- Changing date of report to reflect date report is delivered to the Client
- Removal of any instructions/guidelines embedded in a report template
- Correcting typos (misspellings, dates, names, gender, grammar, etc)
- Correcting formatting (spacing, bolding of questions, addition of page #s, moving information from one section to a different more appropriate section, etc)
- Removal of non-relevant records or demographic information (job description, prior reviews, client case notes where appropriate, etc)
- Replacing terms with client preferred language (impaired>disabled, claimant/customer>patient, etc)
- Simplifying DOL frequencies for Sit, Stand, Walk to match Client requirements (i.e., removal of episodic time and total time when only Frequency is requested)
- Corrections to signature line (missing digital signature, state of licensure, license number)
- Reformatting of Addendums/Clarifications per client protocols

***No changes made will alter your provided opinions. All inquiries will be returned to you during the corrections phase of QA. The final version of your report will be housed in our system of record and available to you upon request. If you do not authorize these edits, please contact us prior to submission of your report.***

# EXHIBIT 8

TheStandard®

April 9, 2024

NICHOLAS MATTHEWS
1514 CURTIS AVENUE
MANHATTAN BEACH, CA 90266

RE: Disability Income Policy: 00CC338770
Claim Number:00WA0352

Dear Dr. Matthews,

We are writing in regard to your Individual Disability Income (IDI) claim with Standard Insurance Company (The Standard). We have recently completed an updated review of your claim to determine if you continue to meet your policy's definition of Disability and other provisions. Based on the available information, reviewed in the context of your claim file as a whole, we find you no longer meet the definition of Disability and your claim has been closed with our payment through the date of this letter. A summary of our findings and an explanation of the basis of our determination is below.

In order to remain entitled to benefits, you must satisfy all the requisite provisions of your policy. This includes, but is not limited to, the definition of Disability. As you have reported not working in your Regular Occupation as a Dentist in any capacity, we have been reviewing and administering benefits under the definition of Total Disability. Your policy defines Total Disability as:

***TOTAL DISABILITY/TOTALLY DISABLED*** *– Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial And Material Acts of Your Regular Occupation in the usual and customary way.*

Regular Occupation and Substantial And Material Acts are defined as:

***REGULAR OCCUPATION*** *– Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the specific job You are performing when the Disability begins. If you have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation.*

***SUBSTANTIAL AND MATERIAL ACTS*** *– This means those acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified.*

**Vocational Review:**

At the time you became Disabled your file was reviewed by our Vocational Case Manager and it was determined your Regular Occupation was Dentist, under the U.S. Department of Labor *Dictionary of Occupational Titles*, Fourth Edition, revised 1991. The occupation of Dentist is considered a light level occupation which is described as:

> Light Work – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

Specific to your claimed limitations and restrictions we focused on the following physical demands associated with the occupation of Dentist:

| | | |
|---|---|---|
| Reaching | - | Constant |
| Handling | - | Constant |
| Fingering | - | Constant |
| Sitting | - | Frequent |
| Standing | - | Occasional |
| Walking | - | Occasional |

Reaching is generally performed at patient level, though may occur up to shoulder level when completing certain procedures. Above-shoulder reaching would not be expected except for intermittently to adjust an overhead light.

Use of Foot Controls:

According to an article entitled *The Ergonomics of Dental Foot Controllers* from the xo-care.com website, foot controllers are used almost constantly during clinical procedures. This article also referenced a study which looked at four different types of foot controls and the resulting spinal position and foot pressure impacts of each. The foot controls include the following: universal pedal controller, the combined sliding pedal controller, and the XO CARE sliding rotation pedal controller.

The results of this study found the following:

- During the use of the *universal pedal controller,* the foot undergoes a bend (flexion) followed by a stretch (extension).
- To actuate the *combined sliding pedal controller,* the foot must operate in a combined vertical and horizontal motion. During this motion, the foot is bent and applies pressure onto the pedal.

- Operation of the *pedal controller* the foot undergoes the least amount of movement. This happens primarily due to the horizontal foot movement, and the fact that the foot is on the floor most of the time. It has also the lowest pressure load of all the tested foot controllers.

Please note that your Regular Occupation is not limited to one specific employer.

**Medical Review:**

Our records indicate you ceased work on April 26, 2019 due to left calcaneal fracture. Additional conditions of left shoulder injury (labral tear), thoracic outlet syndrome and cervical degenerative disc disease have also been reported throughout the duration of your claim.

On a Supplemental Questionnaire you completed on May 11, 2023, you reported you were unable to work as a Dentist because of "pain in neck/shoulder, numbness/pain in my left hand, cannot stand/walk for long periods, cannot reach for instruments".

To help in our ongoing review, medical records were most recently requested from your current treating physicians at UCLA. This includes Dr. Hugh Gelabert, Dr. Jae H. Jung, and Dr. Nelson SooHoo.

On February 7, 2024 your records from UCLA were received and on February 13, 2024 your file, including all previously received records, was referred for updated medical review by a Physician Consultant board-certified in Physical Medicine & Rehabilitation with sub-specialty certification in Spinal Cord Injury Medicine. This Physician Consultant also previously reviewed your file on September 13, 2023.

During their most recent review the Physician Consultant had a conversation with your treating provider, Dr. Jung, on February 26, 2024. Dr. Jung reported to the Physician Consultant that he last saw you in early 2023 and that, at that time, you were found to have no focal deficits in your left upper extremity but, because your strength was rated at 4 out of 5, he felt you had some weakness of the entire left upper extremity from shoulder to hand. Dr. Jung attributed this to pain.

Prior Physician Consultant reviews have been completed throughout the duration of your claim by physician's board certified in Orthopedic Surgery and Occupational Medicine.

Please note the following is a summary of the currently available information in your claim file and is not intended to be a complete account of each and every chart note or medical record. While we may not include a description of every office visit, chart note, or test result, please be assured we considered all of the information currently available to us. Additionally, for added understanding, we have outlined information for each condition separately.

**Left ankle calcaneal fracture -** You underwent open reduction internal fixation of the left foot on May 8, 2019 with Dr. Nelson SooHoo, orthopedic surgeon. Following surgery you underwent physical therapy and medical management but later developed post-traumatic left subtalar arthritis. In your most recent visit with Dr. SooHoo on November 2, 2023, he again suggested you undergo subtalar fusion surgery for your continued complaints. He previously suggested this surgery at your last prior appointment in 2021; however, you expressed your wish to continue with conservative treatment/management such as supportive shoe wear, achilles tendinitis stretches, and activity

modification. Mild sensation deficits were noted at the dorsal midfoot but no strength deficits or loss of range of motion of the left leg was reported that would substantiate any restrictions other than only occasionally using your left lower extremity for foot controls. It has also been reported in your recent records that you have a normal gait.

**Left shoulder** - The initially noted diagnosis for your left shoulder is pan labral tear with small Hill-Sachs legion. A November 7, 2019 MRI arthrogram of the left shoulder showed mild tendinosis of the intra-articular long head biceps tendon and tearing of the superior, anterior superior, and anterior inferior labrum. On May 28, 2020 you had a phone consultation with Dr. Frank Petrigliano, orthopedic sports medicine surgeon, where it is noted you had failed non-surgical management of your left shoulder and would like to proceed with surgery. However, by the time you were next seen by Dr. Petrigliano on October 5, 2020 you still had not had surgery though you complained of persistent left shoulder pain and instability. No further record of treatment with Dr. Petrigliano is reported. On November 17, 2020 you were seen by Dr. Bradley Thomas, another orthopedic surgeon, for assessment of instability of the left shoulder joint and superior glenoid labrum lesion of the left shoulder as well as cervical disc disorder with radiculopathy and left cubital tunnel syndrome. Dr. Thomas also noted that he recommended surgical management of the left shoulder; however, there is no indication at any point within your records that you have undergone surgery or plan to undergo surgery for your left shoulder.

**Thoracic Outlet Syndrome** - Left anterior scalene muscle block and left pec minor block were given on July 8, 2022 and July 22, 2022, respectively. MRI of the left brachial plexus on November 29, 2022 demonstrated mild focal kinking of the supraclavicular area. When seen by Dr. Hugh Gelabert, vascular surgeon, on January 18, 2023, and by Dr. Ausef Bari, neurosurgeon, on August 30, 2023, you reported numbness in the left side of the neck, left underarm, and into the left upper extremity, as well as spontaneous twitching/tic on the left side. You also reported diminished sensation in the left 4th and 5th digits of your left hand. Both Dr. Gelabert and Dr. Bari recommended a left first rib resection and supraclavicular decompression; however, concern was raised about the surgery's possible benefit given your injury had occurred four years prior to the recommendation. Dr. Bari advised you in August 2023 to obtain an updated EMG (electromyography)/NCS (nerve conduction study) of the bilateral upper extremities as well as a repeat MRI of the left upper extremity for further evaluation and pre-operative planning. He also asked that you obtain an MRI of the brain for further evaluation of your reported left-sided tic. You expressed an understanding and agreement with Dr. Bari's plan but to date no further diagnostic testing appears to have been done and you have not followed up with either Dr. Bari or Dr. Gelabert.

**Cervical degenerative disc disease** - You were seen by Dr. Jae H. Jung, pain management and rehabilitation physician, most recently on February 1, 2023. Upon examination, Dr. Jung did not find any abnormalities of the cervical spine to explain your reported left upper extremity symptoms. She did however confirm "sympathetic pain involving left upper extremity" suspicious for possible neuralgia as well as myofascial pain in her assessment. MRI of the cervical spine was normal in all areas.

Following their review of the medical records currently available, the Physician Consultant, board certified in pain management and rehabilitation, opined the following regarding each of your claimed conditions:

- Left heel pain, left calcaneal fracture, and subtalar arthritis are supported by history, exam, and x-ray. However, medically necessary limitations and/or restrictions are no longer present.

- Left shoulder pain/left labral tear is supported by history, exam, and MRI. The currently supported restriction related to this condition would be lifting no more than 20 lbs. occasionally with the left upper extremity. Usage of the left hand and/or upper extremity for fingering, grasping, pinching, handling, fine motor movement, and reaching can be done constantly.
- Cervical degenerative disc disease was not supported by MRI, which was normal, or a prior EMG which showed no abnormalities. However, given left upper extremity strength of 4 out of 5 (with uncertain etiology) and ongoing complaints, the same restriction supported for the left shoulder of lifting no more than 20 lbs occasionally is reasonable.
- Thoracic outlet syndrome is not supported by EMG, trials of blocks, or documented physical exam.

**Determination**

Please understand, although a medical professional may indicate you are unable to work, we consider whether the information in your file supports this recommendation and your stated level of impairment. It is also important to understand, while we consider your physician's opinions and your statements in our evaluation, all information is reviewed collectively and in the context of the entire record. Merely having a diagnosis, living with a medical condition, and/or receiving treatment does not necessarily entitle someone to continued benefits.

When we compare the physical demands presented by the Vocational Case Manager, and noted above, to the medically supported limitations and restrictions opined by the Physician Consultant, it does not appear you continue to be restricted from performing the Substantial And Material Acts of your Regular Occupation. Specifically, your occupation of Dentist does not require lifting greater than 20 lbs. Further, while our Physician Consultant was of the opinion that no restrictions are supported for your left calcaneal fracture with subsequent subtalar arthritis, even if we accept Dr. SooHoo's reported restriction of only occasionally using your left lower extremity for foot controls, our Vocational Case Manager has confirmed that the use of foot controls would reasonably be expected to occur with your right lower extremity as you are right-hand dominant. Also, even if we accept that there may be some pain, weakness or numbness associated with the left arm and the 4th and 5th digits of your left hand, the dominant upper extremity, or your right upper extremity, would most reasonably be used to manipulate the dental instruments required for dental procedures. The non-dominant upper extremity, your left upper extremity, would be utilized during dental procedures or examinations only to perform such activities as holding a mirror or holding back/positioning the patient's mouth, tongue, lips/cheeks.

After carefully reviewing and considering all of the available information, we find it does not support a continued Disability as defined in your policy and your claim has been closed with our payment to you through the date of this letter, April 9, 2024.

**Waiver of Premium**

Please note that once you no longer meet the definition of Disability, waiver of premium must end. The Standard's Client Services Department will notify you of when your next premium payment is due. If you have any questions regarding your premiums, please contact Client Services at (800) 247-6888.

**Right to Review**

***REVIEW PROCEDURE*** *– If We deny all or part of Your claim, You may request a review. You must make the request within 180 days after receiving notice of the denial. Your request must be in writing.*

*If We deny Your claim:*

1. *You may send Us written comments or other items to support Your claim; and*
2. *You may review any non-privileged information that relates to Your request for review.*

*We will review Your claim promptly after We receive Your request. We will send You a notice of Our decision within 60 days after We receive Your request. If special circumstances require an extension We will send it to You within 120 days. We will state the reasons for Our decision; and We will refer You to the relevant parts of the policy.*

Lastly, since you are insured under a policy issued in the State of California, you may also wish to have this matter reviewed by the State of California Department of Insurance. You may contact the Department of Insurance, Consumer Communications Bureau, at 300 South Spring Street, South Tower, Los Angeles, California 90013. That office can also be reached by calling 213-897-8921 or toll-free 800-927-4357.

Should you have any questions pertaining to your claim or this letter please contact me.

Sincerely,

Kim Sparrow

Kim Sparrow
Sr. Disability Claim Specialist
Individual Disability Claims
(800) 628-9797 Ext. 4489
(971) 321-5609 Fax

RICARDO ECHEVERRIA #166049
DANICA CRITTENDEN #273309
TAYLOR R. PORTER #334862
CLAIRE ARNAIZ #352001
**SHERNOFF BIDART ECHEVERRIA LLP**
600 South Indian Hill Boulevard
Claremont, California 91711
Telephone: (909) 621-4935
Facsimile: (909) 625-6915

Electronically FILED by Superior Court of California, County of Los Angeles 9/03/2024 2:18 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Ayala, Deputy Clerk

Attorneys for Plaintiff

SHERNOFF BIDART ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| NICHOLAS MATTHEWS, an individual;<br><br>Plaintiff,<br><br>v.<br><br>STANDARD INSURANCE COMPANY, an Oregon corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 24STCV22519<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>2. BREACH OF CONTRACT<br><br>3. VIOLATIONS OF BUSINESS & PROFESSIONS CODE § 17200, *et seq.* |

## I.

## INTRODUCTION

1. Defendant Standard Insurance Company ("The Standard") sells and markets their insurance products to millions of vulnerable consumers who have the right to rely on The Standard to handle their total disability claims with the utmost good faith.

2. The privilege of selling insurance in California imposes solemn, obligatory responsibilities on insurers such as The Standard to promptly, thoroughly, and fairly conduct balanced investigations of claims for benefits made by their insureds.

3. In discharging this responsibility, The Standard is required to:

- Give as much consideration to the interests of its insureds as it does to its own; and
- Search diligently for any and all facts that support the payment of the claim for benefits.

4. Despite these solemn obligations, The Standard is engaged in an unremediated pattern and practice of unreasonable and egregious claims investigation procedures. The Standard's systematic violations of California law include improperly evaluating occupational disability claims, repeatedly ignoring treating physicians' recommendations, improperly administering functional capabilities examinations, and relying on extrinsic and undisclosed policies in the administration of functional capabilities examinations.

5. Plaintiff Nicholas Matthews, D.D.S. ("Nick" or "Plaintiff") and his wife, Christine Matthews, D.D.S ("Christine"), began their careers as dentists in 2006. They loved their work and enjoyed caring for their patients. In 2010, they started their own practice. In 2011, Nick and Christine's oldest child was born, and by 2014, they had three children. As their family and practice began to grow, Nick wanted to protect his family financially in the event he was no longer able to work as a dentist.

6. In October 2013, Nick contacted The Standard regarding its disability insurance options. Subsequently, he procured an Individual Disability Income Insurance policy, Policy Number 00CC338770, effective November 4, 2013 (the "Policy"). The Policy afforded Nick $15,000 per month in disability benefits through "November 4, 2045," in the event he became disabled and could no longer perform his "Regular Occupation."

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

7. On April 25, 2019, Nick sustained serious, permanent injuries that rendered him unable to perform his work as a dentist. When his treaters opined that he could no longer work as a dentist, he was devastated. Soon after, The Standard determined that he was disabled, could no longer perform his regular occupation, and began paying the disability benefit.

8. However, beginning in January 2021, The Standard began making despicable attempts to terminate Nick's disability benefit. On January 26, 2021, without any reasonable basis for doing so, The Standard notified Nick that it determined he was not disabled. He promptly appealed the denial, which was then overturned.

9. Over the next few years, Nick's disability did not improve, and he remained unable to perform the regular duties of a dentist. Notwithstanding his continued disability, on April 9, 2024, The Standard again notified Nick that it believed he was no longer disabled under the Policy and terminated his benefits. As of the filing of this Complaint, he remains unable to perform his regular occupation and is entitled to the disability benefits under the Policy.

10. As a direct result of The Standard's conduct, Nick has suffered economic and non-economic damages.

11. This conduct has not only caused harm to Nick, but also to other Californians similarly situated.

12. The Standard's denial of coverage for Nick's total disability is a tortious breach of the implied covenant of good faith and fair dealing and breach of contract. In addition, it constitutes unfair, unlawful, and fraudulent conduct that violates the UCL and should be enjoined.

## II.

## THE PARTIES

13. Plaintiff Nick is, and at all relevant times was, a resident of the State of California, County of Los Angeles.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

14. Defendant Standard Insurance Company is, and at all relevant times was, duly organized and existing under the laws of the State of Oregon and is authorized to transact, and is transacting, the business of insurance in the State of California, with its principal place of business in the Portland, Oregon.

15. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 100, inclusive, are unknown to Plaintiff, who therefore sue said defendants by such fictitious names. Plaintiff is informed and believes, and on such information and belief alleges, that each of the defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and will ask leave of this Court to amend this Complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to Plaintiff.

16. Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the defendants was the agent, partner, joint venturer, associate, and/or employee of one or more of the other defendants and was acting in the course and scope of such agency, partnership, joint venture, association, and/or employment when the acts giving rise to the causes of action occurred.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## III.

## FACTUAL BACKGROUND

### A. Nick establishes and grows his dental practice

17. In 2006, Nick obtained his Doctor of Dental Surgery and shortly thereafter began working as a dentist at a dental practice. He immediately fell in love with the practice of dentistry. He especially loved exploring the implementation of new technologies in his practice.

18. As Nick grew in his profession, he and his wife, Christine, realized they wanted more freedom to implement new technologies and specialize their practice. In 2010, they decided to branch out on their own and opened their own dental practice,

Nicholas Matthews DDS, Inc. dba The Dental Spot ("The Dental Spot") in Redondo Beach, California.

19. The Dental Spot grew significantly and became a thriving business within just the first year. As the years went on, The Dental Spot continued to gain popularity and notoriety within the dental community. Nick specifically was known for his exceptional workmanship, personable approach, and community-focused demeanor that drew patients to the practice.

20. In 2018, Nick and Christine decided to expand their practice to aesthetics. Nick was dedicated to using the best materials and procedures available in service of his patients, and used cutting-edge implant technology, such as Chairside Economical Restoration of Esthetic Ceramics, which allowed for the creation of a dental crown in a single visit. This cutting-edge technology further allowed The Dental Spot to shine among its competitors.

21. In his daily practice, Nick performed routine dental procedures like teeth cleanings, surgical procedures on teeth, bone, and soft tissue and diagnostic testing. He also diagnosed oral diseases and created treatment plans for patients. Nick appreciated detail-oriented work and found deep satisfaction in the intricacies required in dentistry. Most of all, he loved creating relationships with his patients and helping them look and feel their best. He was known for spending extra time with his patients during appointments to ensure their questions were answered, irrespective of the time constraints required in a successful dental practice. He appreciated that his small-town dental practice allowed him the flexibility to form relationships with his patients.

22. Although his work was physically exhausting, requiring near-constant use of his hands, arms, and feet, Nick loved being a dentist and had never had any intention of changing his career.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**B. Nick purchases a Total Disability Income Insurance Policy with The Standard**

23. On October 7, 2013, Nick applied for a Total Disability Income Insurance Policy with The Standard. On November 4, 2013, The Standard issued Nick the Policy, Policy Number 00CC338770 ("the Policy"), conditioned on delivery of his premium payment and several other documents by December 16, 2013. Nick timely submitted the premium payment and documents, and the Policy went into effect. (Exhibit 1.)

24. The Policy defines "We/Our" as Standard Insurance Company and "You/Your" as the Insured under the Policy. (*Id.* at pp. 14, 16.) Nick is the Named Insured under the Policy. (*Id.* at p. 23.)

25. The Policy goes on to define "Disability" as "Total Disability." (*Id.* at pp. 14, 25.) In turn, "Total Disability" is defined as follows:

> Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to perform Your Regular Occupation in the usual and customary way and You choose not to work in any occupation.
>
> If You choose to work at any job, You will not be considered Totally Disabled under this policy. However, You may qualify for the benefit for Partial Disability found in the Partial Disability Rider. In compliance with California law, the Partial Disability Rider is mandatory and is attached to this policy. (*Id.* at pp. 14, 27.)

26. However, the Policy includes an Own Occupation Benefit Rider, which changes the definition of Total Disability/Totally Disabled as, "Because of Your Injury or Sickness You are unable to perform with reasonable continuity the Substantial And [sic] Material Acts of Your Regular Occupation ***in the usual and customary way.***" (*Id.* at p. 49, emphasis added.)

27. "Injury" is defined in the Policy as "Injury sustained by You: 1. After the Effective Date; and 2. While this policy is in force." (*Id.* at pp. 14, 25.)

28. "Regular Occupation" is defined as follows:



SHERNOFF BIDART ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

> Your occupation at the time Disability begins. Regular Occupation is not necessarily limited to the job You are performing when the Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation. If You are retired at the time Disability begins, being retired will be deemed to be Your Regular Occupation. (*Ibid.*)

29. "Substantial and Material Acts" is defined as, "[T]hose acts normally required for the performance of Your Regular Occupation and which cannot be reasonably omitted or modified." (*Id.* at pp. 14, 26.)

30. If found to have a "Total Disability," upon the 91st day of that disability, the Policy states The Standard will pay the Basic Monthly Benefit of $15,000.00 until Nick turned 67 years old on November 4, 2045. (*Id.* at pp. 3, 15.)

31. In other words, if at any point during the Policy period, Nick sustains an injury that renders him unable to perform the usual and customary acts normally required by him as a dentist, he would be considered totally disabled and would be entitled to the monthly disability benefit.

32. To file a claim, the Policy requires written notice of a claim by Nick within 30 days after the loss, or as soon reasonably possible after that. (*Id.* at p. 5.)

33. The Policy also includes an "Indexed Cost of Living Benefit Rider," which Nick separately purchased. (*Id.* at pp. 39–41.) This rider provides that in the event of a disability, his benefit would increase by either 3% or the average Consumer Price Index for All Urban Consumers, minus one, on the anniversary of the date his disability began. (*Ibid.*) Thus, the Policy guarantees that Nick's benefits will increase each year he is disabled.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

### C. Nick falls off a ladder and can no longer perform the normal duties of a dentist

34. On April 25, 2019, Nick's life changed forever. As he was preparing for his daughter's birthday celebration, he slipped and fell off a ladder from a two-story height onto the ground. Immediately, he felt extreme pain in his entire body, and Christine saw that he was badly bruised and cut on his back left side. She quickly took him to the hospital for emergency treatment. There, he was administered pain medication in his left arm.

35. Ultimately, Nick was diagnosed with a calcaneal fracture in his left foot, pan labral left shoulder tear, thoracic outlet syndrome (neck pain and numbness and decreased strength in fingers), and posttraumatic left subtalar arthritis in his left ankle as the result of the fall. Although he did not realize it at the time, this was the last day he was able to practice dentistry and live without daily pain.

36. Despite seeking medical treatment, it soon became clear to Nick and his treaters that he was no longer able to perform his duties as a dentist due to his injuries. Working as a dentist requires a high level of manual dexterity, physical stamina, and ability to perform delicate procedures in close proximity to patients. Due to the pain in Nick's neck and shoulder and the numbness and pain in his left hand, he was, and is, unable to hold instruments in his left hand or reach for instruments during procedures. These limitations make it impossible for him to perform the intricate and precise movements needed to perform dental procedures.

37. Even if Nick were to try to perform his duties with additional assistance, the inability to reach for instruments would prolong appointments, which would be uncomfortable for his patients and negatively affect the success of The Dental Sport. More importantly, if he tried working as a dentist despite his hand numbness, Nick would be putting his patients at risk. Moreover, he is unable to walk or stand for long periods of time due to his left ankle injury. This inability poses a safety risk to himself, his staff, and his patients, as dentistry involves working in a small and confined space.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

Any sudden movements or loss of balance could lead to injuries to the patient, support staff, or himself.

38. Nick's pain and physical limitations also impacts his personal life. He struggles to sleep at night, and if he turns his body even slightly in the wrong direction, he is left writhing in pain. He also can no longer help with physical chores around the home or play sports with his kids.

39. Thus, Nick's injuries forced him to step away from dentistry despite his love for the profession and his patients.

**D. The Standard accepts and then denies Nick's Individual Disability Benefits claim**

40. On July 2, 2019, Nick submitted an Individual Disability Benefits Claim, Claim Number 00WA0352 (the "Claim"), with The Standard due to his injuries and inability to work as a dentist.

41. On August 7, 2019, the Claim was assigned to a Senior Disability Claim Specialist in the Individual Disability Claims department at Standard, Kim Sparrow.

42. On September 9, 2019, the Claim was approved for Total Disability under the Own Occupation Benefit Rider, and Nick began to receive monthly benefits shortly thereafter.

43. On May 19, 2020, upon The Standard's request, Nick completed an Activities and Capabilities Questionnaire where stated he was employed by The Dental Spot, but was not presently working. He stated his sources of income as the disability benefits he received from The Standard and as owner of Nicholas Matthews DDS, Inc. (i.e., the Dental Spot) and Jn Builds, Inc. ("Jn Builds"), a construction company. In his capacity at Jn Builds, Nick stated he was the owner or part-owner of the business, but did not actively engage in its operation. Instead, he worked over the phone and networked for the company.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

44. As time passed, Nick continued to receive medical treatment for his injuries. Unfortunately, he continued to experience the numbness in his left hand and pain in his neck and left hand, arm, shoulder, and ankle. Although he deeply desired to return to work at The Dental Spot, he remained physically unable to do so. He continued to struggle with sleep and could not perform the responsibilities he felt he had as a father and husband.

45. To Nick's surprise, on January 26, 2021, The Standard issued its first denial of the Claim, stating he no longer met the definition of Disability in his "Regular Occupation" as a dentist after June 29, 2020. (Exhibit 2.) The rationale for the denial was based on observations made of him in his daily life and a paper review by a Physician Consultant of his medical records. The letter cited to the U.S. Department of Labor *Dictionary of Occupational Titles*, Fourth Edition, revised 1991, which rated the purported strength level for the occupation of dentist as "light," which was defined as:

> Light Work – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible. (Exhibit 2, p. 2.)

46. The letter then acknowledged that Nick's duties required constant reaching, handling, and fingering; frequent sitting; and occasional standing and walking. (*Id.* at p. 3.) It then concluded, based on a review of medical records and observations of Nick walking, that he no longer met the definition of "Total Disability."



SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

(*Id.* at p. 7.) Notably, the Physician Consultant who purportedly reviewed Nick's medical records never spoke with any of his treating physicians, nor did he personally examine Nick.

47. Moreover, The Standard argued that Nick held a "dual occupation[]" as owner of Jn Builds, a construction company. The Standard "closed" Nick's claim and stopped payment of his benefits, effective January 26, 2021. It gave Nick 180 days to appeal the denial.

48. On July 16, 2021, Nick submitted an appeal of The Standard's denial explaining that his extensive injuries made it impossible for him to work as a dentist and requested the Claim be re-opened and reinstated. (Exhibit 3.) In his appeal, Nick attached medical records from several different providers, including records from 2021, showing that his injuries and pain were ongoing.

49. On August 17, 2021, after an administrative review of its January 26, 2021 denial, The Standard overturned the denial and determined that "limitations and restrictions" prevented Nick from performing "Substantial and Material Acts" in his "Regular Occupation" as a dentist. However, prior to reopening the Claim, The Standard requested additional documentation to determine if he met the definition of Total Disability or Partial Disability, which Nick later provided.

50. Almost five months after the denial was overturned, in a letter dated January 12, 2022, The Standard notified Nick that it had conducted an investigation to determine his regular occupation and whether he continued to be totally disabled. It then determined that his regular occupation was that of a dentist and found him to be Totally Disabled and re-opened the Claim. Furthermore, retroactive benefits covering the period of January 27, 2021 to December 31, 2021 would be released, and his monthly benefits would be reinstated moving forward. Additionally, effective May 1, 2021, his monthly income benefit would be increased in accordance with the Indexed Cost of Living Benefit Rider attached to the Policy.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

51. However, despite it overturning the denial, The Standard continued to "investigate" the Claim. The letter concluded by requesting Nick's treating providers complete and return a Physician's Report – Musculoskeletal ("Physician's Report") form.

52. Nick promptly sent the Physician's Report form to his orthopedic surgeon, Nelson Soohoo, M.D. at UCLA Medical Center for completion. On January 26, 2022, Dr. SooHoo submitted the Physician's Report form and explained that Nick had significant left post-traumatic subtalar traumatic arthritis pain in his left ankle and was unable to stand or bend, even for short periods of time.

53. For several months thereafter, The Standard had limited communication with Nick regarding the Claim. Throughout this time, Nick continued to seek medical treatment for his injuries, which sadly did little to alleviate his pain, and did nothing to increase his ability to perform his duties as a dentist.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**E. The Standard demands Nick undergo a Functional Capacities Evaluation to support the Claim and refuses to allow audio or video recording**

54. As Nick has now come to learn, The Standard had little interest in performing its duties and properly paying the disability benefits without also looking for reasons to deny the Claim. In a letter dated July 14, 2022, an entity Nick had never heard of, Exam Coordinators Network ("ECN"), advised Nick that The Standard required him to undergo an Independent Functional Capacities Evaluation (the "Evaluation") to continue receiving benefits for the Claim. ECN scheduled the Evaluation for July 27, 2022 with Samantha E. Nusbaum, OT.

55. On July 22, 2022, ECN sent a letter rescheduling the Evaluation with Ms. Nusbaum to August 26, 2022. On August 24, 2022, Nick sent an email to Ms. Sparrow confirming he would attend the Evaluation and stated his intention that Christine accompany him and video tape the Evaluation with her phone.

56. On August 26, 2022, as Nick was leaving his house to drive to the Evaluation, he received a call stating the Evaluation was cancelled because the event could not be staffed. However, on August 31, 2022, Ms. Sparrow sent Nick an email stating the examining facility was unable to staff the Evaluation because they would not allow him to be accompanied by an observer or videotape, purportedly, due to other patients' Health Insurance Portability and Accountability Act ("HIPAA") rights. Ms. Sparrow stated The Standard agreed with the facility's position and would expect Nick to comply with these limitations once the Evaluation was rescheduled.

57. On September 8, 2022, ECN sent Nick a letter rescheduling the Evaluation to September 20, 2022 with Jason J. Baran, PT. A few days later, on September 13, 2022, it sent another letter confirming the Evaluation on September 20, 2022 with Jason J. Baran, PT. Then, in a letter dated September 16, 2022, ECN advised Nick that his Evaluation would now be conducted by Carissa Beyer, P.T.

58. That same day, Ms. Sparrow sent an email to Nick claiming that it was the examination provider, ECN, which prohibited videotaping the Evaluation. It would, however, allow Christine to attend and observe.

59. On September 19, 2022, Nick sent an email reiterating his intention to attend the Evaluation with Christine present and have it *audio* recorded. (Exhibit 4.) Ms. Sparrow responded stating that audio recording was not permitted, and the examiner would terminate the Evaluation if any recording was attempted. (*Ibid.*) She further stated The Standard would consider termination of the Evaluation due to audio or video recording as Nick's failure to cooperate. (*Ibid.*)

60. Later the same day, Jonathan T. Nguyen, Esq. of Gilbert & Nguyen sent a letter to The Standard advising it of his representation of Nick. Mr. Nguyen reiterated Nick's intention of audio recording the exam and explained that it was necessary in light of Standard's previous attempt to terminate the disability benefits. He then requested The Standard provide the Policy provision that prohibited audio recording during the Evaluation. (Exhibit 5.)



SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

61. Despite the assertion of Mr. Nguyen as Nick's counsel, Ms. Sparrow responded to Nick directly reiterating The Standard's position regarding the Evaluation. Ms. Sparrow did not provide the Policy provision that stated audio recording was not permitted during the Evaluation. She also threatened to hold Nick in breach of the Policy if he tried to audio record the Evaluation, stating:

> Your failure to attend tomorrow's FCE, or any termination of the FCE due to an attempt to record it would represent your unreasonable failure to cooperate under the policy. I can assure you The Standard is aware of the implied duty of good faith and fair dealing in every contract in California, including insurance policies. We would point out that this duty applies both to the insurance company and the insured. (Exhibit 6.)

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

62. On September 20, 2022, Nick and Christine attended the Evaluation with Ms. Beyer. The Evaluation was held in an office building housing several businesses and a common conference room. Nick and Christine were taken to a conference room—not a treatment room—for the Evaluation. No other patients were in sight, and audio taping the exam would not have violated any other patient's HIPPA rights as Ms. Sparrow had previously claimed. Consequently, Christine notified Ms. Beyer that she was audio recording the Evaluation. Ms. Beyer confirmed that was not a problem with her, and in fact, insisted that ***The Standard did not allow videotaping or audiotaping***. Ms. Beyer further stated ***The Standard had instructed her to stop the Evaluation immediately upon learning of the recording and note that it was a failed Evaluation***.

63. At this time, Ms. Beyer handed Christine pages 1, 2, and 3 of the instructions from ECN on how to proceed with the Evaluation. Christine then took photographs of these instructions. (Exhibit 7.) Curiously, these pages stated Ms. Beyer was to submit her report of the Evaluation in Word document format so that The Standard could make "administrative edits." It further stated that Ms. Beyer should contact The Standard if she did not authorize those edits.

64. Shortly thereafter, without having examined Nick, Ms. Beyer ended the Evaluation in accordance with The Standard's instructions.

65. For months after the incomplete Evaluation, Nick did not receive any communications with The Standard regarding the Evaluation.

66. Despite The Standard's clear efforts to find any excuse to terminate Nick's benefits, his condition did not improve. In fact, his shoulder pain only worsened. He could not sleep comfortably at night. The wrong movement would leave him in excruciating pain. Nick wanted nothing more than to improve so he could play with his kids, but he physically could not. For example, whenever he tried to throw to play catch with his son, with just one throw his left shoulder and arm stung with excruciating pain, and he could barely sleep for days after.

67. On top of the physical pain and inability to engage in the activities with his family or work in the career that he loved, The Standard's conduct caused Nick severe stress. Knowing that it could be constantly observing him, looking for any excuse to deny his disability benefits made him anxious and on edge. He hoped, however, that The Standard would accept the reality that his career as a dentist was over. It did not.

**F. The Standard denies the Claim for a second time**

68. In the months that followed, Nick continued receiving treatment for his disability. On January 18, 2023, Nick attended an appointment with Hugh Gelabert, M.D., a vascular surgeon at UCLA Medical Center, for the pain and numbness in his neck, left arm, and left hand. Dr. Gelabert reviewed an MRI of Nick's brachial plexus (network of nerves in the shoulder) and found the MRI was "evidently abnormal" and "appear[ed] to undercount the degree of abnormality." Further, he noted that Nick's symptoms remained the same as before and were possibly more severe. Moreover, Dr. Gelabert stated in his report that Nick could not hold dental instruments in his left hand as he drops them and has pain, numbness, and tingling in his left arm.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

69. In April 2023, The Standard sent a letter requesting Nick complete a medical questionnaire, which he did. He then sent the questionnaire to Dr. Gelabert. On June 5, 2023, The Standard received the medical questionnaire signed by Dr. Gelabert, which clearly stated his January 18, 2023 findings that Nick could not hold dental instruments in his left hand due to numbness and tingling.

70. On August 30, 2023, Nick attended a consultation with Ausaf Bari, M.D., a neurosurgeon at UCLA Medical Center. In his report from this visit, Dr. Bari stated that Nick's November 19, 2022 MRI demonstrated clear kinking of the supraclavicular area of his left shoulder.

71. As time passed, Nick's condition did not improve. The numbness and pain in his left hand, arm, and shoulder continued, and his left ankle continued to limit his ability to walk or stand for periods of time.

72. Nearly a year passed after Dr. Gelabert submitted the questionnaire to The Standard. Then, unexpectedly, in a letter dated April 9, 2024, The Standard denied Nick's Claim for a second time based on a mere paper review of his medical records. It asserted several unsupported bases for the denial. (Exhibit 8.)

73. Specifically, the letter argued that "Regular Occupation is not limited to one specific employer." (*Id.* at p. 3.) However, it did not provide any support for this assertion. In fact, the Policy only ever refers to the term occupation in the singular.

74. Furthermore, the April 9, 2024 denial stated that The Standard's "Physician Consultant" had reviewed Dr. Gelabert's and Dr. Bari's recent respective records, and spoke with Jae Jung, M.D., Nick's physical medicine and rehabilitation specialist. It claimed that Dr. Jung had reported that Nick had "no focal deficits in [his] left upper extremity but, because [his] strength was rated 4 out of 5, [Dr. Jung] felt you had some weakness of the entire left upper extremity from shoulder to hand." (*Ibid.*) However, the denial omitted any reference to Dr. Jung's notes from his February 1, 2023 visit with Nick in which he noted that his spinal range of motion was restricted in all planes, that his hand and forearm were hypersensitive, that he continued to experience

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

severe pain, among other symptoms. Nor did the letter indicate that The Standard's consultant made any attempt to speak with Nick's other providers, including Dr. Gelabert and Dr. Bari.

75. In fact, the denial was rife within consistent and false statements. For example, it argued that Nick had "normal gait." (*Id.* at p. 4.) Yet, records from his recent November 2, 2023 appointment with Dr. Soohoo confirmed that Nick had an "antalgic gait"—or in other words, a limp that is caused by pain.

76. The letter further explained that The Standard's consultant—who had never examined Nick and only based the review on his medical records—concluded that Nick no longer had any restrictions due his left calcaneal (heel) fracture and subtalar (ankle) arthritis injury, could lift up to 20 pounds despite his shoulder pain and labral tear, and that his thoracic outlet syndrome (neck pain and numbness and decreased strength in fingers) was not supported by the medical records (although none of his providers ever made such an inference).

77. Absurdly, The Standard concluded that Nick was able to perform the duties of a dentist with the primary use of his non-injured right hand, while only using his injured left hand in a supportive role, despite the persistent numbness and pain. Notably, it made no mention of how Nick's left hand, shoulder, and neck pain might endanger a patient. The denial letter was signed by Ms. Sparrow.

78. Upon receiving the letter, Nick was devastated. He had attended dozens of medical appointments in the last five years, had to stop working in the career that he loved, could no longer play sports with his kids, and lived in daily pain. The Standard's conduct left Nick with severe anxiety and stress.

79. Despite The Standard's denial of the Claim and termination of ongoing disability payments, Nick has continued paying the premiums on the Policy.

SHERNDOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**FIRST CAUSE OF ACTION**

**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against all Defendants)**

80. Nick refers to each and every paragraph above and incorporate those paragraphs as though set forth in full in this cause of action.

81. The Standard and DOES 1 through 100, inclusive, and each of them, breached their duty of good faith and fair dealing owed to Nick in the following respects:

a) Unreasonably delaying and denying benefits under the Policy;

b) Unreasonably failing to conduct a thorough, fair, and balanced investigation in evaluating Nick's claims for disability benefits;

c) Unreasonably failing to give at least as much consideration to Nick's interests and welfare in the investigation and handling of his claims as it gave to its own interests;

d) Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to Nick's in the investigation and handling of his claim as it gives its own interests;

e) Conducting unreasonable investigations into Nick's claims, including surveillance that unreasonably invades Nick and his family's privacy and places their safety and welfare at risk;

f) Unreasonably placing its own financial interests above Nick's interests;

g) Unreasonably failing to diligently search for and consider evidence to support coverage for Nick's Claim;

h) Unreasonably relying on extrinsic guidelines instead of the terms of the Policy to deny benefits;

i) Unreasonably misapplying the standards in the medical community in evaluating Nick's claims;

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

j) Unreasonably failing to contact Nick's treating physicians to conduct peer-to-peer discussions;

k) Unreasonably giving Nick's treating physicians arbitrary and unreasonable deadlines to conduct peer-to-peer discussions;

l) Unreasonably failing to provide the proper criteria to its consultants investigating Nick's claims;

m) Unreasonably failing to give the proper measure of deference to Nick's treating physicians in evaluating his Claim;

n) Unreasonable failing to apply the Policy's definitions and terms to determine whether Nick's Claim was covered; and

o) Unreasonably compelling Plaintiff to institute this litigation to obtain benefits due under the Policy.

82. The Standard and DOES 1 through 100, inclusive, and each of them, have breached their duty of good faith and fair dealing owed to him by other acts or omission of which Nick is presently unaware, and which will be shown according to proof at the time of trial.

83. The foregoing unreasonable conduct was not limited to the Defendants' evaluation of Nick's claims, but represents an ongoing pattern and practice, which it applies to all of its policyholders, which is specifically designed by the Defendants to save money at the expense of its policyholders. This ongoing pattern of conduct constitutes institutional bad faith.

84. Defendants' institutional bad faith constitutes reprehensible conduct because it is part of a repeated pattern of unfair practices and not an isolated occurrence. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Defendants' established company policies and practices. Defendants have engaged in similar wrongful conduct as to individuals other than Nick and substantially increased their profits as a result of causing similar harm to others.

85. Defendants' conduct was undertaken by its deputies or managing agents, who were responsible for claims supervision and operations, communications and decisions. This conduct was undertaken on behalf of Defendants. Defendants further had advanced knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized and approved by managing agents whose precise identities are unknown to Nick at this time.

86. As a proximate result of the aforementioned unreasonable and bad faith conduct by Defendants, and each of them, Nick has suffered, and will continue to suffer in the future, damages under the Policy, plus interest and other economic and consequential damages, including personal physical injuries, physical sickness, and physical disability, for a total amount to be shown at the time of trial.

87. As a further proximate result of Defendants', and each of them, unreasonable conduct, Nick has suffered physical harm, additional treatment, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, worry, humiliation and mental and emotional distress, all in a sum to be determined at the time of trial.

88. As a further proximate result of the aforementioned wrongful conduct by Defendants, and each of them, Nick was compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore, Defendants are liable to Nick for the reasonable attorneys' fees, witness fees, and costs of litigation reasonably necessary and incurred by Nick to obtain the benefits under the Policy, in a sum to be determined at the time of trial. (*Brandt v. Superior Court* (1985) 37 Cal.3d 812.)

89. Defendants', and each of them, conduct described above was intended by them to cause injury to Nick, and/or was despicable conduct carried on by them with a willful and conscious disregard of Nick's rights; and/or or subjected Nick to cruel and unjust hardship in conscious disregard of their rights; and/or constituted intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Nick of property or legal rights or to otherwise cause injury,

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

such as to constitute malice, oppression, or fraud under California Civil Code § 3294, thereby entitling Nick to an award of punitive damages in an amount appropriate to punish Defendants and to set an example for other similarly situated insurers and health plans.

90. Defendants', and each of them conduct described above was undertaken by the corporate defendants' officers or managing agents, who were responsible for claims supervision and operations, underwriting, communications, and/or decisions. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate defendants. Further, said managing agents either had advance knowledge of the actions and conduct of said individuals, whose actions and conduct were authorized and/or approved by the managing agents, or the conduct has been fully ratified by Defendants and/or their managing agents.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## SECOND CAUSE OF ACTION

**(Breach of Contract Against all Defendants)**

91. Nick refers to each and every paragraph above and incorporates those paragraphs as though set forth in full in this cause of action.

92. Defendants owed duties and obligations to Nick under the Policy.

93. Nick fulfilled and performed all his obligations under the Policy.

94. Defendants, and each of them, breached the terms of the Policy by denying benefits to which Nick was entitled under the Policy.

95. As a direct and proximate result of Defendants' conduct and breach of its policy obligations, Nick has suffered damages in an amount to be determined according to proof at trial.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**THIRD CAUSE OF ACTION**

**(Violations of Bus. & Prof. Code §§ 17200 *et seq.***

**Against all Defendants.)**

96. Nick refers to each and every paragraph above and incorporates those paragraphs as though set forth in full in this cause of action.

97. Business and Professions Code sections 17200 *et seq.*, the unfair competition law ("UCL") precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair, and fraudulent. Business and Professions Code § 17203 permits the Court to issue injunctive relief to prevent a defendant from continuing to engage in conduct that violates the UCL.

98. Business & Professions Code § 17204 permits individuals, such as Nick, to institute an action on behalf of the general public to obtain injunctive and restitutionary relief against persons and entities that engage in unfair business practices and/or unfair competition.

99. Defendants', and each of them, business practices alleged above constitute conduct that violates the UCL because it is (a) unfair to The Standard's subscribers and results in the denial of claims that should be covered under the terms of the EOC; (b) is unlawful because it violates the implied covenant of good faith and fair dealing, as well as various provisions of the Insurance Code § 790.03, subdivision (h); and (c) is fraudulent because it is likely to mislead The Standard's subscribers about the scope of what their health plans cover and exclude, and fails to abide by the regulators' determinations.

100. Nick has suffered injury in fact as a result of Defendants', and each of them, unlawful, unfair, and fraudulent business practices. Defendants' unlawful, unfair and fraudulent business practice of improperly analyzing and disregarding the Policy provisions, utilizing and misapplying extrinsic guidelines, and violations of Insurance Code § 790.03, subdivision (h) have caused Nick to suffer personal physical injury,

economic and consequential damages, plus interest, for a total amount to be proven at the time of trial.

101. Nick has suffered a loss of money or property as a result of Defendants', unlawful, unfair and/or fraudulent business practices. Nick has been denied his legal right to a full, complete and fair handling of their claims in violation of well-established principals of insurance claims handling set forth in statutory and case law.

102. Defendants have committed acts of unfair, unlawful and fraudulent business practices as defined by Business & Professions Code § 17200 *et seq.* by engaging in the following acts:

a. Unlawfully, unfairly and/or fraudulently misrepresenting the terms of the applicable policies to their subscribers;

b. Unlawfully, unfairly and/or fraudulently denying benefits based on based incomplete medical records and failing to conduct a reasonable investigation;

c. Unlawfully and unfairly engaging in unfair claims settlement practices in violation of California Insurance Code § 790.03, subdivision (h); and

d. Other acts of unfair competition of which Nick is presently unaware, and which may be determined through discovery in this action.

103. Plaintiff requests an injunction be issued against Defendants, and each of them, to enjoin them from engaging in the unfair, unlawful and/or fraudulent conduct alleged herein.

104. Plaintiff also requests an award of attorneys' fees upon prevailing in the request for equitable relief pursuant to California Code of Civil Procedure § 1021.5.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**

1. Damages for the delay and failure to provide benefits under the Policy, plus interest, in a sum to be determined at the time of trial;

2. For prejudgment interest on all damages awarded to Plaintiff in accordance with California Civil Code section 3287;

3. For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to obtain the Plan benefits, in an amount to be determined at trial;

4. For economic and consequential damages arising out of Defendants' unreasonable failure to provide benefits under the Plan;

5. For general damages for mental and emotional distress in a sum to be determined at the time of trial;

6. For punitive and exemplary damages in an amount appropriate to punish or set an example of defendants;

7. For costs of suit herein; and

8. For such other relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT:**

1. Damages under the Policy, plus interest, and other economic and consequential damages, in an amount to be determined according to proof at the time of trial;

2. For prejudgment interest on all damages awarded to Plaintiff in accordance with California Civil Code section 3287;

3. For costs of suit herein; and

4. For such other relief as the Court deems just and proper.

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**AS TO THE THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *ET SEQ.*:**

1. For an injunction against defendants restraining and enjoining them from engaging in the unfair, unlawful or fraudulent business practices alleged herein;
2. For the attorneys' fees incurred to obtain the equitable relief requested;
3. For costs of suit incurred herein; and
4. For such other and further relief as the Court may deem just and proper.

Date: September 3, 2024

SHERNOFF BIDART ECHEVERRIA LLP

By: ______________________
RICARDO ECHEVERRIA
DANICA CRITTENDEN
TAYLOR R. PORTER
CLAIRE ARNAIZ
Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff hereby demand a jury trial.

Date: September 3, 2024

SHERNOFF BIDART ECHEVERRIA LLP

By: ______________________
RICARDO ECHEVERRIA
DANICA CRITTENDEN
TAYLOR R. PORTER
CLAIRE ARNAIZ
Attorneys for Plaintiff